IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

VINCENT S. SAMMONS
    *Plaintiff*,

    v.                             Civil No. ELH-20-3010

ALAN J. MCCARTHY, *et al*.,
    *Defendants*.

**MEMORANDUM OPINION**

In this free speech case, plaintiff Vincent Sammons claims that various municipal officials in Cecil County, Maryland violated his rights under the First Amendment to the Constitution as well as Article 40 of the Maryland Declaration of Rights.  In an Amended Complaint (ECF 15, the "Complaint"), Sammons has sued Cecil County, Maryland (the "County"), as well as seven individuals who served as County officials at the relevant time: Alan McCarthy, the County Executive;[1] Alfred Wein, Jr., the Director of Administration; Jennifer Lyall, Public Information Officer; Maggie Tome, Unified Communications Specialist; Robert Meffley, President of the County Council; Brian Miller, the Director of Information Technology; and Jason Allison, County Attorney (collectively, the "Individual Defendants").[2]  The Individual Defendants have been sued in their individual and official capacities.  And, plaintiff has appended numerous exhibits to the suit.  *See* ECF 15-1 through ECF 15-16.

---

[1] The Docket erroneously reflects McCarthy's surname as "McCarty."  *See* Docket.  I shall direct the Clerk to correct the spelling.

[2] As discussed, *infra*, at least some of the Individual Defendants no longer serve as officials with the Cecil County government.  Further, plaintiff does not indicate whether he holds political office.  But, some exhibits seem to suggest that, at least at the relevant time, he served on the Republican Central Committee.  *See*, *e.g.*, ECF 15-13 at 6.

The Complaint contains seven counts and pertains to three incidents that, in plaintiff's view, amounted to unlawful viewpoint discrimination.[3]  As to each occurrence, the Complaint asserts a claim under the First Amendment (Counts I through III) as well as Article 40 (Counts IV through VI).  And, in Count VII, Sammons asks the Court to issue a declaratory judgment holding that certain provisions of the "Cecil County Government Communication Plan" (the "Communication Plan") are unconstitutional.  Moreover, plaintiff seeks both compensatory and punitive damages as to Counts I through VI.

In particular, Sammons claims that Lyall, Allison, and McCarthy engaged in unlawful viewpoint discrimination when they deleted comments that plaintiff made on a Facebook page entitled "Dr. Alan McCarthy Cecil County Executive" (the "County Executive Page" or the "Page"), and blocked Sammons from making further posts on the Page (Counts I and IV).  Plaintiff also contends that McCarthy, Wein, Tome, and Meffley impermissibly precluded plaintiff from participating in a public budget meeting (Counts II and V).  And, Sammons alleges that McCarthy, Allison, and Miller unlawfully blocked plaintiff from accessing "county agency email systems" (Counts III and VI).  With respect to each of plaintiff's claims arising under Article 40, Sammons also names the County as a defendant.  *See id.* at 32, 34, 37.

Defendants have moved to dismiss the Complaint or, in the alternative, for summary judgment (ECF 26), which is supported by a memorandum of law (ECF 26-1) (collectively, the

---

[3] Plaintiff's initial suit included thirteen counts and named the County and eight individuals as defendants, including Deborah Sniadowski.  *See* ECF 1.  But, in ECF 15, plaintiff omitted six claims that he previously asserted under 42 U.S.C. §§ 1985 and 1986, and he did not include Sniadowski as a defendant.  *See* ECF 15.

The amended pleading replaces and supersedes the original pleading.  *See*, *e.g.*, *Goodman v. Diggs*, 986 F.3d 493, 498 (4th Cir. 2021).  However, the Docket continues to list Sniadowski as a defendant.  Therefore, I shall direct the Clerk to terminate Sniadowski as a defendant.

"Motion") and four exhibits.  ECF 26-3; ECF 26-4; ECF 26-5; ECF 26-6.  Plaintiff opposes the

Motion (ECF 33, the "Opposition"), which is supported by a Rule 56(d) affidavit of Ray Shepard,

who serves as plaintiff's counsel in this case  (ECF 33-1) and one exhibit.  ECF 33-2.  Defendants

have replied.  ECF 41 (the "Reply").[4]

In addition, non-party George McDermott, who is self-represented, has filed a "Motion

And Or Petition For A Reconsideration/Rehearing By The Full Court".  ECF 50 (the

"Reconsideration Motion").  He seeks, *inter alia*, reconsideration of the Court's Memorandum

(ECF 47) and Order (ECF 48) of October 12, 2021, denying his request (ECF 14) to intervene in

this suit.  Additionally, McDermott has submitted several other motions, asserting a wide range of

allegations, including a challenge to the Court's authority.  ECF 49; ECF 51; ECF 52.[5]  Defendants

---

[4] In referencing the parties' submissions, the Court cites to the electronic pagination, which does not always correspond to the page number imprinted on the document.

[5] For instance, ECF 49 is captioned "Intervenors [sic] Motion And Petition/Official Public Notice & Lawful Demand Of The Court Produce Is Legally Required Under 5 USC 2901-2906 and 15 USC 7001-7006 Verifiable Proof That The Court Is In Full Compliance With The Above Statute And That The Court Will Produce Within 15 Days A True Copy Of The Alleged Judges Oath Of Office, Alleged Judges Bond, And Copies Of The Alleged Electronic Verifiable Transfers From The Judge's Chambers To The Court Clerk Authorizing The Clerk To Prepare And Mail Any Unsigned Unauthorized Orders Judgments And Decrees."  He asserts, *inter alia*, "misprision of felony," "conspiracy against the rights of citizens," extortion, "1001 fraud and false statements," and racketeering.

ECF 51 is titled "Intervenors [sic] E-M-E-R-G-E-N-C-Y And Request And Legal Notice To The Court Pursuant To The 'Administrative Procedures Act of 1946 At 5 USC § 551 et seq. Foreign Agent Registration Act. Of This Claim Is Also Against The Maryland State CSA And COA Court's Clerks Offices And Judges As Agents Of The MD State Bar Association And Defendant's As B.A.R. Card Holders".

And, ECF 52 is titled "Intervenors [sic] Motion And Notice To The Court Of The Continual Misconduct Of Defendants And Their Attorney Is Now Openly States For The Record, False Allegations.  Asserting His Office Does Not Represent The Defendant Known As The Municipal Corporation Trading As Cecil County Maryland Inc. Under FRCP Rule 4.1, 5.1, (A-1- (A)(B), (B)(C)(D) Federal Constitutional Questions Has Ben [sic] Raised But Not Addressed By The Court".

3

oppose the Reconsideration Motion (ECF 53), but Sammons has not responded. *See* Docket. And, McDermott has replied. ECF 54.

No hearing is necessary. *See* Local Rule 105.2(a). For the reasons that follow, I shall grant the Motion in part and deny it in part. And, I shall deny the Reconsideration Motion, as well as Mr. McDermott's additional motions.

## I.      Reconsideration Motion

George McDermott, who is not a party to the case, has asked the Court to reconsider its earlier decision, denying his request to intervene in the case. *See* ECF 50. As noted, he has also filed several other motions. *See* ECF 49; ECF 51; ECF 52. I previously denied McDermott's earlier motion to intervene (ECF 14), as well as other motions that he filed, by Memorandum (ECF 47) and Order (ECF 48) of October 12, 2021. Principally, I determined that McDermott had failed to show any common interest with the parties to this case, and thus he was not entitled to intervene as a matter of right. I also declined to permit intervention in the exercise of my discretion. ECF 47 at 9-10.

The Order of October 12, 2021 (ECF 48) adjudicated "fewer than all the claims or the rights and liabilities of fewer than all the parties." Fed. R. Civ. P. 54(b). Therefore, it is an interlocutory order that "may be revised at any time" before the entry of final judgment. *Id.*; *see Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12 (1983); *Nadendla v. WakeMed*, 24 F.4th 299, 304 (4th Cir. 2022); *Carlson v. Boston Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017). However, the Fourth Circuit has said that a court should only revise an interlocutory order in limited circumstances, in order to promote efficiency, judicial economy, and finality. *See, e.g.*, *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 515 (4th Cir. 2003); *Sejman v. Warner-Lambert Co, Inc.*, 845 F.2d 66, 68-69 (4th Cir. 1988); *see*

*also Christianson v. Colt Indus. Oper. Corp.*, 486 U.S. 800, 816 (1988). Indeed, "allowing litigants a 'second bite at the apple' via a motion to reconsider is disfavored." *Nadendla*, 24 F.4th at 305.

In particular, a court should revise an interlocutory order only to account for "'(1) a subsequent trial producing substantially different evidence; (2) a change in applicable law; or (3) clear error causing manifest injustice.'" *U.S. Tobacco Coop. Inc. v. Big S. Wholesale of Virginia, LLC*, 899 F.3d 236, 256 (4th Cir. 2018) (quoting *Carlson*, 856 F.3d at 325).

The only possible basis for McDermott's request is the third category—a clear error causing manifest injustice. In this regard, the Fourth Circuit has colorfully reiterated: "A prior decision does not qualify for th[e] third exception by being just maybe or probably wrong; it must strike us as wrong with the force of a five-week-old, unrefrigerated dead fish. It must be dead wrong.'" *U.S. Tobacco Coop.*, 899 F.3d at 258 (quoting *TFWS, Inc. v. Franchot*, 572 F.3d 186, 194 (4th Cir. 2009)) (alteration in *U.S. Tobacco Coop.*).

In his various filings, McDermott has failed to identify any basis from which the Court could discern that he shares a common question of fact or law with the parties to the instant suit, so as to warrant his intervention. Nor has McDermott shown that the Court's prior decision was made in error. Consequently, I shall deny the Reconsideration Motion. ECF 50. And, because I decline to allow McDermott to intervene in the suit, I need not consider his remaining motions *See* ECF 49; ECF 51; ECF 52.

## II.      Motion to Dismiss

### A.  Background[6]

The allegations underlying this suit- pertain to three discrete but interrelated incidents: (1) McCarthy, Allison, and/or Lyall deleted comments posted by Sammons to the County Executive Page, and thereafter blocked Sammons from accessing the Page; (2) McCarthy, Wein, Tome, and Meffley allegedly refused to provide Sammons with an opportunity to speak and display his video feed during a virtual town hall meeting; and (3) Allison, McCarthy, and Miller precluded Sammons from emailing County officials for a one-month period.

The events culminating in this suit began in 2015, when "McCarthy was campaigning to be elected as the Cecil County Executive."  ECF 15, ¶ 13.  The Cecil County Executive (the "County Executive") is "the chief executive officer of the County" and is empowered to "faithfully execute the laws" and to assure "that the affairs of the executive branch are administered properly and efficiently, and that employees of the executive branch faithfully perform their duties."  CECIL COUNTY CHARTER, Art. 4, § 402.[7]

The Cecil County Charter (the "Charter") provides for a five-member County Council (the "Council").  *Id.*, Art. 2, § 201.  It is vested with "[a]ll legislative powers which may be exercised

---

[6] As discussed, *infra*, I construe the Motion as a motion to dismiss the Complaint, pursuant to Fed. R. Civ. P. 12(b)(6).  Therefore, the Court assumes the truth of the allegations in the Complaint.  *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019).

[7] The Cecil County Charter is available online.  *See* Cecil County Charter, CECIL COUNTY, MD, https://ecode360.com/15790778 (last visited Feb. 27, 2022).  And, the Court may take judicial notice of "'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'"  *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015) (quoting *Philips v. Pitt Cnty. Mem'l Hosp.,* 572 F.3d 176, 180 (4th Cir. 2009)); *see* Fed. R. Evid. 201(b).  Broadly speaking, the Court may also take judicial notice of "factual information found on the world wide web."  *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007); *see* Fed. R. Evid. 201(b).

by the County under the Maryland Constitution and laws of the state."  CECIL COUNTY CHARTER, Art. 2, § 202.  And, the County Executive has the "duties and responsibilities" to prepare and submit "to the Council the annual County Budget" and to recommend to "the Council such measures for legislative action that the Executive may consider to be in the best interests of the County."  *Id.* §§ 402(b), (e).

### 1.

Prior to McCarthy's launch of his campaign, McCarthy maintained only a "personal Facebook profile."  ECF 15, ¶ 13; *see* ECF 15-1 (screenshots of McCarthy's personal Facebook page).[8]  But, in his effort to obtain public office, "McCarthy created a second Facebook page on November 2, 2015, which he called the 'Dr. McCarthy for Cecil County Executive' Facebook

---

[8] Facebook is a social media site and social networking service owned by Meta Platforms, Inc. f/k/a Facebook, Inc.  *See Introducing Meta: A Social Technology Company*,  META, https://about.fb.com/news/2021/10/facebook-company-is-now-meta/ (last visited Mar. 25, 2022). Facebook enables its users to "find and connect with people, groups, businesses, organizations, and others . . . ."  *Terms of Service*, FACEBOOK, https://www.facebook.com/terms.php (last visited Mar. 5, 2022); *see Bland v. Roberts*, 730 F.3d 368, 385 (4th Cir. 2013) (describing Facebook as "'an online social network where members develop personalized web profiles to interact and share information,'" such as "'news headlines, photographs, videos, personal stories, and activity updates,'" with other Facebook "'members'") (quoting *Lane v. Facebook, Inc.*, 696 F.3d 811, 816 (9th Cir. 2012)).

Although "[t]he Facebook platform and the software that underlies that platform is, according to Facebook's *Terms of Service*, property of Facebook, Inc.", Facebook users "own the content [they] create and share on Facebook and the other Facebook Products . . . ."  *Davison v. Randall*, 912 F.3d 666, 682 n.4 (4th Cir. 2019) (internal quotation marks and citations omitted) (alteration in *Davison*).

To that end, Facebook users can maintain personal profiles, which are used for non-commercial purposes and represent individual people.  *What's the difference between a profile, Page and group on Facebook?*, FACEBOOK, https://www.facebook.com/help/337881706729661 (last visited Feb. 27, 2022).  In addition, Facebook allows users to create a "Page", which is typically used by "artists, public figures, businesses, brands, organizations, and nonprofits" for the purpose of "connect[ing] with their fans or customers."  *Id.*  Such users "must have a profile to create a Page or help manage one."  *Id.*

Page." ECF 15, ⁋ 13[9]; *see* ECF 15-2 at 5 (Email from Sammons to County officials stating the name of the Page).  Two weeks later, on November 16, 2015, McCarthy changed the name of the Page to include his first name.   ECF 15, ⁋ 13; *see* ECF 15-2 at 5.[10]

In November 2016, McCarthy was elected as the Cecil County Executive.  ECF 15, ⁋ 14. Accordingly, on November 17, 2016, McCarthy "changed the name" of the Page to "'Dr. Alan McCarthy Cecil County Executive—Elect.'"  *Id.* ⁋ 13; *see* ECF 15-2 at 5.  Then, on December 4, 2016, after McCarthy assumed office as the County Executive, he "again changed the name" of the Page to "'Dr. Alan McCarthy Cecil County Executive.'"  ECF 15, ⁋ 16; ECF 15-2 at 4 (email reflecting that the edit occurred on December 4, 2016).[11]  This was the name of the Page when plaintiff published comments on it, when plaintiff's comments were deleted, and when plaintiff was blocked from subsequently publishing further comments on the Page.  *See* ECF 15, ⁋⁋ 26-33.

Sammons claims that the County Executive Page "was open to the public and contained an interactive section that allowed members of the public to communicate with each other and with

---

[9] The suit does not indicate the basis for McCarthy's reference to himself as a "Dr." According to a publicly available biography, McCarthy earned a Doctor of Veterinary Medicine degree in 1978 from the College of Veterinary Medicine at the University of Georgia.  *See Alan J. McCarthy, D.V.M.*, MARYLAND MANUAL ON-LINE, https://bit.ly/3D2RJn8 (last visited Mar. 22, 2022).

[10] Pertinent here, "[t]here are 5 different types of roles for people who manage classic Pages."  *What are the different Page roles and what can they do?*, FACEBOOK, https://www.facebook.com/help/289207354498410 (last visited Mar. 5, 2022). They include "admin"; "editor"; "moderator"; "advertiser"; and "analyst".  *Id.*  A Facebook user who "create[s] a Page . . . automatically become[s] the Page's admin," which allows a user to "change how the Page looks and publish as the Page."  *Id.*  Further, an "admin can assign roles and change others' roles."  *Id.*  In addition, both an admin and an editor have the ability to "Edit the Page and add apps" as well as to "Create and delete posts as the Page."  *Id.*  And, an admin, editor, and moderator can, among other things, "Send messages as the Page"; "Respond to and delete comments and posts to the Page"; and "Remove and ban people from the Page."  *Id.*

[11] The parties do not specify the date on which McCarthy assumed office.  But, according to plaintiff's submissions,  McCarthy did so prior to December 4, 2016.  *See*  ECF 15, ⁋ 16; ECF 15-2 at 4.

McCarthy, to post comments, comment on posts made by others and like or dislike other people's posts." ECF 15, ¶ 19. Plaintiff states: "McCarthy placed no restrictions on the public's access to the [Page] or use of its interactive component." *Id.* But, "the owner and/or administrator(s) of the [Page] had the ability to delete posts and to block members of the public from having access to the interactive component of the [Page] or to the [Page] altogether." *Id.*

On July 18, 2018, McCarthy and Wein adopted a written communication plan called the "Cecil County Government Communication Plan." *Id.* ¶ 20; *see* ECF 15-4 (the "Communication Plan"). The Communication Plan reflects that it was prepared by Lyall, McCarthy, Wein, members of the Council, including Meffley, as well as Dr. Carl Roberts. ECF 15-4 at 2. The Communication Plan articulated a number of the County's goals with respect to communications with County residents. These include, *id.* at 6: "Build a sustainable communications framework"; "Expand the County's reach"; and "Develop proactive communication."

In addition, the Communication Plan includes a "Social Media Policy." *Id.* at 14-18. It outlines the County's expectations for the use of social media sites by County employees for personal purposes and for County business. *Id.* at 14-16. Among other things, the Communication Plan bars offensive and inappropriate personal conduct, *id.* at 14. And, it provides: "Employees are responsible for anything posted to social media sites, especially as it applies to the County." *Id.* at 15. Further, it instructs employees to "[p]rotect confidential and proprietary information[.]" *Id.* It also prohibits the use of "the copyrighted County seal or any other County images or iconography on personal social media sites." *Id.*

County departments "that would like to join social networks" are directed to "contact the Public Information Officer to ensure coordination with other County sites and their content." *Id.*

9

at 16.  And, the Communication Plan instructs: "If you are representing the County when posting on a social media platform, acknowledge who you are."  ECF 15-4 at 16.

The Communication Plan also includes a list of "DOs & DO NOTs for Social Media."  *Id.* at 17.  It states, in part, *id.*: "DO remain neutral in terms of political viewpoints."; "DO NOT allow anyone to post directly to our pages.  We control content on our sites."; and "DO NOT delete comments unless severely obscene *(1st Amendment – Freedom of Speech)*".

The Communication Plan also identifies the County's "CURRENT FACEBOOK ACCOUNTS."  *Id.*  They include eleven accounts: "Cecil County Government"; "Cecil County Animal Services"; "Cecil County Animal Services Volunteer Page"; "Cecil County Agriculture & Farmers' Market"; Cecil County Historic District Commission"; "Cecil County Housing & Community Development"; "Cecil County Office of Economic Development"; "Cecil County Parks & Recreation"; "Cecil County Tourism"; "Cecil Transit"; and "Volunteer Cecil".  *Id.*[12]  I shall refer to these accounts, collectively, as the "County Facebook Pages."  Notably, the County Executive Page is not listed as one of the County Facebook Pages.

With respect to the "Cecil County Government Facebook Page," the Communication Plan provides, in part, *id.* at 17-18 (emphasis omitted):

> Cecil County Government reserves the right to monitor and remove any content at any time for any reason at its sole, subjective discretion.  Comments, opinions, advice, statements, discussion posts, wall posts, and any other user-generated content that is deemed inappropriate by Cecil County Government will be removed from the page.  Advertisements posted without the advance written approval of Cecil County Government will be deleted.
>
> Cecil County Government expressly prohibits, and will remove, comments, opinion, advice, position, statement, or material that is:
> 1. Abusive, defamatory or obscene
> 2. Fraudulent, deceptive or misleading

---

[12] Elsewhere, the Communication Plan indicates that the County maintains twelve accounts on Facebook.  ECF 15-14 at 5.  But, it enumerates only eleven such accounts.

3.  In violation of any intellectual property right of another
4.  In violation of any law or regulation, or otherwise offensive

If an individual continually posts prohibited or offensive material, the Cecil County Government may exercise its right to block that individual from posting content onto the Cecil County Facebook Page.

In the Complaint, plaintiff states: "In 2019, it became clear that County Executive McCarthy would face challengers in the Republican 2020 primary election . . . ."  ECF 15, ¶ 24. He identified Danielle Hornberger as one of the challengers.  *Id.*

Beginning in January 2019, Sammons posted "several comments critical of McCarthy's tax policies and critical of Defendant McCarthy continuing to serve as Cecil County Executive on the Cecil County Executive Facebook Page." *Id.* ¶ 25.  Specifically, Sammons accused McCarthy of "involvement in public corruption committed through the Cecil Business Leaders Political Action Committee, which collected large donations from area builders and other businesses who then received kickbacks in the form of favorable treatment from the County in things like zoning and licensing determinations." *Id.*  Sammons maintains that his posts were not "obscene or inappropriate." *Id.* ¶ 26.  But, he has not provided the Court with copies of any of his posts, or otherwise specifically described their content.

In February 2019, Sammons's posts were deleted. *Id.*  He was also blocked from making further posts or otherwise "interacting with McCarthy and other citizens of Cecil County" on the County Executive Page. *Id.*  Initially, the blockage continued until the end of April of 2019. *Id.* ¶ 30.  As discussed, *infra*, in the Fall of 2019, Sammons was again blocked from posting comments on the Page. *Id.*

In particular, on the morning of April 27, 2019, Sammons sent an email to several individuals, including McCarthy and Meffley, "complaining that McCarthy's block of Plaintiff's

11

posts—which had been in place 'for quite some time'—was in violation of his First Amendment free speech rights."  ECF 15, ⁋ 28.  Sammons wrote, in part, ECF 15-5 at 2:

> It is a violation of First Amendment free-speech rights to block users from government-sponsored social media accounts just because they posted critical comments[.]  As a constituent I have every right to comment on this page as anyone else in the county.  It has been this way for quite some time.
>
> I would expect this to be corrected immediately to avoid retaining a civil liberty attorney to assist my remedy which may also result in a suite [sic] with the county for additional damages . . . .

Approximately twenty minutes after sending this email, Sammons forwarded the email to Allison, who then served as the County Attorney.  ECF 15, ⁋ 28; *see* ECF 15-5 at 1.  Two days later, on April 29, 2019, Allison responded, "asserting incorrectly that Plaintiff had blocked McCarthy from the Cecil County Executive Facebook Page and therefore the problem was with Plaintiff, not McCarthy."  ECF 15, ⁋ 29.  Allison said, in relevant part: "Upon further inquiry, it is apparent that Dr. McCarthy has **not** blocked or otherwise precluded you from accessing the abovementioned Facebook page, nor has he prevented you from posting comments on this page.  Instead, it appears that it is in fact **you** who has blocked Dr. McCarthy from accessing your Facebook pages."  ECF 15-2 at 5.  In addition, Allison said: "[I]t is worth noting that your unsubstantiated and unjustified threat to initiate litigation against Dr. McCarthy and/or the County is deemed harassment.  I'm not sure why you appear to have an axe to grind with Dr. McCarthy, however, I am certain that any other or further baseless threats or accusations on your part will result in an application for [an] injunction to preclude you from future action that impedes the orderly business of the County."  *Id.*

Plaintiff responded that same day, asserting: "Your staff must have been looking under the wrong account.  I have indeed blocked Alan McCarthy's personal account . . . .  To be Clear it is the 'Dr. Alan McCarthy Cecil County Executive' account in question and not his personal

account." ECF 15-2 at 4.  Allison promptly replied, *id.* at 3: "I have talked with Dr. McCarthy on two separate occasions this afternoon, and Dr. McCarthy is adamant that you have not been blocked on any of his pages."  Further, Allison said: "[I]f you believe that you are in fact blocked, then I respectfully ask that you please kindly provide me with documentation establishing this contention."  *Id.* at 3.

Sammons indicated that he would not be able to provide Allison with documentation, explaining: "Typically when a page is blocked neither party is able to see the page at all."  *Id.* at 2.  Allison responded at 5:47 p.m., stating that he would "investigate further in the morning."  *Id.* The following morning, April 30, 2019, Allison sent another email to Sammons, stating, *id.* at 1: "Please note that you now have full access to the Facebook page 'Dr. Alan McCarthy Cecil County Executive.'"

Sammons asserts that he was "restored 'full access'" to the County Executive Page by April 30, 2019.  ECF 15, ⁋ 30.  Thus, in plaintiff's view, his email exchange with Allison reflects that "both McCarthy and Allison had oversight and control over the Cecil County Executive Facebook Page."  *Id.* ⁋ 29.

However, "[b]y the fall of 2019, with the election getting closer, Plaintiff Sammons' posts critical of McCarthy's policies and of McCarthy himself . . . were again deleted from the Cecil County Executive Facebook Page . . . ."  *Id.* ⁋ 30.  Moreover, Sammons "was again blocked from making further posts and again blocked from interacting with McCarthy and other citizens of Cecil County on the Cecil County Executive Facebook Page."  *Id.*

On December 10, 2019, Sammons again emailed McCarthy, Wein, and Allison, along with three other individuals, "complaining that he was again being denied access" to the Page.  *Id.* ⁋ 31. Sammons wrote: "Here we go again.  This is the second time this has happened within a year.  The

3rd time I will be seeking other means of remedy.  I expect this to be corrected immediately."  ECF 15-6 at 2.  And, plaintiff added: "*I am unable to comment (actively blocked) and only sharing abilities.  I have verified others have the ability to post.  I have also verified this from numerous devices to ensure it was not a glitch."  *Id.*

Allison responded: "The Facebook page that you refer to below is not a County social media site.  Rather, it is a social media site affiliated with Dr. McCarthy's campaign.  As such, we have no jurisdiction to act on your demand."  *Id.* at 1.  Allison suggested that Sammons "contact Dr. McCarthy's campaign chairperson to express [his] concern."  *Id.*

According to Sammons, Allison's statement was knowingly false because, in his view, the Page had "the hallmarks of an official County Facebook page subject to the County's jurisdiction and control."  ECF 15, ⁋ 32.  He alleges that Allison made this misrepresentation "purposefully to continue to deny Plaintiff Sammons access to the Cecil County Executive Facebook Page in violation of Sammons' free speech rights."  *Id.*

Sammons has provided the Court with several screenshots of the Page, which reflect numerous posts that were published on the Page between September 29, 2019, and June 2, 2020.  *See* ECF 15-3 at 3-17; *see also* ECF 15-5.   The screenshots do not contain each post in its entirety.  *See*, *e.g.*, ECF 15-3 at 6.  But, the screenshots reflect the name of the individual who "published" each post.  They include Jennifer Tuerke Lepore, Amber Hudler, Jackson Leith, John Hanley, and Owen Patrick McEvoy.  *See id.* at 4-17.  The screenshots do not indicate that McCarthy, Lyall, or Allison ever published such a post.

According to Sammons, the screenshots show that McCarthy "clothed his Cecil County Executive Facebook Page in the power and prestige of his public office."  ECF 15, ⁋ 17.  In particular, he points out that the Page "contained the official copyrighted County seal and logo of

Cecil County and was labeled with McCarthy's position in office, i.e., 'Cecil County Executive.'" ECF 15, ⁋ 17; *see* ECF 15-3 at 1-2.  In addition, the Page included McCarthy's County email address and phone number.  ECF 15-3 at 14.

Other screenshots show that the Page described McCarthy as a "Politician."  *Id.* at 3. Further, the Page included a photo of McCarthy juxtaposed with Governor Larry Hogan and former President Donald Trump.  *Id.*  In addition, the Page included the following link: "http://alanmccarthycountyexecutive.com/".  *See id.*[13]  And, several of the screenshots indicate that an entity known as "Friends of Alan McCarthy" was "responsible" for the Page.  *Id.* at 10, 11, 12, 13, 14, 16,

Sammons asserts that Lyall, in her role as the County Public Information Officer, "shared administrative rights with McCarthy regarding the Cecil County Executive Facebook Page."  ECF 15, ⁋ 27.  Further, plaintiff points out that Leith, "who worked under Defendant Lyall as an intern for Cecil County, also had administrative rights to the [Page] and made posts to the [Page]."  *Id.*; *see* ECF 15-9 (Newsletter identifying Leith as an intern for the County).  Thus, in plaintiff's view, McCarthy, Lyall, "or an employee acting at [their] direction, would have been responsible for deleting Plaintiff's posts and blocking Plaintiff from accessing the Cecil County Executive Facebook Page."  ECF 15, ⁋ 27.

According to Sammons, the screenshots reveal that McCarthy "used" the Page "to communicate with his Cecil County constituents, to announce news relevant to the Cecil County community, to alert his constituents to his accomplishments and activities as County Executive and to otherwise conduct official business as County Executive."  *Id.* ⁋ 18.  For example, on January 27, 2020, Hudler published a post that attributed the County's low unemployment rate to

---

[13] The website is no longer operative.

"McCarthy's pro-jobs reforms." ECF 15-3 at 5. And, on February 18, 2020, Hudler published a post that stated, "Alan McCarthy Built The First Public School In 30 Years." *Id.* at 7.

Plaintiff also draws the Court's attention to a post that was republished on the Page from the "Cecil County Government Facebook page," all on February 3, 2020, "announcing 'County Executive to Hold Citizen Input Session for FY21 Budget #FY2021 #Cecil County . . . .'" ECF 15, ¶ 18; *see* ECF 15-3 at 6. And, on May 21, 2020, the Page disseminated a statement, as follows: "'This week the County Council passed historic tax relief for seniors and veterans. This was just the first step in our approach to the economic damage caused by the coronavirus shutdown. Together we will emerge from this crisis stronger than ever!'" ECF 15, ¶ 18, *see* ECF 15-3 at 13.

Some posts criticized Hornberger, McCarthy's primary opponent. For instance, on April 30, 2020, Hanley published a post that criticized Hornberger for airing negative advertisements attacking McCarthy, and touted McCarthy as the "trusted conservative in this race." ECF 15-3 at 10. And, on May 5, 2020, McEvoy published a post that critiqued the "Hornberger campaign" for "attacking public safety officials in Cecil County . . . ." *Id.* at 11.

### 2.

On May 12, 2020, a few months into the COVID-19 global pandemic, and while Sammons "continued to be denied access to the Cecil County Executive Facebook Page," plaintiff attended by Zoom a public budget meeting held by the Council (the "Budget Meeting"). ECF 15, ¶ 34.[14]

---

[14] Zoom Video Communications, Inc. ("Zoom") provides video conferencing services that enable "Hosts to schedule and start Meetings and to allow Participants to join Meetings for the purpose of collaborating using voice, video, and screensharing functionality." *Zoom Services Description*, ZOOM, https://explore.zoom.us/en/services-description/?_ga=2.23703743.48751783.1646322341-287169558.1646322341 (last visited Mar. 3, 2022) (hereinafter "Services Description"). A "Host" is "an individual who is . . . assign[ed] the right to host Meetings." *Id.* According to Zoom, a Host has "full permissions to manage the meeting." *Roles in a meeting*, ZOOM, https://support.zoom.us/hc/en-us/articles/360040324512-Roles-in-a-meeting (last visited Mar. 3, 2022). Among other things, the Host may "Start the

The Complaint does not specify the purpose of the Budget Meeting, but its agenda (the "Agenda") is publicly available. *See Public Budget Meeting*, CECIL COUNTY, MARYLAND, https://www.ccgov.org/Home/Components/Calendar/Event/8846/20 (last visited Mar. 5, 2022).

The Agenda reflects that the Budget Meeting was held to provide the public with an opportunity to comment on a number of bills that were pending before the Council. *Id.* These included a bill to approve the County's proposed Annual Budget and Appropriation Ordinance for Fiscal Year 2021, as well as a bill setting the local tax rate on real and personal property for Fiscal Year 2021. *Id.*

During the Budget Meeting, "participants were able to see other participants in separate windows on their computer screens and were able to have real time voice communications." ECF 15, ¶ 34. Plaintiff "filled his virtual window (which could be seen by other meeting participants) with a video feed loop displaying three signs he had made." *Id.* ¶ 35. Each sign portrayed one of the following messages: "'McCarthy Stop Blocking Me on Facebook'"; "'Vote for Hornberger'"; and "'No More Tax Increases'". *Id.* (quoting ECF 15-10) (Photographs of the signs used in the video feed). According to plaintiff, the sign that read "'McCarthy Stop Blocking Me on Facebook'" was "intended as a grievance . . . ." ECF 15, ¶ 35. And, in Sammons's view, the other signs were "purely political speech and relevant to the County's budget discussions." *Id.*

---

Meeting"; "End the Meeting"; "Mute or unmute participants"; "Stop participant's video"; and "Remove attendees." *Id.*

The Services Description indicates that a "Participant" is "an individual, other than the Host, who accesses or uses the Services, with or without permission and knowledge of the Host." And, "Participant[s]" are capable of "[m]ut[ing]/unmut[ing] themselves" and "[s]tart[ing]/stop[ing] their own video."

Plaintiff submitted a video recording of the meeting as an exhibit to the Complaint.  *See* ECF 15-12 (the "Recording").  Notably, the Recording displays only the video feed of the person who was speaking at a given point in time.  Thus, most of the conduct of the named defendants during the Budget Meeting is not depicted in the Recording.  Nor is plaintiff's video feed visible in the Recording.[15]

At the outset of the Recording, Tome, the Uniformed Communications Specialist, was seated in a conference room, along with Jim Massey, the Manager of the Council, and Terry Hale, an administrative assistant for the Council.  ECF 15, ⁋ 39; *see* ECF 15-10.  According to plaintiff, Tome acted as the "host" of the Zoom meeting.  ECF 15, ⁋⁋ 90, 134.   Further, Meffley, the President of the Council, "participated in the meeting from his home and ran the [Budget Meeting]."  *Id.* ⁋ 39.

The Budget Meeting begins approximately fifteen minutes into the Recording, "at which point Jim Massey . . . open[ed] the meeting with welcoming remarks."  *Id.*; *see* ECF 15-12 at 00:15:53-00:17:45.   Thereafter, Meffley invited McCarthy to "make comments regarding the proposed budget . . . ."  ECF 15, ⁋ 39.  The Recording shows that McCarthy delivered his remarks from a podium, as Wein sat behind him.  ECF 15-12 at 00:25:30-00:34:29; *see also* ECF 15, ⁋ 39.

---

[15] The version of the Recording submitted to the Court includes footage reflecting the fifteen minutes that preceded the beginning of the Budget Meeting.  An excerpt is also available online.   *See County calendar—Public Budget Meeting*, CECIL COUNTY, MARYLAND, https://www.ccgov.org/Home/Components/Calendar/Event/8846/20 (last visited Feb. 27, 2022).

Thereafter, Meffley opened the Budget Meeting for public comment, and provided an overview for how the public comment portion of the meeting would proceed.[16]  Meffley said, *see* ECF 15-12 at 00:34:31-00:35:20:

> We will now welcome public comments on the budget.  The public was to pre-register today between noon and 6:00 p.m. with the Council office.  We will allow additional speakers who have not registered as time allows at the end of the hearing.  We will be calling names in the order that you registered.  Two names will be called at a time so that the next speaker can be prepared to speak.  When your name is called, make sure that you have not muted your microphone.  And, there are so many people—this is a must—please keep your comments to two minutes.

Plaintiff does not indicate whether he complied with the pre-registration requirement.

After a few participants had spoken, Meffley instructed Massey to "'make sure that everybody mutes their mic[rophone] when somebody's talking, the first two people you couldn't hear very well.'"  ECF 15, ⁋ 40; *see* ECF 15-12 at 00:44:13.  Massey responded: "'[W]e can do that from our side' . . . ."  ECF 15, ⁋ 40; *see* ECF 15-12 at 00:44:15.  According to Sammons, "[f]rom this point on, microphones were muted by the host of the meeting and individual participants could be heard only if both the host and the participant had the participant's microphone 'unmuted.'"  ECF 15, ⁋ 40.  Plaintiff also points out that Hornberger, McCarthy's challenger in the then upcoming Republican primary, offered her comments on the proposed budget.  *Id.*; *see* ECF 15-12 at 00:52:11-00:53:16.

Approximately sixty-five minutes into the Recording, Massey "call[ed] out Plaintiff Sammons' name for comment."  ECF 15, ⁋ 41; *see* ECF 15-12 at 01:05:53.  But, Sammons complains that "the host did not unmute Plaintiff Sammons' microphone when his

---

[16] The Agenda reflects many of the same guidelines that Meffley described.  *See Public Budget Meeting*, CECIL COUNTY, MARYLAND, https://www.ccgov.org/Home/Components/Calendar/Event/8846/20 (last visited Mar. 5, 2022).

name was called, and Plaintiff was denied any opportunity to speak." ECF 15, ¶ 41. Sammons alleges: "During the approximate eight seconds he was awaiting a response from [plaintiff], Massey's facial expression changed, and he appear[ed] . . . to grimace or frown, just before calling the next person's name." *Id.*; *see* ECF 15-12 at 1:05:53-1:06:01. Plaintiff contends that this eight-second period was "the only opportunity [he] received to speak during the [Budget Meeting]." ECF 15, ¶ 41.

In the Complaint, Sammons asserts: "Defendants McCarthy, Wien [sic], Tome, and Meffley . . . denied Plaintiff Sammons a reasonable opportunity to speak at the public budget meeting by unmuting or causing to be unmuted his Zoom connection for only a split second and then re-muting Plaintiff Sammons before he could speak or by not unmuting Plaintiff's microphone at all." *Id.* ¶¶ 91, 135; *see also* ECF 15-13 at 17-18 (Email dated May 13, 2020, from Sammons to County officials in which he claimed, in part: "I was 'given an opportunity' to speak last night however my mic was open so briefly [that by] the time I unmuted my mic the 'opportunity' was over.")

Approximately fifteen minutes after Sammons was called on, and as the public comment period continued, Sammons observed Wein and McCarthy conversing. ECF 15, ¶ 42. Plaintiff alleges that, immediately following Wein's conversation with McCarthy, Wein "enter[ed] the conference room where Massey, Defendant Tome and Hale [were] sitting." *Id.*; *see* ECF 15-12 at 01:21:35. Wein then "walked across the conference room to where Defendant Tome was sitting" and initiated a conversation with her. ECF 15, ¶ 42. While Tome and Wein were speaking, Hale "can been [sic] seen . . . to have the laptop mouse in her left hand." *Id.*; *see* ECF 15-12 at 01:21:38. But, after Tome and Wein finished speaking, Tome took the laptop mouse and began "taking some action with regards to the meeting." ECF 15, ¶ 42; *see* ECF 15-12 at 01:22:17. According to

plaintiff, the Recording shows that "Wein stay[ed] in the room until Tome . . . finished using the laptop mouse," at which time he "return[ed] to the adjacent room," where he had initially been sitting with McCarthy.  ECF 15, ⁋ 42.[17]

At this time, according to Sammons, his "video feed was turned off and the following message was displayed on [his] computer screen: 'Meeting Alert . . . You cannot start your video because the host has stopped it.'"  *Id.*; *see* ECF 15-11.  Notably, plaintiff avers that "other video feeds, such as one stating 'Yes to Southfields,' were allowed to remain up and visible to all meeting participants during the entire meeting."  ECF 15, ⁋ 36.  Moreover, Sammons claims: "[I]t is reasonable to infer from McCarthy's conversation with Wein immediately before Wein enter[ed] the . . . conference room that McCarthy instructed Wein to have Sammons' video feed turned off or blocked."  *Id.* ⁋ 42.  And, in Sammons's view, given the proximity in time between when plaintiff's video feed was disabled and Wein's discussion with Tome, "a reasonable inference is that Wein instructed Tome to delete Plaintiff's video feed, which was displaying Plaintiff's three signs . . . ."  *Id.*

Plaintiff asserts that because his "video feed was blocked and he remained muted by the meeting host, [he] believed reasonably that he would be unable to participate in the meeting further . . . ."  *Id.* ⁋ 43.  Therefore, "he left the Zoom meeting angry and in disgust with the manner in which he was treated."  *Id.*  However, the Recording reflects that all participants who had pre-registered to speak were allowed to do so, and thereafter Massey provided anyone who had not yet been able to speak with an opportunity to do so.  *See* ECF 15-12 at 01:33:55-01:34:41.

---

[17] The Recording does not show Wein leaving the conference room.  But, after the 01:22:36 mark, he is not seen again in the conference room with Tome, Massey, or Hale.  *See* ECF 15-12 at 01:22:36.

**3.**

The following day, May 13, 2020, Sammons sent an email to Massey and the Council. ECF 15, ⁋ 44; *see* ECF 15-13 at 17-18.  It stated, in part, ECF 15-13 at 18:

> I was very disappointed on [sic] the abuse of technology to subdue my freedom of speech and the opportunity to interject and speak about the pending budget.  I and others have been blocked from the County Executive social media page that I have officially communicated to the county twice on this matter[.] The first time the county attorney corrected it and the second time he made some lame legal opinion on why [McCarthy] can block others.  To this day I remained blocked from commenting and correcting the County Executive on his false messages to the public while his cheerleaders sing him praise.

> Never the less [sic], last night I wanted to speak out on how embarrassed I was to call these elected official Republicans due to their liberal tax and spend policies and I did not want the taxes to go up yet again.  I also had a video feed up during the meeting that had several signs made that reflected my opinions on this that was later silenced as McCarthy did not like the fair but negative messaging. Meanwhile, The "YES to Southfields" video feed was allowed to continue throughout the online session.  I was "given an opportunity" to speak last night however my mic was open so briefly [that by] the time I unmuted my mic the "opportunity" was over. The host has to open the mic and then the recipient has to also unmute manually the mic in order to talk.  I had to click on a box to say yes unmute my mic and then had to go and unmute again on my interface to talk.

> In closing, I would like for the county Executive to UNBLOCK EVERYONE (not only me) and be allowed to have our voices back and give him the criticism he is deserving of on his tax and spend policies.

In the days that followed, plaintiff did not receive a response to his complaint.  ECF 15, ⁋ 45.  Accordingly, on May 18, 2020, at 8:51 a.m., Sammons sent another email to Massey, the Council, Allison, and a reporter for a local newspaper.  *Id.*; *see* ECF 15-13 at 17.  In his second email, Sammons complained that he had not received a response regarding his complaint, reiterated his request for an explanation as to why he was not able to participate fully in the Budget Meeting, and again inquired why he remained unable to comment on the County Executive Page. ECF 15, ⁋ 45; *see* ECF 15-13 at 17.

Allison responded to Sammons approximately one hour later, stating: "First, I've already explained to you that County government has no jurisdiction over an elected official's <u>campaign media</u>." ECF 53-13 at 16.  Second, Allison questioned why Sammons "copied a reporter for the Cecil Whig on [his] email," and warned that Sammons was "bound by the confidentiality provisions codified at Section 39-10 of the Cecil County Code." *Id.*[18]

Sammons and Allison exchanged a series of emails throughout the remainder of the day and the following morning, discussing plaintiff's issues.  *See id.* at 7-15.  At 8:58 a.m. on May 19, 2020, Allison sent an email to Sammons, summarizing his position with respect to Sammons's contentions.  *Id.* at 6.  Allison said, *id.*: "This will be the last time I address these issues with you via email.  If you have other or further issue, then please use paper, pen, and USPS to the address below."[19]  Further, Allison indicated: "The budget hearing last Tuesday evening was . . . a <u>County Council meeting</u>.  If you have [an] issue with the ability to comment during the meeting, then you should direct your question(s) to the Council manager or Council President.  It was their meeting, and they controlled the forum."  *Id.* (emphasis omitted).

---

[18] Section 39-10 of the Cecil County Code is titled "Complaints."  It governs the process by which a person "may file a complaint with the [Ethics Commission] alleging a violation of [Chapter 39 of the Cecil County Code]."  And, pertinent here, subsection (H) provides: "After a complaint is filed and until a final finding of a violation by the Commission, all actions regarding a complaint are confidential . . . The Commission, its staff, counsel, the complainant and the respondent shall not disclose any information relating to the complaint . . . ."

The basis for Allison's reference to this provision is not readily apparent.  The Complaint is devoid of any allegation that Sammons filed a complaint with the County's Ethics Commission. The only mention of such a complaint comes in an email that Sammons sent to Allison, in which plaintiff states that he made an "Ethics Complaint for unethical practices in our government by Council Member George Patchell." ECF 15-13 at 8.  The Court has not been provided with a copy of this complaint.  But, it does not appear to be immediately pertinent to this case.

[19] Although not specified, the reference to "address below" presumably pertained to the address listed under Allison's email signature.  ECF 15-13 at 6.

Concerning plaintiff's continued grievances with respect to the County Executive Page, Allison stated: "I have no jurisdiction over <u>any candidates'</u> related social media."  ECF 15-13 at 6.  Allison added, *id.*:

> When you initially reached out to me last year, I looked into the matter, and determined that the County Executive's Facebook page did not clearly indicate that it was a campaign site, and not a site affiliated with County government.  As such, I advised that he should either permit all individuals to post comments, or not allow anyone to comment.  Since then, the County Executive has changed his Facebook page such that it is now clearly campaign related.  That act takes it outside my jurisdiction.

About twenty minutes later, Sammons replied, in relevant part: "Thank you, that was most helpful."  *Id.* at 5.

However, that exchange did not end the matter.  Rather, about two hours later, at 11:39 a.m. on May 19, 2020, Allison sent a lengthy email to Sammons, in which, among other things, he offered to discuss Sammons's complaints in a telephone call.  *Id.* at 4.  Allison wrote, in part, *id.*: "We are faced with an existential public health and economic crisis . . . in a way that our Country has never faced.  I respect liberty and the right to disagree . . . . What I don't respect is dirty politics, personal attacks . . . that serve to do nothing more than divide us when we need, more than ever, to find a way to be united."  Further, Allison said, *id.*:  "You can call me any time . . . provided that if, as, or when you can call, you're prepared to have a reasonable, civil, honest, and productive discourse."  *Id.*  Allison also advised: "If you call, I'm going to ask in advance that we record the call, so that there's a record . . . .   What I'm trying to do is to head off conflict that is unnecessary and, ultimately, harmful . . . ."  *Id.*

At 12:39 p.m., Sammons replied: "I am not sure what this email is all about.  All I want is to have my complaint filed with the county.  Not to talk politics."  *Id.* at 3.  Further, Sammons

wrote: "You answered my questions adequately in the previous email correspondence.  I will follow up with the state in the areas you fail to have jurisdiction."  ECF 15-13 at 3.

Within ten minutes, Allison sent another email to Sammons, stating, *id.* at 2:

Do what you think you have to do.  I have no issue with that . . . . If [you] want to take this to war, I'll engage in you in war [sic]. . . .  At this point, I'm going to advise IT to block you from all communication with County agencies.  You're adversarial and have a litigious agenda.  You have freedom of expression, but it will be via pen and paper, USPS, and not in harassing email to myself or other County officials.

In response, Sammons inquired: "Are you trying to threatening [sic] me for trying to file a complaint? Really?"  *Id.*  Allison answered: "No.  What I'm doing is blocking you now from further communication via email . . . .  You have the right to communicate with County government.  Your right is now restricted to paper and pen writing delivered via USPS.  Your choice Sir.  Bye bye.b"  *Id.* at 1.[20]  Allison "copied" Miller, the Director of Information Technology for the County, on this email.  ECF 15, ⁋ 108; *see* ECF 15-13 at 1.

At 11:15 p.m. on May 19, 2020, Allison sent Sammons another email, from his private account.  ECF 15-14.  He wrote, *id.*:

Man, you're a Mitch.  You bloviate all over social media and then, when called to the carpet, you make your FB page private?  HAHAHAHAH.  You're a hypocrite and a coward of the first degree.  I pity you.  This is a private, personal communication – you're acting like a bottom feeder.  I know you're better than this. Get a grip, sir.[21]

Plaintiff maintains that this email indicates that Allison "harbor[s] significant animus towards" him.  ECF 15, ⁋ 49.

---

[20]  Sammons avers that that the phrase "'Bye bye.b'" was code for calling plaintiff a "'bitch.'"  ECF 15, ⁋ 49 n.1 (quoting ECF 15-13 at 1).

[21]  Plaintiff states that, "[a]ccording to the Urban Dictionary, a 'Mitch' refers to a male 'Bitch.'"  ECF 15, ⁋ 49, n.1 (quoting ECF 15-14 at 1).

Sammons replied to Allison's email on the morning of May 20, 2020, asking Allison to "stop harassing [him]." ECF 15-14 at 1.  Further, Sammons said, *id.*:  "I thought your goal was to refrain from contact with me and is why you gave orders to blocked [sic] me from [the] county email system." *Id.*  And, plaintiff asked Allison to cease "contacting" him, "unless it is for official county business issues." *Id.*

Plaintiff avers that "Allison would not have engaged in such a course of action without informing and consulting with his boss, Defendant McCarthy, and receiving directives from McCarthy." ECF 15, ₱ 107.  And, according to Sammons, McCarthy and Allison directed Miller to "ban Plaintiff from being able to email anyone within Cecil County government." *Id.* ₱ 109.  And, according to Sammons, "Miller followed the directive communicated by Allison and, from approximately May 19, 2020 until on or about June 15, 2020, caused all emails from Plaintiff to any recipient within the Cecil County government to be blocked or redirected so that they never reached their intended recipients." *Id.* ₱ 110.

## B.  Standards of review

### 1.  Fed. R. Civ. P. 12(b)(1)

As mentioned, in Count VII, plaintiff requests declaratory relief, seeking to hold certain provisions of the Communication Plan unconstitutional, null, and void.  ECF 15, ₱ 156-64.  Defendants insist that Sammons lacks standing to assert such a claim because it does not present a case or controversy, and thus the Court lacks subject matter jurisdiction over the claim.  ECF 26-1 at 33-36.  This argument implicates Fed. R. Civ. P. 12(b)(1).

Under Rule 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction.  *See Demetres v. E. W. Const., Inc*., 776 F.3d 271, 272 (4th Cir. 2015); s*ee also The Piney Run Preservation Ass'n v. Cty. Comm'rs of Carroll*

*Cty.*, 523 F.3d 453, 459 (4th Cir. 2008); *Evans v. B.F. Perkins Co*., 166 F.3d 642, 647 (4th Cir. 1999).  A challenge to subject matter jurisdiction under Rule 12(b)(1) may proceed "in one of two ways": either a facial challenge or a factual challenge. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted); *accord Hutton v. Nat'l Bd. of Examiners Inc.*, 892 F.3d 613, 620-21 (4th Cir. 2018); *Durden v. United States*, 736 F.3d 296, 300 (4th Cir. 2013).

In a facial challenge, "the defendant must show that a complaint fails to allege facts upon which subject-matter jurisdiction can be predicated." *Hutton*, 892 F.3d at 621 n.7 (citing *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017)); *see also Kerns*, 585 F.3d at 192.  Alternatively, in a factual challenge, "the defendant maintains that the jurisdictional allegations of the complaint are not true." *Hutton*, 892 F.3d at 621 n.7 (citing *Beck*, 848 F.3d at 270).  In that circumstance, the court "may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *see also Beck*, 848 F.3d at 270; *In re KBR, Inc., Burn Pit Litig*., 744 F.3d 326, 333 (4th Cir. 2014); *Evans*, 166 F.3d at 647.

The Motion posits that there is no case or controversy with respect to the Communication Plan because it applies to the Cecil County Government Facebook page, but not the County Executive Page.  ECF 26-1 at 35-36.  Therefore, it could not have been invoked to justify deleting plaintiff's posts or blocking plaintiff from continuing to post on the County Executive Page.  *Id.*  Further, defendants argue that there is no impending threat that the Communication Plan will be enforced in the future to restrict plaintiff's free speech rights.  *Id.*

Plaintiff's challenge is, in essence, a factual one.  Therefore, in resolving Count VII, I may consider the exhibits.

### 2.   Rule 12(d), Rule 12(b)(6), and Rule 56

The Motion is styled as a "Motion To Dismiss Amended Complaint Or, In the Alternative, For Summary Judgment."   ECF 26.   A motion styled in the alternative implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.   *See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).   However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).   If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."   Fed. R. Civ. P. 12(d).   But, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious."   *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[22]

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6)

---

[22] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so.   *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

motion and rely on it, thereby converting the motion, or to reject it or simply not consider it."  5C Wright & Miller, Federal Practice & Procedure § 1366 (3d ed. 2018).  But, this discretion "should be exercised with great caution and attention to the parties' procedural rights."  *Id*.  In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary.  *Id*.

Summary judgment ordinarily is inappropriate "where the parties have not had an opportunity for reasonable discovery."  *E.I. de Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011); *see Putney v. Likin*, 656 Fed. App'x 632, 639 (4th Cir. 2016) (per curiam); *McCray v. Md. Dep't of Transp., Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014)).  However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'"  *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).  To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery.  Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

To justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to the [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted), *rev'd on other grounds sub nom.  Gardner v. Alley Fin., Inc.*, 514 F. App'x 378

(4th Cir. 2013) (per curiam).  A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment."  *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874 (4th Cir. 2019); *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 Fed. App'x 274 (4th Cir. 2008) (per curiam), *cert. denied*, 555 U.S. 885 (2008).

As noted, a Rule 56(d) affidavit was appended the Opposition, authored by plaintiff's counsel, contending that plaintiff requires discovery in order to litigate his case.  *See* ECF 33-1. In general, "[s]ummary judgment before discovery forces the non-moving party into a fencing match without a sword or a mask."  *McCray v. Md. Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2014).

I am of the view that summary judgment would be premature because the factual record is not fully developed.  Therefore, I decline to convert the Motion to one for summary judgment. Instead, with respect to Counts I through VI, I shall construe the Motion as a motion to dismiss under Rule 12(b)(6).

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  *Nadendla*, 24 F.4th at 304; *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir. 2019); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom. McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an

assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Nadendla*, 24 F.4th at 305; *Paradise Wire & Cable*, 918 F.3d at 317; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, *Miss.*, 574 U.S. 10, 10 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of

31

relief.  *Iqbal*, 556 U.S. at 678.  Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely."  *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'"  *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting  *E.I. du Pont de Nemours & Co.*, 637 F.3d at 440); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015).  However, "a court is not required to accept legal conclusions drawn from the facts."  *Retfalvi*, 930 F.3d at 605; *see Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010).  "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought.  *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'"  *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards*, 178 F.3d at 243).  But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)."  *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336

(4th Cir. 2009).  Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'"   *Goodman,* 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst,* 4 F.3d at 250).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'"  *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448).  *See Goines*, 822 F.3d at 166 (a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits."); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).  In contrast, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]"  *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed. v. Town of Gilbert*, 576 U.S. 155 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

And, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it."  *Goines*, 822 F.3d at 167.  Of import here, "[w]hen the plaintiff attaches or incorporates a document upon

which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Id.* Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

Moreover, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines,* 822 F.3d at 166 (citations omitted); *see also Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, ___U.S.___, 138 S. Ct. 558 (2017); *Kensington Volunteer Fire Dep't v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011)) (emphasis in original) (citation omitted); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*,

565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

As mentioned, the Complaint is supported by several exhibits. *See* ECF 15-1 through ECF 15-16. With the exception of ECF 15-15, each is expressly referenced in the Complaint. *See* ECF 15, ¶¶ 13, 17, 20, 28, 31, 33, 35, 37, 38, 44, 49, 70. And, they are integral to the suit. As to ECF 15-15, it contains a screenshot of a public announcement issued on February 3, 2020, expressing McCarthy's intention to hold a "Citizen Input Session for the FY21 Budget." The statement is available online. *See County Executive to Hold Citizen Input Session for FY21 Budget*, Cecil County, Maryland, https://bit.ly/3L6UaIg (last visited Feb. 27, 2022). Because this is a matter of public record, I may consider it in resolving the Motion. *See* Fed. R. Evid. 201.

Defendants submitted two exhibits that were also included with the Complaint. *See* ECF 26-3 (Screenshots of the Page); ECF 26-5 (email between Sammons and Allison complaining of his treatment in the Budget Meeting). Thus, I may also consider these exhibits.

In addition, defendants provided affidavits from McCarthy and Allison. ECF 26-4 (McCarthy); ECF 26-6 (Allison). Plaintiff did not rely on either exhibit, nor are they integral to the suit. Therefore, I may not rely on them in resolving the Motion.

The Opposition includes an email disseminated by the "Friends of Alan McCarthy" on December 10, 2019. ECF 33-2. It reflects that McCarthy's reelection bid was endorsed by former Governor Bob Ehrlich. *Id.* The email is not mentioned in the Complaint, however, nor does

plaintiff's suit appear to be predicated on the existence of the email.  Therefore, I may not consider it in resolving the Motion.

## C.  Legal Principles

### 1.  42 U.S.C. § 1983

The Complaint is styled, in part, as an action brought under 42 U.S.C. § 1983.  ECF 15, ¶¶ 59-62, 73-114.  Under § 1983, a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 575 U.S. 983 (2015).  However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017).

In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).  Notably, "[t]he first step in any such claim is to pinpoint the specific right that has been infringed." *Safar*, 859 F.3d at 245.

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019); *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area*

*Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997).

The phrase "under color of state law" is an element that "'is synonymous with the more familiar state-action requirement' for Fourteenth Amendment claims, 'and the analysis for each is identical.'" *Davison*, 912 F.3d at 679 (quoting *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982). A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk County v. Dodson*, 454 U.S. 312, 317-18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Philips*, 572 F.3d at 181 ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient.") (citations and internal quotation marks omitted).

Section 1983 also requires a showing of personal fault based upon a defendant's personal conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights). In other words, there is no respondeat superior liability under § 1983. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . .; § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *see also Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

Liability of supervisory officials under § 1983 "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). With respect to a supervisory liability claim in a § 1983 action, a plaintiff must allege:

> (1) That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to . . . the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted), *cert. denied*, 513 U.S. 813(1994); *see also Wilcox*, 877 F.3d at 170.

## 2.   First Amendment & Article 40—In General

As discussed, plaintiff alleges violations of his free speech rights as guaranteed by the First Amendment to the Constitution (Counts I through III) as well as Article 40 of the Maryland Declaration of Rights (Counts IV through VI).

"The First Amendment 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Connick v. Myers*, 461 U.S. 138, 145 (1983) (citations omitted). "'Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints.'" *Am. Civil Liberties Union of N. Carolina v. Tata*, 742 F.3d 563, 565-66 (4th Cir. 2014) (quoting *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010)). Pursuant to the First Amendment, "government generally has no power to restrict expression because of its message, its ideas, its

subject matter, or its content." *Barr v. Am. Assoc. of Political Consultants, Inc.*, ___U.S.___, 140 S. Ct. 2335, 2346 (2020) (quotation marks and citation omitted).

The Supreme Court has said: "The hallmark of the protection of free speech is to allow 'free trade in ideas'—even ideas that the overwhelming majority of people might find distasteful or discomforting." *Virginia v. Black*, 538 U.S. 343, 365 (2003) (quoting *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)). A "core postulate of free speech law" is that the "government may not discriminate against speech based on the ideas or opinions it conveys." *Iancu v. Brunetti*, ___U.S.___, 139 S. Ct. 2294, 2299 (2019). Put another way, the government "'ordinarily'" may not "'prohibit dissemination of social, economic and political doctrine which a vast majority of its citizens believes to be false and fraught with evil consequence.'" *Black*, 538 U.S. at 365; *see Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994); *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972); *Am. Booksellers Ass'n, Inc. v. Hudnut*, 771 F.2d 323, 328 (7th Cir. 1985), *aff'd*, 475 U.S. 1001 (1986).

Article 40 of the Maryland Declaration of Rights is Maryland's constitutional counterpart to the provisions for freedom of speech and freedom of the press contained in the First Amendment. The Maryland Court of Appeals has said that courts ordinarily "need not consider Article 40 and the First Amendment separately as Article 40 is read generally *in pari materia* with the First Amendment." *Nefedro v. Montgomery County,* 414 Md. 585, 593 n. 5, 996 A.2d 850, 855 n. 5 (2010). Neither side asserts that plaintiffs' claims under the First Amendment are subject to substantively different standards from his claims arising under Article 40. Accordingly, and because the federal and State provisions are ordinarily construed *in pari materia,* I will analyze plaintiff's federal and State claims together.

"The first inquiry a court must undertake when a First Amendment claim is asserted is whether the plaintiff has engaged in 'protected speech.'"  *Goulart v. Meadows*, 345 F.3d 239, 246 (4th Cir. 2003) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985)).  But, in this case, there is no dispute that in each of the incidents at issue, Sammons engaged in protected speech.  Therefore, in evaluating each incident, I consider only whether plaintiff has adequately alleged that the conduct of defendants amounted to an unlawful infringement of plaintiff's free speech rights.

### 3.  Qualified Immunity

The Individual Defendants assert qualified immunity as to each of plaintiff's federal law claims, to the extent these claims are brought against them in their individual capacity.  ECF 26-1 at 36-37.

"Qualified immunity bars § 1983 actions against government officials in their individual capacities 'unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time.'"  *Barrett v. PAE Government Services, Inc.*, 975 F.3d 416, 428 (4th Cir. 2020) (quoting *District of Columbia v. Wesby*, ___U.S.___, 138 S. Ct. 577, 589 (2018)) (cleaned up); *see also Halcomb v. Ravenell*, 992 F.3d 316, 319 (4th Cir. 2021); *Humbert v. Mayor and City Council of Balt.*, 866 F.3d 546, 555 (4th Cir. 2017), *cert. denied*, ___U.S.___, 138 S. Ct. 2602 (2018); *Osborne v. Georgiades*, 679 F. App'x 234, 237 (4th Cir. 2017); *Scinto v. Stansberry*, 841 F.3d 219, 235 (4th Cir. 2016); *Hunter v. Town of Mocksville*, 789 F.3d 389, 401 (4th Cir. 2015).  In *Owens*, 767 F.3d at 395, the Fourth Circuit reiterated: "Qualified immunity protects government officials from liability for 'civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known.'"  (Quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

The doctrine of qualified immunity "balances two important interest—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *see also Barrett*, 975 F.3d at 428-29; *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019); *Wilson v. Prince George's Cty.*, 893 F.3d 213, 219 (4th Cir. 2018); *Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015).  The cases are legion in support of these principles.  *See, e.g., Wesby*, 137 S. Ct. at 589; *Reichle v. Howards*, 566 U.S. 658, 664 (2012); *Saucier v. Katz*, 533 U.S. 194, 206 (2001); *Robertson v. Anderson Mill Elem. School*, 989 F.3d 282, 288 (4th Cir. 2021); *Ray v. Roane*, 948 F.3d 222, 229-30 (4th Cir. 2020); *Hupp v. Cook*, 931 F.3d 307, 317 (4th Cir. 2019); *Attkisson v. Holder*, 925 F.3d 606, 623 (4th Cir. 2019); *Williamson v. Stirling*, 912 F.3d 154, 186 (4th Cir. 2018); *Wilson*, 893 F.3d at 219; *Sims v. Labowitz*, 885 F.3d 254, 260 (4th Cir. 2018); *Spivey v. Norris*, 731 F. App'x 171, 175 (4th Cir. 2018); *O'Neal v. Rollyson*, 729 F. App'x 254, 255 (4th Cir. 2018) (per curiam); *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 582-83 (4th Cir. 2017); *Occupy Columbia v. Haley*, 738 F.3d 107, 118 (4th Cir. 2013); *Bland v. Roberts*, 730 F.3d 368, 391 (4th Cir. 2013); *Merchant v. Bauer*, 677 F.3d 656, 661 (4th Cir. 2012), *cert. denied*, 568 U.S. 1068 (2012).

Qualified immunity turns on the "objective reasonableness of an official's conduct, as measured by reference to clearly established law."  *Harlow*, 457 U.S. at 818.  An officer who makes an honest but objectively unreasonable mistake is not protected by qualified immunity.  Rather, the doctrine protects officials "'who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful.'"  *Williams v. Ozmint*,

716 F.3d 801, 805 (4th Cir. 2013) (citation omitted); *accord Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012).

The cases teach that qualified immunity "'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'" *Lane v. Franks*, 573 U.S. 228, 243 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)); *accord Robertson*, 989 F.3d at 288 ("'[I]n gray areas, where the law is unsettled or murky, qualified immunity affords protection to' government officials who take 'action[s] that [are] not clearly forbidden.'") (quoting *Occupy Columbia*, 738 F.3d at 118); *Brawn v. Maynard*, 652 F.3d 557, 560 (4th Cir. 2011) (observing that qualified immunity protects government officials from liability for "'bad guesses in gray areas'") (citation omitted). In other words, "[t]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *accord Stanton v. Sims*, 571 U.S. 3, 5-6 (2013) (per curiam).

Thus, "even when the facts in the record establish that the officer's conduct violated a plaintiff's constitutional rights, the officer still is entitled to immunity from suit 'if a reasonable person in the [officer's] position could have failed to appreciate that his conduct would violate those rights.'" *Wilson*, 893 F.3d at 219 (quoting *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991)); *see also Williams v. Strickland*, 917 F.3d 763, 768 (4th Cir. 2019); *Greene v. Feaster*, 733 F. App'x 80, 82 (4th Cir. 2018) (per curiam) ("Even when a prison official [is shown to have violated a constitutional right of a plaintiff], qualified immunity will shield him from liability as long as his 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'") (quoting *Goines*, 822 F.3d at 170).

"[A] government official who is sued in his individual capacity may invoke qualified immunity." *Bland*, 730 F.3d at 391; *see Harlow*, 457 U.S. at 818.  Moreover, "[t]he protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson*, 555 U.S. at 231.

The Fourth Circuit has explained: "In determining whether defendant government officials are protected by qualified immunity, the court considers both 'whether a constitutional right [was] violated on the facts alleged' and 'whether the right was clearly established' at the time of the conduct in question." *Scinto*, 841 F.3d at 235 (citations omitted); *see also Cannon v. Village of Bald Head Island*, 891 F.3d 489, 497 (4th Cir. 2018).  Thus, the qualified immunity analysis involves two inquiries: (1) whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a constitutional [or statutory] right," *Saucier*, 533 U.S. at 201; and (2) whether the right at issue "'was clearly established in the specific context of the case—that is, [whether] it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted.'" *Merchant*, 677 F.3d at 662 (quoting *Figg v. Schroeder*, 312 F.3d 625, 635 (4th Cir. 2002)); *see Wesby*, 138 S. Ct. at 589; *Ray*, 948 F.3d at 226; *Owens*, 767 F.3d at 395-96.  The "two inquiries . . . may be assessed in either sequence." *Merchant*, 677 F.3d at 661-62; *accord Ray*, 948 F.3d at 226; *Labowitz*, 885 F.3d at 260; *Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018).

"The plaintiff bears the burden of proof on the first question—i.e., whether a constitutional violation occurred . . . . [and] [t]he defendant bears the burden of proof on the second question—*i.e.*, entitlement to qualified immunity." *Henry v. Purnell*, 501 F.3d 374, 377–78 (4th Cir. 2007) (internal citations omitted).  In other words, "[b]ecause an official 'who performs an act

43

clearly established to be beyond the scope of his discretionary authority is not entitled to claim qualified immunity,' the defendant bears the initial burden 'of demonstrating that the conduct of which the plaintiff complains falls within the scope of the defendant's duties.'"  *Id.* at 377 n.2 (citation omitted).

If an officer is shown to have violated the rights of a plaintiff, the court must then "evaluate whether the right at issue was 'clearly established' at the time of the officer's conduct." *Wilson*, 893 F.3d at 219.  This is a question of law for the court to resolve.  *Ray*, 948 F.3d at 228; *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992).  The inquiry "turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)).

If the law at the time of the alleged violation was not "clearly established," the official will be entitled to qualified immunity because "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818.  On the other hand, "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Id.* at 818-19.

To determine whether the right was clearly established, the court first must define the right at issue.  *Scinto*, 841 F.3d at 235; *see Occupy Columbia*, 738 F.3d at 118. "A right is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand that what he is doing violates that right.'" *Carroll v. Carman*, 574 U.S. 13, 16 (2014) (quoting *Creighton*, 483 U.S. at 640).  Notably, "a right may be clearly established by any

number of sources, including a . . . case, a statute, or the Constitution itself." *Owens*, 767 F.3d at 399; *see Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 543 (4th Cir. 2017).

Generally, to "determine whether a right is clearly established," courts "assess whether the law has 'been authoritatively decided by the Supreme Court,[ ] the appropriate United States Court of Appeals, or the highest court of the state.'" *Wilson*, 893 F.3d at 221 (citation omitted); *see Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163, 176 (4th Cir. 2010) (stating that "'ordinarily [courts] need not look beyond the decisions of the Supreme Court, [the Fourth Circuit], and the highest court of the state in which the case arose'" as of the date of the conduct at issue), *cert. denied*, 562 U.S. 890 (2010). "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Carroll*, 574 U.S. at 16-17 (quoting al-Kidd, 563 U.S. at 741); *see Kisela v. Hughes*, ____U.S.____, 138 S. Ct. 1148, 1152 (2018); *White v. Pauly*, ___U.S.___, 137 S. Ct. 548, 551 (2017) (per curiam); *San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015); *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014); *see also Reichle*, 566 U.S. at 664 ("To be clearly established, a right must be sufficiently clear that 'every reasonable official would [have understood] that what he is doing violates that right.'") (citation and some quotation marks omitted).

However, "[a] right need not be recognized by a court in a specific factual context before such right may be considered 'clearly established' for purposes of qualified immunity." *Wilson*, 893 F.3d at 221; *see Thompson v. Virginia*, 878 F.3d 89, 98 (4th Cir. 2017) ("[A] 'general constitutional rule . . . may apply with obvious clarity . . . even though the very action in question has not previously been held unlawful.'") (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)); *Booker*, 855 F.3d at 544. Indeed, the Supreme Court has never required a "'case directly on point for a right to be clearly established.'" *Kisela*, 138 S. Ct. at 1152 (quoting *White*, 137 S.

Ct. at 551); *see al-Kidd*, 563 U.S. at 741; *see also Crouse*, 848 F.3d at 582-83. Thus, "even without 'directly on-point, binding authority,' qualified immunity is inappropriate if 'the right was clearly established based on general constitutional principles or a consensus of persuasive authority.'" *Ray*, 948 F.3d at 229-30 (quoting *Booker*, 855 F.3d at 543).

But, "courts are 'not to define clearly established law at a high level of generality.'" *Wilson*, 893 F.3d at 221 (quoting *Kisela*, 138 S. Ct. at 1152); *see also Sheehan*, 575 U.S. at 613-14; *Plumhoff*, 572 U.S. at 779. Rather, courts are to "consider whether a right is clearly established 'in light of the specific context of the case, not as a broad general proposition.'" *Adams*, 884 F.3d at 227 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)).

The central question is "whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted." *See Raub v. Campbell*, 785 F.3d 876, 882 (4th Cir. 2015). To defeat qualified immunity, "'the existing authority must be such that the unlawfulness of the conduct is manifest.'" *Merchant*, 677 F.3d at 665 (quoting *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998)); *see Bland*, 730 F.3d at 391 (stating that "[f]or a plaintiff to defeat a claim of qualified immunity, the contours of the constitutional right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right") (internal quotations omitted). Notably, qualified immunity is an "'immunity from suit rather than a mere defense to liability[.]'" *Ussery*, 786 F.3d at 337 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) (emphasis in *Mitchell*). Accordingly, the immunity is "'effectively lost if a case is erroneously permitted to go to trial.'" *Ussery*, 786 F.3d at 337 (quoting *Mitchell*, 472 U.S. at 526).

Of relevance here, the qualified immunity analysis applies only to plaintiff's federal law claims. "[U]nder Maryland law, federal qualified immunity is not a defense for state constitutional

torts." *Borzilleri v. Mosby*, 189 F. Supp. 3d 551, 560 n.4 (D. Md. 2016), *aff'd*, 874 F.3d 187 (4th Cir. 2017).  Thus, the defense is unavailable with regard to plaintiff's State law claims, as set forth in Count IV, Count V, and Count VI. [23]

Further, as to plaintiff's federal law claims, he has sued the Individual Defendants in their official capacities.  Qualified immunity offers no defense to government officials in their official capacities.  *See Carter v. Maryland*, JKB-12-1789, 2012 WL 6021370, at *5 (D. Md. Dec. 3, 2012) ("Qualified immunity does not apply to suits against individuals sued in their official capacities.") (citing *Brandon v. Holt*, 469 U.S.  464, 471-73 (1985)).   Therefore, to the extent that the Court determines that there has been a violation of plaintiff's free speech rights in Counts I through III, qualified immunity poses no bar to the claim moving forward against the relevant defendants in their official capacities.

## D.  Discussion

As indicated, plaintiff's suit concerns three incidents.  First, Sammons complains that Allision, McCarthy, and Lyall violated his free speech rights by deleting posts he made to the County Executive Page and thereafter blocking plaintiff from making further posts.  Second, Sammons claims that McCarthy, Wein, Tome, and Meffley blocked him from participating in the Budget Meeting by refusing to unmute his microphone when he attempted to speak, and blocked the transmission of plaintiff's video feed into the Budget Meeting.  Third, Sammons avers that Allison, McCarthy, and Miller banned Sammons from communicating with County officials via

---

[23]  Certain State law immunities may be relevant to plaintiff's State law claims.  *See, e.g., Henry v. Purnell*, 652 F.3d 524, 536 (4th Cir. 2011) (en banc) (discussing applicability of Maryland Tort Claims Act, Md. Code (2021 Repl. Vol.), § 12–101 *et seq.* of the State Government Article), *cert. denied*, 565 U.S. 1062 (2011).  However, the parties have not discussed whether or to what extent these immunities are applicable in this case.

email from the period from May 19, 2020, to June 15, 2020.  Defendants lodge numerous arguments in support of dismissal.

### 1.  Counts I and IV: County Executive Page

In Counts I and IV, plaintiff alleges that McCarthy, Allison, and/or Lyall unlawfully deleted comments made by Sammons on the County Executive Page.  Plaintiff also contends that the defendants thereafter unlawfully blocked plaintiff from publishing further comments on the Page.

Defendants maintain that Sammons's claims cannot succeed under either the First Amendment or Article 40 because he has not alleged any facts that, if proven, would show conduct under color of law.  ECF 26-1 at 21-25.  Further, defendants argue that the claims are subject to dismissal on the ground that the Page did not constitute a public forum.  *Id.* at 25-26.  They also assert that Counts I and IV do not include sufficient allegations to maintain a cause of action against Lyall and Allison.  *Id.* at 14-15.  And, they maintain that, to the extent that plaintiff has alleged a violation of his free speech rights, defendants are entitled to qualified immunity.  *Id.* at 36-37.

### a.  Color of Law

As indicated, to state a claim under 42 U.S.C. § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Davison*, 912 F.3d at 679.  And, "[t]he traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  *West*, 487 U.S. at 49 (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).

48

Thus, § 1983 "does not regulate private conduct." *Peltier v. Charter Day School, Inc.*, 8 F.4th 251, 261 (4th Cir. 2021), rehearing en banc granted, 2021 WL 4892153 (4th Cir. Oct. 19, 2021); *see Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999).  However, in some instances, "a private actor's conduct may be considered state action, rather than private action." *Peltier*, 8 F.4th at 261.

"'[T]here is no specific formula for determining whether state action is present.'" *Davison*, 912 at 679 (quoting *Holly v. Scott*, 434 F.3d 287, 292 (4th Cir. 2006) (alteration in *Davison*). Rather, the determination "'is a matter of normative judgment and the criteria lack rigid simplicity.'" *Davison*, 912 at 679-80 (quoting *Holly*, 434 F.3d at 292).  Indeed, the inquiry is a practical one: "To determine whether a private actor is engaging in state action for the purposes of § 1983," courts must consider whether "'the alleged infringement of federal rights [is] fairly attributable to the state[.]'" *Peltier*, 8 F.4th at 261 (alteration added) (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982)).  In other words, courts must evaluate the "totality of the circumstances . . . to determine if the action at issue bore a sufficiently close nexus with the State to be fairly treated as that of the State itself." *Davison*, 912 F.3d at 680 (internal citations and quotations omitted).

When examining whether actions taken by a public official amount to action taken under the color of law, the Fourth Circuit has instructed, *id.* (some alterations in *Davison*):

> Although no one factor is determinative, . . . a defendant's purportedly private actions bear a "sufficiently close nexus" with the State to satisfy Section 1983's color-of-law requirement when the defendant's challenged "actions are linked to events which arose out of his official status." [*Rossignol v. Voorhaar*, 316 F.3d 516, 524 (4th Cir. 2003)].  When a defendant's "status" as a public official "enabled [her] to execute [a challenged action] in a manner that private citizens never could have," then the action also is more likely to be treated as attributable to the state. *Id.* at 526; *see also Martinez v. Colon*, 54 F.3d 980, 986 (1st Cir. 1995) ("[S]ection 1983 is . . . implicated . . . [when] the conduct is such that the actor could not have behaved in that way but for the authority of his

office.");  *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 343 (4th Cir. 2000) (holding that challenged conduct is more likely to amount to state action when "the injury caused is aggravated in a unique way by the incidents of governmental authority" (internal quotation marks omitted)).  Likewise, an official's conduct is more likely to amount to state action when it "occurs in the course of performing an actual or apparent duty of his office." *Martinez*, 54 F.3d at 986.  And the challenged action of a defendant governmental official is likely to be treated as taken under color of law when the official "use[d] the power and prestige of his state office to damage the plaintiff." *Harris v. Harvey*, 605 F.2d 330, 337 (7th Cir. 1979).  In the context of an alleged First Amendment violation, in particular, this Court has found that a challenged action by a governmental official is fairly attributable to the state when "the sole intention" of the official in taking the action was "to suppress speech critical of his conduct of official duties or fitness for public office." *Rossignol*, 316 F.3d at 524.

Defendants posit that the County Executive Page was McCarthy's private, campaign page. ECF 26-1 at 21-25.  Thus, in their view, Sammons's allegations, taken as true, do not show that Lyall, McCarthy, or Allison took action under color of law with respect to the Page.  *Id.* Unsurprisingly, plaintiff disputes defendants' characterization of the Page.  *See* ECF 33 at 28-36.

To provide guidance on the issue, the parties' briefing directs the Court's attention to two recent cases that consider how the management of a social media site by a government official intersects with the exercise of a private citizen's free speech rights: *Davison*, 912 F.3d 666, and *Campbell v. Reisch*, 986 F.3d 822 (8th Cir. 2021).  *See* ECF 26-1 at 22-25; ECF 33 at 28-31;

In *Davison*, 912 F.3d at 681, the plaintiff, Davison, a county resident, brought a § 1983 suit against the Loudoun County Board of Supervisors (the "Board") and Randall, the Chair of the Board (the "Chair").  He alleged that Randall violated his First Amendment and due process rights by blocking him from the Chair's social media page.  As to the Board, the district court granted a post-discovery summary judgment motion in its favor.  But, the court found a material dispute of fact as to whether Randall acted under color of law, and whether her Facebook page amounted to a limited public forum.  *Id.* at 676.  Therefore, the claims against Randall proceeded to a bench trial, which culminated in a judgment in Davison's favor as to the First Amendment and due

process claims and analogous Virginia provisions.  *Id.* at 677.  In relevant part, the trial court determined that Randall acted under color of law when she blocked a constituent from the interactive portion of her Facebook page.  *Id.*

The Fourth Circuit affirmed.  *Id.* at 691.  Notably, it observed that Randall created and used the Facebook page "to further her duties as a municipal official" and as an outlet to provide and solicit information about official activities and policy matters.  *Id.* at 680 (quotation marks and citation omitted).  Specifically, the *Davison* Court highlighted that the page included the Chair's title, was characterized as "a government official" page, listed official municipal contact information, including Randall's official email address and her office telephone number, and included a link to Randall's county website.  *Id.* at 680-81.

Consequently, the Fourth Circuit determined that Randall "clothed the Chair's Facebook Page in the 'power and prestige of h[er] state office . . . and created and administered the page to perform[ ] actual or apparent dut[ies] of h[er] office . . . ."  *Id.* at 681 (internal citations and quotations omitted) (alterations in *Davison*).  Thus, the Court concluded: "A private citizen could not have created and used the Chair's Facebook Page in such a manner."  *Id.* at 681. (citing *Rossignol v. Voorhaar*, 316 F.3d 516, 526 (4th Cir. 2003)).

In *Campbell,* 986 F.3d at 823, the plaintiff, a Missouri resident, sued his State senator, Reisch, alleging that Reisch infringed the plaintiff's free speech rights by blocking him from accessing Reisch's Twitter account.  Reisch initially created the Twitter account to announce her candidacy for public office, and maintained it following her assumption of that office.  *Id.* Accordingly, the plaintiff asked the district court to issue a declaration that Reisch's actions amounted to unlawful viewpoint discrimination.  And, Campbell sought to enjoin Reisch from blocking the plaintiff or any other Twitter user from Reisch's Twitter account, based on the content

or viewpoint of the user's speech. *Campbell v. Reisch*, 2:18-CV-4129-BCW, 2019 WL 3856591, at *1 (W.D. Mo. Aug. 16, 2019).

Following a bench trial, the district court determined that Reisch acted under the color of law when she blocked Campbell from accessing her Twitter account.  In the court's view, the account was "controlled by [Reisch] in her capacity as a state legislator,"  because the Twitter account "references [Reisch's] elected district account"; "her Twitter account links to her campaign webpage"; "the image associated with [Reisch's] Twitter account is a photo of her on the state house floor"; and Reisch "used the Twitter account to tweet about her work as a public official." *Id.* at *8.  (alteration added).

On appeal, the Eighth Circuit reversed.  Notably, it explained that Reisch created the account as a private individual before her election and subsequently "used [the account] overwhelmingly for campaign purposes." *Id.* at 826.  Further, the Eighth Circuit highlighted that Reisch's Twitter posts "frequently harkened back to promises she made on the campaign trail, and [ ] touted her success in fulfilling those promises and in her performance as a legislator, often with the same or similar hashtags as the ones she used while a candidate." *Id.*  (alteration added).

Although Reisch occasionally "provide[d] updates on where certain bills were in the legislative process or the effect certain recently enacted laws had on the state," the *Campbell* Court concluded that "sporadic engagement in these activities does not overshadow what . . . was quite clearly an effort to emphasize [the senator's] suitability for public office." *Id.* at 826–27 (alteration added).  In reaching its decision, the Eighth Circuit also stated that "the mere fact of Reisch's election did not magically alter the account's character" because "the overall theme" of the page "remained the same after her electoral victory." *Id.* at 826.  Neither was the registration of the

Twitter account at issue as one belonging to a government official sufficient to transform it into an "organ of official business."  *Id.*

Sammons urges this Court to reach the same outcome as the *Davison* Court.  In particular, he points out that, like the Facebook page at issue in *Davison*, the County Executive Page "contained the official title of McCarthy's elected public office, listed official Cecil County Government telephone numbers for constituents to call, and used McCarthy's official Cecil County Government email address, 'ammccarthy@ccgov.org,' which McCarthy did not have or use prior to the election."  ECF 33 at 31; *see* ECF 15-3 at 3, 14.  He also notes that on at least one occasion, the Page republished a post from the "Cecil County Government" Facebook Page.  ECF 33 at 31; *see* ECF 15-3 at 6.  This post alerted County residents to an upcoming "Citizen Input Session." ECF 15-3 at 6.  Thus, plaintiff maintains that this post shows that the Page was used to "solicit input from the public on governmental matters, such as the county budget . . . ."  ECF 33 at 31.

In contrast, defendants contend that the Page, and the manner in which it was employed, bears a stronger resemblance to the Twitter account at issue in *Campbell*.   ECF 26-1 at 23-25. The Page describes McCarthy as a politician, rather than a government official.  *See* ECF 15-3 at 3.  Further, one of the Page's header photographs juxtaposes McCarthy with other prominent Republican politicians.  *See id.*  The Page also lists a link to the web page "https://alanmccarthycountyexecutive.com".  *Id.* at 14.  Defendants maintain that this web page was associated with McCarthy's official reelection campaign, although it is no longer operational. ECF 41 at 3 & n.3.  Plaintiff does not contradict defendants' characterization of the web page.

In addition, the screenshots reflect that an entity called "Friends of Alan McCarthy," rather than McCarthy himself, was responsible for the content of the Page.  *See*, *e.g.*, ECF 15-3 at 5. Moreover, unlike the Facebook page at issue in *Davison*, the screenshots of the Page do not show

that McCarthy ever published any posts on the Page, or otherwise engaged with his constituents through it.  Broadly speaking, the screenshots show posts celebrating McCarthy's achievements in office.  *See Campbell*, 986 F.3d at 827 (observing that posts "consistent with a desire to create a favorable impression of [the official] in the minds of [the official's] constituents" were insufficient to show that a campaign page became a "tool for governance") (alterations added).  Among other things, the Page published posts touting the County's low unemployment rate, an increase in the number of available manufacturing jobs in the County, and the construction of the County's first public school in thirty years.  *See* ECF 15-3 at 5, 6, 7, 13.

The Page is also replete with posts promoting McCarthy's suitability for office, and distinguishing McCarthy from his primary opponent, Danielle Hornberger.  For example, on April 30, 2020, the County Executive Page described McCarthy as "the trusted conservative in this race" and critiqued Hornberger for airing "negative ads attacking [McCarthy]" in an attempt to "lie and scare people."  ECF 15-3 at 10.   And, on May 5, 2020, the Page published a post criticizing Hornberger for issuing a "mailer" that purportedly "attack[ed] public safety professionals in Cecil County."  *Id.* at 11.

To be sure, as in *Campbell*, 986 F.3d 822, courts have found that posts of the kind at issue here are insufficient to transform a government official's campaign page into "an important tool of governance."  *Knight First Amend. Inst. v. Trump*, 928 F.3d 226, 235-36 (2d Cir. 2019), *vacated as moot sub nom. Biden v. Knight First Amend Inst.*,___U.S.___,141 S. Ct. 1220 (2021); *see, e.g.*, *Buentello v. Boebert*, 545 F. Supp. 3d 912, 920-21 (D. Colo. 2021) (denying a preliminary injunction because the plaintiff was unlikely to show that Congresswoman acted under color of law by blocking a constituent from accessing her Twitter account that was used only to "discuss political issues such as legislation, the federal budget, [the Congresswoman's] legislative agenda,

and, perhaps, most frequently, her political opponents" because these topics were the "same kinds of issues [the Congresswoman] raised on the campaign trail"); *Clark v. Kolkhorst*, 1:19-CV-198-LY, 2021 WL 5783210, at *5 (W.D. Tex. Dec. 7, 2021) (finding, after a bench trial, that a State senator did not use her Facebook page as "an important tool of governance" where the page at issue was used to "highlight meetings, events, and projects that [defendant] engaged with while serving as a state senator," on the ground that "these posts largely aim to promote [defendant's] successes from a campaign perspective . . . ."). As the *Campbell* Court said, 986 F.3d at 827, "occasional stray messages that might conceivably be characterized as conducting the public's business are not enough to convert [a campaign account] into something different from its original incarnation."

In light of the foregoing, the Page may not have constituted an "important tool of governance," and was, instead, a means by which McCarthy, or at least McCarthy's supporters, endeavored to bolster his reelection campaign. Nonetheless, dismissal of the suit on this basis would be premature.

Critically, both *Davison* and *Campbell* involved rulings that were made following bench trials. And, those trials followed the opportunity to engage in discovery and gather evidence concerning the degree of involvement that the public official had with regard to the administration of the social media account and its content. In contrast, Sammons has not yet had the opportunity to engage in discovery, so as to contextualize the posts captured by the screenshots that have been provided to the Court. Nor has plaintiff been able to explore the relationship between McCarthy and the group that apparently administered the Page, the "Friends of Alan McCarthy," or ascertain the manner in which the County Executive Page was managed.

At the motion to dismiss stage, I must assume the truth of the factual allegations asserted in the Complaint, and draw all reasonable inferences in the light most favorable to the plaintiff. *See King*, 825 F.3d at 214.  Taking the allegations as set forth in the Complaint as true, and drawing all reasonable inferences in favor of plaintiff, the Page could be found to share a sufficiently close nexus with McCarthy's official position to be fairly construed as an extension of his office.  *See Rossignol*, 316 F.3d at 523.

Indeed, at this stage, I can hardly determine, as a matter of law, that the Page was solely a private, campaign page that had such a tenuous connection with McCarthy's public office that defendants' alleged actions with respect to the Page could not have been made under the color of law.  Thus, I decline to dismiss Counts I and IV on this ground.  *See Windom v. Harshbarger*, 396 F. Supp. 3d 675, 685 (N.D. W. Va. 2019) (declining to dismiss a similar suit given the posture of the case, although "the factors listed by the Fourth Circuit [in *Davison*], overall . . . weigh[ed] slightly against a finding . . . that [defendant] acted under color of state law").

### b.  Forum Analysis

In the space of approximately one page, the Motion appears to contend that Count I and Count IV are subject to dismissal because the Page was a nonpublic forum, and therefore defendants were entitled to deny plaintiff access to the Page.  ECF 26-1 at 25-26.  They point out that the Page is hosted by Facebook, a private company.  *Id.*  And, they direct the Court's attention to the recent concurrence of Justice Thomas in *Knight*, 141 S. Ct. at 1221 (Thomas, J., concurring), in which Justice Thomas opined in a case involving Twitter that it would be "odd to say that something is a government forum when a private company has unrestricted authority to do away with it."

Treating the subject with equally short shrift, plaintiff contends that the Page constituted a public forum. ECF 33 at 32-33. He asserts: "McCarthy opened the public comment section of his [County Executive Page] for public discourse on any topic of public concern, and numerous constituents posted comments on the [Page], including Mr. Sammons." *Id.* at 32. The screenshots reveal posts from a number of individuals who published comments on the Page, without apparent limitation. *See* ECF 15-3 at 1. However, Sammons does not clarify whether he regards the Page as a traditional public forum, a designated public forum, or a limited public forum. Rather, Sammons merely intimates that the resolution of the issue is controlled by the Fourth Circuit's decision in *Davison*, 932 F.3d 666. ECF 33 at 32.

"The first inquiry a court must undertake when a First Amendment claim is asserted is whether the plaintiff has engaged in 'protected speech.'" *Goulart*, 345 F.3d at 246 (quoting *Cornelius*, 473 U.S. at 797). However, "[e]ven protected speech is not equally permissible in all places and at all times. Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius*, 473 U.S. at 799-800. Therefore, the Court must "'identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic.'" *Goulart*, 345 F.3d at 246 (quoting *Cornelius*, 473 U.S. at 797).

"The three recognized types of fora are the traditional public forum, the nonpublic forum, and the designated or limited public forum." *Goulart*, 345 F.3d at 248. "The first category of government property, the traditional public forum, is a place that 'by long tradition or by government fiat ha[s] been devoted to assembly and debate.'" *Id.* (quoting *Perry*, 460 U.S. at 45). Such locations "'have the characteristics of a public thoroughfare, a purpose that is compatible

with expressive conduct, as well as a tradition and history of being used for expressive public conduct.'" *Davison*, 912 F.3d at 681 (quoting *Am. Civil Liberties Union v. Mote*, 423 F.3d 438, 443 (4th Cir. 2005)).  Public streets, sidewalks, and parks are the "archetype of a traditional public forum." *Frisby v. Schultz*, 487 U.S. 474, 480 (1988).

"In the traditional public forum, which includes the streets, sidewalks, parks, and general meeting halls, speakers' rights are at their apex." *Steinburg v. Chesterfield Cnty., Planning Comm'n*, 527 F.3d 377, 384 (4th Cir. 2008).  These locations occupy a "special position in terms of First Amendment protection" because, for "[t]ime out of mind," they "have been used for public assembly and debate." *Snyder v. Phelps*, 562 U.S. 443, 456 (2011) (citations and internal quotation marks omitted) (alteration in *Snyder*).

The First Amendment "strictly limit[s]" government entities "in their ability to regulate private speech in . . . 'traditional public fora.'" *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009) (citation omitted).  For a public forum, content-based restrictions on speech must satisfy strict scrutiny.  This means that "'the restriction must be narrowly tailored to serve a compelling government interest.'" *Christian Legal Soc'y Chapter of the Univ. of California, Hastings College of Law v. Martinez*, 561 U.S. 661, 679 n.11 (2010) (quoting *Pleasant Grove City*, 555 U.S. at 469); *see Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 171 (2015); *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011).  As to narrow tailoring, the government must "prove that no 'less restrictive alternative' would serve its purpose." *Cent. Radio Co. Inc. v. City of Norfolk, Va.*, 811 F.3d 625, 633 (4th Cir. 2016) (citing *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000)).  However, "[a] regulation that serves purposes unrelated to the content of expression is deemed [content] neutral, even if it

has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

However, "even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech . . . ." *Ward*, 491 U.S. at 791 (citation omitted); *see City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 428 (1993). But, a "time, place, and manner" restriction on speech must (1) be "'justified without reference to the content of the regulated speech'"; (2) be "'narrowly tailored to serve a significant governmental interest'"; and (3) "'leave open ample alternative channels for communication of the information'" that the speaker wishes to communicate. *Ward*, 491 U.S. at 791 (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)); *see Perry*, 460 U.S. at 45. The government bears the burden of showing that the regulation satisfies the applicable level of scrutiny. *See Deegan v. City of Ithaca*, 444 F.3d 135, 142 (2d Cir. 2006) (holding that government bears the burden of showing the restriction is narrowly tailored and justified by the interest asserted).

Although "a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests," and the regulation may not "burden substantially more speech than is necessary to further the government's legitimate interests," it "need not be the least restrictive or least intrusive means of doing so. Rather, the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Ward*, 491 U.S. at 799 (internal citations and footnote omitted). In other words, "[s]o long as the means chosen are not substantially broader than necessary to achieve the government's interest, . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Id.* at 800.

The nonpublic forum is at the other end of the spectrum.  A nonpublic forum is "not open by tradition or designation to the public for expressive activity."  *Goulart*, 345 F.3d at 238.  Moreover, "opening it to expressive conduct would 'somehow interfere with the objective use and purpose to which the property has been dedicated.'"  *Davison*, 912 F.3d at 682 (citation omitted).  "These forums are defined by 'selective access,' with permission 'contingent upon non-ministerial judgments.'"  *Child Evangelism Fellowship of S.C. v. Anderson School Dist. Five*, 470 F.3d 1062, 1067 (4th Cir. 2006) (internal citations omitted).  The government may restrict access to a nonpublic forum—even on the basis of subject matter and speaker identity—as long as "'the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.'"  *Goulart*, 345 F.3d at 248-49 (quoting *Cornelius*, 473 U.S. at 806); *see also Perry*, 460 U.S. at 47; *Child Evangelism Fellowship of S.C.*, 470 F.3d at 1067.

There is an intermediate tier of forum, which has been variously referred to as a "designated public forum" or a "limited public forum."  *See Christian Legal Soc'y*, 561 U.S. at 679 n.11.  The terms are sometimes used interchangeably.  But, some cases seem to regard the terms as distinct concepts.

A governmental entity creates a designated public forum when "government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose[.]"  *Id.*  "A designated public forum can only be created by 'purposeful government action' in which 'the government must intend to make the property generally available.'"  *Goulart*, 345 F.3d at 249 (quoting *Ark. Educ. Television Com'n v. Forbes*, 523 U.S. 666, 678 (1998)).  And, as with a traditional public forum, content-based speech restrictions are subject to strict scrutiny.  *Pleasant Grove City*, 555 U.S. at 469-70.

60

A limited public forum is established when the government property is "limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Id.* at 470. The Supreme Court "has permitted restrictions on access to a limited public forum . . . with this key caveat: Any access barrier must be reasonable and viewpoint neutral." *Christian Legal Soc'y*, 561 U.S. at 679; *see Pleasant Grove City*, 555 U.S. at 470 ("The Court has also held that a government entity may create a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects. In such a forum, a government entity may impose restrictions on speech that are reasonable and viewpoint neutral." (internal citation omitted)); *Good News Club v. Milford Central School*, 533 U.S. 98, 106-07 (2001) (recognizing, in a limited public forum, that [t]he State's power to restrict speech . . . is not without limits. The restriction must not discriminate against speech on the basis of viewpoint, and the restriction must be 'reasonable in light of the purpose served by the forum.'" (internal quotations omitted)); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) ("Once it has opened a limited forum . . . the State must respect the lawful boundaries it has itself set. The State may not exclude speech where its distinction is not 'reasonable in light of the purpose served by the forum,' nor may it discriminate against speech on the basis of its viewpoint." (internal quotations omitted)); *Steinburg*, 527 F.3d at 385 ("In a limited public forum . . . the government still 'must not discriminate against speech on the basis of viewpoint, and any restriction must be reasonable in light of the purpose served by the forum.'") (internal quotations omitted)); *Page v. Lexington Cty. School Dist. One*, 531 F.3d 275, 286 (4th Cir. 2008) ("Regardless of whether the newsletter was a nonpublic or limited public forum, '[c]ontrol over access to [the forum] can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.'") (internal quotation omitted) (alterations in *Page*).

The precise boundaries between designated, limited, and nonpublic fora are sometimes amorphous.  Notably, "[t]o maintain a nonpublic forum, the government must employ 'selective access' policies, whereby forum participation is governed by 'individual, non-ministerial judgments.'"  *Child Evangelism Fellowship of MD, Inc. v. Montgomery County Public Schools*, 457 F.3d 376, 381 (4th Cir. 2006) (quoting *Forbes*, 523 U.S. at 680).  The Supreme Court explained in *Forbes*, 523 U.S. at 679: "[T]he government does not create a designated public forum when it does no more than reserve eligibility for access to the forum to a particular class of speakers, whose members must then, as individuals, 'obtain permission' . . . to use it."  (quoting *Cornelius*, 473 U.S. at 804).  Moreover, "[s]elective access does not transform government property into a public forum," unless this access is "granted as a matter of course."  *Perry*, 460 U.S. at 47.

In *Davison*, the Fourth Circuit determined that the Facebook page at issue was "'compatib[le] with expressive activity.'"  *Davison*, 932 F.3d at 682 (quoting *Cornelius*, 473 U.S. at 802) (alteration in *Davison*).  The Court observed that the Supreme Court has "analogized social media sites, like the Chair's Facebook Page, to 'traditional' public forums, characterizing the internet as 'the most important place[ ] (in a spatial sense) for the exchange of views.'"  *Davison*, 912 F.3d at 682 (quoting *Packingham v. North Carolina*, ___U.S.___, 137 S. Ct. 1730, 1735 (2017)) (alterations in *Davison*).  Moreover, the Fourth Circuit said in *Davison*, 912 F.3d at 682-83: "Even assuming the intangible space at issue is 'private property,' as Randall claims . . . the Supreme Court never has circumscribed forum analysis solely to government-owned property."  Rather, "forum analysis applies 'to private property dedicated to public use.'"  *Id.* at 683 (quoting *Cornelius*, 473 U.S. at 801) (emphasis omitted).

Against this backdrop, the *Davison* Court noted that the public official in that case "expressly opened the Chair's Facebook Page's middle column—its interactive space—for 'ANY' user to post on 'ANY issues,' . . . and therefore did not retain 'final approval authority' over that aspect of the Chair's Facebook Page." *Davison*, 912 F.3d at 687.   Accordingly, the Fourth Circuit concluded that the "interactive component of the Chair's Facebook Page constitutes a public forum." *Id.*

According to the defense, the case *sub judice* is distinguishable from *Davison* because the Page did not expressly invite "any and all posts," but instead was "silent on the subject." ECF 41 at 6.  But, they do not point to any case law that suggests that this distinction is of any significance. Rather, they cite only *Campbell*, 986 F.3d 822, arguing that the Eighth Circuit's holding in that case "necessarily included finding that the Twitter page at issue was not a public forum even though the interactive feature there had also been enabled."  ECF 41 at 6 (citing *Campbell*, 986 F.3d at 827).  But, *Campbell,* discussed only whether the public official at issue had acted under color of law.  It did not purport to examine whether, or in what circumstances, a social media site that is administered by a public official under color of law constitutes a public forum.

Defendants correctly observe that Justice Thomas has expressed concern about extending the public forum analysis to social media platforms.  But, they also concede that the Supreme Court has not yet squarely addressed how the public forum analysis applies to "'digital platforms.'"  ECF 26-1 at 26 (quoting *Knight*, 141 S. Ct. at 1221) (Thomas, J., concurring).  And, in the absence of countervailing Supreme Court precedent, this Court must follow Fourth Circuit instruction on the issue.

In my view, *Davison* disposes of defendants' argument, at least for present purposes.  In light of *Davison*, I am persuaded that plaintiff has adequately alleged that the Page was opened to

the public to comment on matters of public import.  ECF 15, ¶ 19.  Therefore, plaintiff has adequately alleged that the Page constituted a public forum.

As mentioned, plaintiff alleges that, on two occasions, defendants deleted his comments on the Page.  His comments asserted, among other things, that McCarthy was "involve[d] in public corruption committed through the Cecil Business Leaders Political Action committee . . . ."  *Id.* ¶ 25; *see id.* ¶ 26, 30.  Further, plaintiff contends that that he was twice blocked from publishing comments on the Page.  *See id*. ¶¶ 26, 30.  Assuming the truth of these allegations, which I must at this stage, this contention amounts to a claim of unlawful viewpoint discrimination in connection with a public forum.  *See Davison*, 912 F.3d at 687 (declining to determine whether the Chair's Facebook page amounted to a traditional, designated, or limited public forum in light of the fact that plaintiff had established that the Chair's actions constituted "'viewpoint discrimination,' which is 'prohibited in all forums'") (quoting *Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five*, 470 F.3d 1062, 1067 n.2 (4th Cir. 2006)).

In sum, plaintiff has adequately alleged that the Page constituted a public forum, and that defendants, acting under the color of law, engaged in viewpoint discrimination when they deleted his comments and blocked him from accessing the Page.  It follows that Sammons has adequately stated a claim in Counts I and IV.

### c.  Allison & Lyall

Defendants urge dismissal of Counts I and IV as to Allison and Lyall, claiming that the Complaint does not include sufficient allegations to state a claim against them.  ECF 26-1 at 19-20.

According to defendants, plaintiff alleges only that Lyall "must have been responsible for the alleged harm based solely on her role as the County Public Information Officer."  *Id.* at 19

(citing ECF 15, ⁋ 27).  And, defendants assert that this allegation, on its own, "cannot support the contention that [Lyall] must have had access to Defendant McCarthy's campaign Facebook page or otherwise deleted Plaintiff's comments or blocked him from the same."  ECF 26-1 at 19.  As to Allison, defendants argue that plaintiff only names him as a defendant because "he responded to the email Plaintiff had addressed to him, complaining about being deleted and blocked."  *Id.* at 20.

Plaintiff responds that his allegations are sufficient because he named Allison and Lyall as an "alternative style of pleading," pursuant to Fed. R. Civ. P. 8(d)(2).  ECF 33 at 52. And, Sammons contends that "[d]iscovery is needed to determine who had administrative rights to the [County Executive Page] and to identify who deleted or caused to be deleted Mr. Sammons' posts and who blocked or caused him to be blocked from the [Page]."  *Id.* at 53.

The Federal Rules of Civil Procedure permit a plaintiff to plead claims in the alternative.  Under Rule 8(d)(2), "[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones.  If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."  Further, "[t]hese provisions are desirable because on many occasions the pleader may find it necessary to demand relief in the alternative when he is uncertain about the factual background or legal bases for the right to recovery." 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1257 (3d ed.).

In Counts I and IV, Sammons claims viewpoint discrimination, in violation of the First Amendment and Article 40.  He alleges that "Lyall, Allison and McCarthy created, administered and/or managed the Cecil County Executive Facebook Page."  ECF 15, ⁋⁋ 74, 116.  He also states: "Lyall, Allison and/or McCarthy . . . deleted or caused to be deleted Plaintiff Sammons' posts critical of McCarthy's policies and of McCarthy himself—none of which were obscene or

inappropriate—because they did not like Sammons' viewpoint." ECF 15, ¶¶ 77, 120. Further, plaintiff maintains that these defendants "blocked Plaintiff Sammons from making further posts on the Cecil County Executive Facebook Page . . . on two separate and independent occasions." *Id.* ¶¶ 78, 121. As a result of the alleged conduct, plaintiff contends that Lyall, Allison, and McCarthy denied plaintiff "the ability to engage in the public debate and denied Plaintiff's ability to exercise his freedom of expression . . . ." *Id.* ¶¶ 80, 123.

Taken as true, Counts I and IV present allegations that lodge plausible claims against Lyall, Allison, and McCarthy for viewpoint discrimination. At the motion to dismiss stage, a plaintiff need not prove his allegations; he need only plead facts that, if proven, would state a plausible claim for relief. *See Retfalvi*, 930 F.3d at 605. In my view, Count I and Count IV are properly styled as claims in the alternative, and defendants' argument to the contrary is not well founded.

### d.  Qualified Immunity[24]

The Motion posits that, to the extent the Court finds that plaintiff has adequately alleged a violation of his free speech rights under the First Amendment, defendants are entitled to qualified immunity. In support, they argue: "No clearly established right exists with respect to the allegations advanced by the Amended Complaint." ECF 26-1 at 37.

As set forth in greater detail above, "[q]ualified immunity bars § 1983 actions against government officials in their individual capacities 'unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the

---

[24] As discussed earlier, under Maryland law, qualified immunity is not a defense to claims arising under State constitutional law. *See Borzilleri*, 189 F. Supp. 3d at 560 n.4. Further, defendants, acting in their official capacities, may not wield the doctrine of qualified immunity as a defense to plaintiff's federal law claims. *See Brandon*, 469 U.S. at 471-73. Consequently, the assertion of qualified immunity bears only on the viability of Count I, to the extent it is lodged against the defendants in their individual capacities, and does not apply to Count IV.

time.'" *Barrett*, 975 F.3d at 428 (quoting *Wesby*, 138 S. Ct. at 589).  Notably, "clearly established law should not be defined at a high level of generality," but "must be particularized to the facts of the case." *White v. Pauly*, ___U.S.____, 137 S. Ct. 548, 552 (2017) (internal quotations and citations omitted).

Dismissal of Count I on the ground of qualified immunity would be inappropriate at this stage.  Sammons plausibly alleges that defendants violated his right to publish comments on a public official's social media site because he expressed a view that defendants did not like.  ECF 15, ¶¶ 73-82.  And, viewpoint discrimination by the government has long been found to be unlawful.  *See Rosenberger*, 515 U.S. at 828 ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys.").

Moreover, in *Davison*, 912 F.3d at 688, the Fourth Circuit established that a private citizen has a right under the First Amendment to publish comments on social media sites that are managed by public officials under color of law, free from the specter of viewpoint discrimination.   Notably, *Davison* was decided in January 2019, approximately one month before plaintiff's comments were deleted from the Page for the first time, in February 2019.  *See* ECF 15, ¶ 26.

Accordingly, accepting plaintiff's allegations as true, Sammons has adequately pleaded that defendants violated his clearly established rights.  As a result, defendants are not entitled to qualified immunity at this stage.  *See West v. Shea*, 500 F. Supp. 3d 1079, 1087 (C.D. Cal. 2020) (denying defendants claim of qualified immunity at the motion to dismiss stage as to a claim of viewpoint discrimination on the ground that the evidentiary record was not yet fully developed).

### 2.  Counts II and V: Budget Meeting

Counts II and V are predicated on plaintiff's allegations that defendants McCarthy, Wein, Tome, and Meffley prevented Sammons from participating in a virtual Budget Meeting held on

May 12, 2020.  ECF 15, ¶¶ 83-94, 127-39.  According to plaintiff, at the meeting, during a period of public comment, the named defendants refused to unmute plaintiff's microphone and thus he was unable to speak during the Budget Meeting.  *Id.* ¶ 41.  Further, plaintiff claims that defendants terminated his video feed during the meeting, which had the effect of preventing him from displaying signs that expressed his point of view.  *Id.* ¶ 42.  Plaintiff claims that this conduct amounted to a violation of his free speech rights, and also violated the Maryland Open Meetings Act (the "OMA"), Md. Code (2019 Repl. Vol., 2021 Supp.), § 3-301 *et seq.* of the General Provisions Article ("G.P.").[25]  *See* ECF 15, ¶¶ 90, 92; *id.* ¶¶134, 136

Defendants deny that plaintiff's constitutional or statutory rights were violated at the Budget Meeting.  ECF 26-1 at 26-30.  They contend that plaintiff includes factual allegations that are contrary to his earlier assertions.  *Id.* at 29 n.10.  They also assert that Count II and Count V do not include allegations that, if proven, would state a plausible claim against Meffley.  *Id.* at 20-21.  Further, with respect to the remaining defendants, the Motion maintains that plaintiff's allegations are unduly speculative.  *Id.* at 20.  And, defendants argue that, even if a violation of law did occur, they are entitled to qualified immunity.  *Id.* at 36-37.

### a. Contrary Allegations

As a threshold matter, defendants argue that the Court should not entertain plaintiff's assertion that defendants did not unmute plaintiff's microphone because that contention is "at odds with his original complaint and his emails to the County Council on May 13, 2020."  ECF 26-1 at 29 n.10; *see id.* at 21 n.8.

---

[25] Until October 2014, the statute was codified in §§ 10-501 through 10-512 of the State Government Article of the Maryland Code.

In the original suit, plaintiff alleged: "Defendants McCarthy, Wein, Tome, and Meffley . . . denied Plaintiff Sammons a reasonable opportunity to speak at the public budget meeting by unmuting his Zoom connection for only a split second and then re-muting Plaintiff Sammons before he could speak."  ECF 1, ⁋ 97; *see id.* ⁋ 189 (stating the same).  Further, in an email sent to County officials on May 13, 2020, Sammons wrote: "I was 'given an opportunity' to speak [at the Budget Meeting] however my mic was open so briefly [that by] the time I unmuted my mic the 'opportunity' was over."  ECF 15-13 at 18.  In contrast, the Complaint states that the host of the Budget Meeting "did not unmute Plaintiff Sammons' microphone when his name was called, and Plaintiff was denied any opportunity to speak."  ECF 15, ⁋ 41.

Defendants contend that the discrepancy between plaintiff's pleadings warrants dismissal of Count II and Count V, because it evinces bad faith on Sammons's part.  ECF 26-1 at 29 n.10. In support, they cite two cases in which the Second Circuit and the Fourth Circuit, respectively, considered whether a district court erred in denying a motion to amend a complaint, on the ground that the proposed amended pleading included allegations that were contradictory to those asserted in the initial pleading.  *Id.* (citing *BLD Prods., LLC v. Remote Prods., Inc.*, 509 F. App'x 81, 82 (2d Cir. 2013) and *Laber v. Harvey*, 438 F.3d 404, 428 (4th Cir. 2006)).

But, defendants did not oppose the amended complaint at the time it was filed.  Thus, *BLD Prods.* and *Laber* are not directly on point.  Moreover, it is well established that, "[a]s a general rule, 'an amended pleading ordinarily supersedes the original and renders it of no legal effect.'"  *Young*, 238 F.3d at 572 (quoting *In re Crysen/Montenay Energy Co.*, 226 F.3d 160, 162 (2d Cir. 2000)); *see Goodman v. Diggs*, 986 F.3d 493, 498 (4th Cir. 2021); *see also* 6 Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure Civ. § 1476 (3d ed. Apr.

2021) ("[P]laintiff may file a new complaint that does not refer to or adopt any of the deficient allegations in the original pleading . . . .").

At the early stage of a case, the plaintiff cannot be expected to have gathered all the facts relevant to the case.  Moreover, there is no meaningful difference between the assertion that the microphone was never unmuted and the assertion that it was unmuted for a "split second."  In either circumstance, plaintiff was not allowed to speak.  But, even assuming that "the allegations in the [initial pleading] and the operative complaint are factually inconsistent, allegations made in a superseded complaint are not treated as judicial admissions." *Midwestern Midget Football Club, Inc. v. Riddell, Inc.*, 2:15-00244, 2016 WL 3406129, at *5 (S. D. W. Va. Jun. 17, 2016).[26]

### b.  Open Meetings Act

Sammons contends that defendants' conduct during the Budget Meeting violated his rights under Maryland's Open Meetings Act.  ECF 15, ¶¶ 85, 134; *see* ECF 33 at 54; G.P. § 3-301 *et seq*.[27]  The claim plainly fails as a matter of law.

The OMA is "[t]he first Maryland comprehensive legislation to require open meetings of public bodies . . . ."  *Cmty. and Labor United for Balt. Charter Comm. ("C.L.U.B.") v. Balt. City Bd. of Elections*, 377 Md. 183, 193, 832 A.2d 804, 809 (2003).  It was enacted for the purpose of ensuring transparency in government operations.  The policy that "undergirds and pervades" the statute reflects "the truism that the ability of the public to attend and report on meetings of public bodies and to witness their deliberations ensures the accountability of government and increases

---

[26] "[A] party's assertion of contrary factual positions in the pleadings is [not] without consequence," however.  *New Hickory Pizza, Inc. v. TIG Insur. Co.*, 5:16-cv-00164-RLV-DSC, 2017 WL 3840278, at *7 (W.D.N.C. Sept. 1, 2017) (citation and internal quotation marks omitted).  Rather, in later stages of litigation, a "superseded pleading may be offered in evidence rebutting a subsequent contrary assertion." *Id.* (citation and internal quotation marks omitted).

[27] Plaintiff does not specify the particular statutory provision that, in his view, was violated.

the faith of the public in government." *Wesley Chapel Bluemount Ass'n v. Balt. Cnty., Md.*, 347 Md. 125, 127-28, 699 A.2d 434, 435 (1997).

In relevant part, G.P. § 3-102(a) provides: "It is essential to the maintenance of a democratic society that, except in special and appropriate circumstances" the "public business be conducted openly and publicly" and that "the public be allowed to observe . . . the performance of public officials" and "the deliberations and decisions that the making of public policy involves." G.P. § 3-303 is titled "Attendance at open session" *Id.*  It provides, in relevant part: "Whenever a public body meets in open session the general public is entitled to attend." *Id.* § 3-303(a).

Notably, the allegations in Count II and Count V do not reflect that plaintiff was prohibited from attending the Budget Meeting. *See* ECF 15, ¶¶ 83-94; 127-39.  Rather, he alleges that he was precluded only from speaking at the Budget Meeting and from displaying his signs.  Thus, even assuming the truth of the allegations, plaintiff has not alleged a claim under the OMA.

### c. Meffley

Defendants maintain that Counts II and V are subject to dismissal as to Meffley.  ECF 26-1 at 20-21.  In their view, the Complaint contains bald assertions with respect to Meffley's actions but is devoid of specific factual allegations that would amount to misconduct, if proven.  *Id.*  They suggest that plaintiff named Meffley as a defendant in these counts solely because Meffley was in a position to observe the conduct of the other named defendants during the Budget Meeting and he "'knew or should have known that Plaintiff's video feed disappeared immediately after Wein spoke with Tome.'"  *Id.* at 20 (quoting ECF 15, ¶ 134).  In their view, this allegation is insufficient to state a claim as to Meffley.

As mentioned, to state a claim for the deprivation of a constitutional right, plaintiff must plead facts that, if proven, would establish that the relevant defendant was personally involved in

the conduct at issue.  *See Love-Lane*, 355 F.3d at 782.  Plaintiff's allegations, accepted as true, do not show that Meffley played any role in the conduct that caused the alleged infringement of plaintiff's rights.

Further, to the extent these counts named Meffley as a defendant under a theory of supervisory liability, the claims fare no better.  As indicated, to state such a claim, plaintiff must plead facts that, if proven, would establish "(1) [t]hat the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to . . . the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff."  *Shaw*, 13 F.3d at 799.

As an initial matter, Sammons cannot state a claim against Meffley under a theory of supervisory liability, for the simple reason that he has not alleged that Meffley was  a supervisor of any of the other named defendants.  However, even if he had, the claim against Meffley is deficient.  This is because the claim is predicated solely on the assertion that Meffley knew or should have known of the alleged deprivation of Sammons's constitutional rights.  *See* ECF 15, ¶¶ 90, 134.  Yet, the Complaint is devoid of any facts that show Meffley knew or should have known of the misconduct of a subordinate.  Nor do the facts allege that Meffley's response was so deficient as to constitute deliberate indifference or tacit authorization.  And, there are no facts alleged that, if proven, would establish a causal link between Meffley's actions, or lack thereof, and the deprivation of plaintiff's constitutional rights.

In the absence of such allegations, plaintiff has not stated a claim against Meffley on a theory of supervisory liability.  *See Shaw*, 13 F.3d at 799.  Therefore, with respect to Count II and Count V, I shall grant the Motion as to Meffley, without prejudice.

### d. McCarthy, Wein, Tome

The Motion challenges plaintiff's free speech claims in Counts II and V as to McCarthy, Wein, and Tome.  In particular, defendants complain that plaintiff "attempts to paint a narrative of concerted effort between Defendants McCarthy, Wein and Tome to deprive him of his alleged constitutional right to have signs displayed on his video feed during the Budget Meeting."  ECF 26-1 at 20.  Yet, plaintiff has not offered any "[b]asis for this allegation," other than "pure speculation and conjecture" about the named defendants' "motives and intent . . . ."  *Id.*

As mentioned, in an exhibit to the Complaint, plaintiff asserted that he was unable to speak during the Budget Meeting because the meeting's host only unmuted plaintiff's microphone for a brief period of time.  ECF 15-13 at 18.  Later in the meeting, plaintiff observed McCarthy speak with Wein, who subsequently went into the room where Tome was sitting and initiated a conversation with her.  ECF 15, ⁋ 42.  After Wein finished speaking with Tome, Sammons noted that Tome began manipulating her computer mouse.  *Id.*  Thereafter, Sammons's video feed was terminated.  *Id.*  And, based on plaintiff's observations of defendants' conduct, Sammons contends that defendants acted intentionally to frustrate plaintiff's exercise of his free speech rights.  *Id.* ⁋⁋ 93-94, 137-38.

As discussed, to survive a motion to dismiss, a complaint need only include allegations that, if proven, would state a plausible claim for relief.  *See Twombly*, 550 U.S. at 556 (explaining that a complaint is sufficient if it sets forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . .

recovery is very remote and unlikely").  Further, the Court "'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'"  *Retfalvi*, 930 F.3d at 605 (alteration in *Retfalvi*) (quoting  *E.I. du Pont de Nemours & Co.*, 637 F.3d at 440).

To be sure, plaintiff may have misinterpreted the conduct of the named defendants.  But, plaintiff has not yet had an opportunity to conduct discovery.  And, the allegations are sufficient to suggest that the named defendants collectively decided to bar plaintiff from participating in the Budget Meeting.  Accordingly, I decline to dismiss Count II and Count V on the basis that the claims are predicated on unduly speculative allegations.

### e. Viewpoint Discrimination

The parties appear to agree that the Budget Meeting constituted a limited public forum. *See* ECF 26-1 at 28 (contending that the Budget Meeting was a limited public forum because "the County created and opened it to the public for purposes of allowing County residents to express their opinions on the proposed budget for fiscal year 2021"); ECF 33 at 38-39 (discussing the relevant standard of review for a limited public forum with respect to the Budget Meeting).  Indeed, a government meeting that is opened to the public for comment on a specific topic, such as the Budget Meeting, is typically considered to be a limited public forum.  *See*, *e.g.*, *Davison v. Rose*, 19 F.4th 626, 635 (4th Cir. 2021) (finding that a school board meeting constituted a limited public forum).  Therefore, the County was empowered to impose "restrictions on speech that [were] reasonable and viewpoint-neutral." *Pleasant Grove City*, 555 U.S. at 469-70.

To begin, plaintiff alleges that the relevant defendants did not unmute plaintiff's microphone for a sufficiently long enough time to enable him to speak during the Budget Meeting. *See* ECF 15-13 at 18.   Yet, Sammons claims that the Individual Defendants provided an

74

opportunity for others to comment on the proposed budget for the upcoming fiscal year.  ECF 15, ¶ 34.

Defendants contend, without citation to legal authority, that, taking plaintiff's allegations as true, plaintiff's free speech rights were not infringed because, at the end of the meeting, participants were given an additional opportunity to speak, and plaintiff had chosen to leave the meeting prior to its conclusion.  ECF 26-1 at 28-29.  In other words, defendants maintain that plaintiff cannot complain of the denial of an opportunity to speak during the Budget Meeting because he waived a subsequent opportunity to do so.  *Id.* at 29.

"The Constitution does not grant to members of the public generally a right to be heard by public bodies making decisions of policy."  *Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 283 (1984).  But, "when a legislative body permits public comment, the legislative body cannot withdraw its permission selectively based on the content of the speech."  *Suydam v. Puiia,* 2:14-cv-00047-JDL, 2016 WL 1029363, at *6 (D. Me. Jan. 28, 2016) (citing *R.A.V. v. City of St. Paul, Minn*., 505 U.S. 377, 382 (1992)).

Thus, crediting plaintiff's allegations as true, he has stated a claim for infringement of his free speech rights, based on viewpoint discrimination.  *See Mobley v. Tarlini*, 641 F. Supp. 2d 430, 440-41 (E.D. Pa. 2009) (explaining that the plaintiff stated a plausible claim for viewpoint discrimination where plaintiff alleged that "he was singled out by Defendant because of both the content of his speech and his viewpoint, that Defendant acted arbitrarily and capriciously, and that Defendant did not treat any of the other . . . speakers in the same fashion as Plaintiff") (internal quotation marks omitted).

Plaintiff also attacks defendants' decision to block his video feed from display during the Budget Meeting.  As mentioned, during the virtual meeting, Sammons "filled his virtual window

(which could be seen by other meeting participants) with a video feed loop displaying three signs that he had made." ECF 15, ¶ 35.  The signs displayed one of the following messages: "'McCarthy Stop Blocking Me on Facebook'"; "'Vote for Hornberger'"; and "'No More Tax Increases.'"  *Id.*; *see* ECF 15-10.  According to Sammons, the feed remained active for more than an hour of the Budget Meeting before the named defendants suspended its transmission.  ECF 15, ¶ 42.  Further, Sammons points out that, throughout the entire meeting, defendants allowed another Budget Meeting participant to display a sign on his screen that read "'Yes to Southfields.'"  *Id.* ¶ 88.  Thus, in Sammons's view, the decision to block his video feed during the meeting amounted to impermissible viewpoint discrimination.  *Id.* ¶ 93.

Defendants claim that Sammons "did not have the right to display campaign and disruptive signs during the meeting."  ECF 26-1 at 29.  To that end, they urge the Court to consider Section A387-25 of the Cecil County Code.  *See id.*  It is titled "Public participation at meetings."  Relevant here, § A387-25(D) states: "The presiding officer shall ensure that the meeting of the public body is conducted in an orderly, civil and courteous manner to permit all participants the ability to state his or her position, and make his or her comments in a professional atmosphere."  Further, under § A387-25(E), "[m]eeting participants are expected to behave in a professional manner and not take any action(s) that would visually or verbally disrupt, interrupt, or otherwise create an antagonistic atmosphere to conduct the business of the County."  And, in subsection (F), the Cecil County Code indicates: "The presiding officer may order any meeting participant who persists in conduct that prohibits the public body from conducting the business of the County removed from the meeting . . . ."

Defendants argue that the Budget Meeting was "not a political campaign forum or a place to air one's grievances about the operation of a campaign social media account."  ECF 26-1 at 30.

"Rather," according to defendants, "the purpose of the County's May 12, 2020 meeting was to discuss budgetary items, and as such, the County Council . . . had the right to remove Plaintiff's disruptive video display."  ECF 26-1 at 30.

Without question, the County has a legitimate interest in carrying out public meetings in an orderly fashion and free from disruption.  *See City of Madison v. Wisconsin Employment Relations Com'n*, 429 U.S. 167, 176 n.8 (1976) ("Plainly, public bodies may confine their meetings to specified subject matter and may hold nonpublic sessions to transact business."); *Davison*, 19 F.4th at 635 ("Since the school board meetings are limited public fora, the [defendant] is 'justified in limiting its meeting to discussion of specified agenda items and in imposing reasonable restrictions . . . to further the forum's purpose of conducting public business.'") (quoting *Steinburg*, 527 F.3d at 385) (alteration in *Davison*).    Further, on its face, this provision appears viewpoint neutral.  Indeed, plaintiff does not launch a facial challenge to this provision of the Cecil County Code.

But, determining that a speech restriction is viewpoint neutral as designed "does not preclude a challenge premised on misuse of the policy to chill or silence speech in a given circumstance." *Steinburg*, 527 F.3d at 387; *see Rosenberger*, 515 U.S. at 829 ("Once it has opened a limited forum . . . the [government] must respect the lawful boundaries it has itself set.").  And, plaintiff alleges that this restriction, as applied to him, amounted to impermissible viewpoint discrimination.  ECF 15, ¶¶ 90-93, 134-37.  Notably, Sammons also alleges that defendants allowed someone else to display a sign throughout the entirety of the budget meeting. *Id.* ¶ 36.

According to defendants,  "the County Council did not cut the video feed of a resident which displayed [the message] 'Yes to Southfields'" because that message was "a reference to a real estate development, whereas Plaintiff's looped-video feed contained messages that sought to

disrupt the meeting and had nothing to do with the budget proposed by the Council . . . ."  ECF 26-1 at 30 n.12.   But, defendants' contention is unavailing. The Budget Meeting concerned the County's planned expenditures and property tax rate for the upcoming fiscal year.  *See generally* ECF 15-12;  *see also Public Budget Meeting*, Cᴇᴄɪʟ Cᴏᴜɴᴛʏ, Mᴀʀʏʟᴀɴᴅ, https://www.ccgov.org/Home/Components/Calendar/Event/8846/20 (last visited Mar. 5, 2022).  It is not immediately apparent to the Court whether or to what extent promoting a real estate development was pertinent to the budgetary topics.

As mentioned, under Cecil County Code § A387-25(F), the "presiding officer may order any meeting participant who persists in conduct that prohibits the public body from conducting the business of the County removed from the meeting."  Defendants did not have plaintiff "removed" from the Budget Meeting.  Instead, they blocked the transmission of plaintiff's video feed.  The facts before the Court do not indicate how, or to what extent, the transmission of plaintiff's signage disrupted the orderly procession of the Budget Meeting. Indeed, plaintiff alleges that the feed ran for more than one hour, before defendants intervened.  *See* ECF 15, ⁋ 42.  And, in any event, defendants' contention that plaintiff's video feed was so disruptive as to warrant blocking its continued transmission is a fact question, not appropriate for resolution at this juncture.  *Cf. Komatsu v. City of New York*, 20-CV-7046, 2021 WL 256956, at *1, 3 (S.D.N.Y. Jan. 26, 2021) (finding that where plaintiff made an "obscene gesture" to City Councilmembers during the course of a virtual public meeting, the City imposed a "reasonable restriction" by "turning off [plaintiff's] camera and muting his microphone" in order to prevent plaintiff from "further disrupt[ing] the meeting").

Even assuming that the power to "remove" an individual could be read to imply the power to block the transmission of a participant's video feed, the Cecil County Code does not clothe

every County official in attendance at a public meeting with the authority to remove a disruptive participant.  Rather, such power is conferred on the "presiding officer."  Cecil County Code, § A387-25(F).

Plaintiff claims that Meffley, as the Council President (*see* ECF 15, ¶ 7), "ran" the Budget Meeting.  *Id.* ¶ 39.  Drawing all reasonable inferences in favor of plaintiff, the Complaint indicates that Meffley was the presiding officer of the Budget Meeting.  Consequently, only Meffley had the requisite authority to remove a disruptive individual from the Budget Meeting.  But, according to the Complaint, McCarthy, not Meffley, made the decision to block the transmission of plaintiff's video feed.  *Id.* ¶ 42.  And, crediting plaintiff's allegations as true, it was McCarthy, not Meffley, who instructed Wein and, through him, Tome, to carry out this directive.  *Id.*  Thus, the Complaint asserts that McCarthy, Wein, and Tome did not act in accordance with the express terms of the Cecil County Code.

In sum, plaintiff's assertions concerning defendants' conduct during the Budget Meeting present a plausible claim for viewpoint discrimination.  *See Draego v. City of Charlottesville*, 3:16-CV-00057, 2016 WL 6834025, at *20 (W.D. Va. Nov. 18, 2016) (finding that, in the context of granting a preliminary injunction, plaintiff was likely to show that the inconsistent application of a municipal policy, which prohibited the dissemination of "group defamation" in a public meeting, amounted to viewpoint discrimination); *Liberty and Prosperity 1776, Inc. v. Corzine*, 720 F. Supp. 2d 622, 635 (D.N.J. 2010) (rejecting a motion to dismiss plaintiff's claim for viewpoint discrimination on the ground that defendant's proffered justification for banning signs during a public meeting due to a security risk was "questionable, to say the least"); *We the People, Inc. of the U.S. v. Nuclear Regulatory Comm'n*, 746 F. Supp. 213, 219 (D.D.C. 1990) (resolving motion for summary judgment in plaintiff's favor where defendant prevented plaintiff from displaying

posters or bumper stickers on the ground that there was no explanation as to how plaintiff's posters were disruptive).

### f.  Qualified Immunity[28]

Defendants also assert qualified immunity as to Count II.  ECF 26-1 at 36-37.  Sammons rejects this contention on the ground that "the exclusion of Mr. Sammons from the public budget meeting and cutting his video feed was speaker-based viewpoint discrimination," in violation of his clearly established rights under the First Amendment.  ECF 33 at 54; *see Rosenberger*, 515 U.S. at 828-29.

The Fourth Circuit has previously determined that, within the context of a meeting opened for public comment, a municipal officer may not deny an individual the opportunity to speak on a permissible topic based solely on the viewpoint that the individual seeks to express.  *See Steinburg*, 527 F.3d at 385 ("[A] government entity . . . is justified in limiting its meeting to discussion of specified agenda items and in imposing reasonable restrictions to preserve the civility and decorum necessary to further the forum's purpose of conducting public business.  But any restriction must not discriminate on the basis of a speaker's viewpoint."); *see also Collinson v. Gott*, 895 F.2d 994, 1000 (4th Cir. 1990) (per curiam) (Phillips, J. concurring) ("[W]hile a ruling, 'We will not listen to your view on capital punishment at this public hearing on rezoning,' certainly must be constitutionally permissible, a ruling, 'We will not listen to yours or any views favoring rezoning at this rezoning hearing,' obviously would not be.") (citing *City of Madison*, 429 U.S. at 175-76 & n.8).  Therefore, at this juncture, the named defendants are not entitled to qualified immunity as to

---

[28] As stated, defendants' assertion of qualified immunity is inapplicable to Count V, in which plaintiff claims a violation of Article 40 of the Maryland Declaration of Rights.  *See Borzilleri,* 189 F. Supp. 3d at 560 n.4.  Further, it has no bearing as to plaintiff's claim in Count II, to the extent it is lodged against the named defendants in their official capacities.  *See Brandon*, 469 U.S. at 471-73.

Sammons's allegation in Count II that they violated his right to free speech by providing him with only a "split second" to speak during the Budget Meeting, because of his views. *See* ECF 15, ¶ 91; ECF 15-13 at 18.

In reaching this conclusion, I note that there are no factual allegations that I may consider that suggest that plaintiff planned to speak on a topic outside the purview of the Budget Meeting, or that he otherwise intended to disrupt the Budget Meeting. To the contrary, the allegations in Count II, taken as true, state a claim for violation of plaintiff's clearly established right to express his views at the Budget Meeting. *See Good News Club*, 533 U.S. at 106-07 (recognizing that the State "may be justified in reserving [its forum] for certain groups or for the discussion of certain topics," but also that the "restriction must not discriminate against speech on the basis of viewpoint . . . and the restriction must be reasonable in light of the purpose served by the forum") (internal citations and quotation marks omitted) (alteration in *Good News Club*).

But, plaintiff does not point to any case law that indicates he had a clearly established right to transmit a video feed displaying expressive signs during a virtual public meeting. And, the Court has not been able to identify any such authority. Thus, as I see it, a municipal officer may not have understood that he could not block the transmission of a video feed with signage that contained messages unrelated to the purpose of the virtual public budget meeting. In particular, plaintiff was displaying signs that were not germane to the topic of the meeting and arguably confrontational. And, in the absence of persuasive authority establishing otherwise, I am persuaded that defendants are entitled to qualified immunity as to Count II to the extent it includes a free speech claim for blocking plaintiff's video feed.

### 3.  Counts III and VI:  Email Ban

Counts III and VI allege that McCarthy, Allison, and Miller violated plaintiff's free speech rights by denying plaintiff the ability to email County officials for a period of more than one month. ECF 15, ¶¶ 95-114; 140-155.  Although not entirely clear, it appears that these counts encompass two claims against the enumerated County officials: (1) a violation of Sammons's right to petition the local government for redress; and (2) retaliation for the exercise of plaintiff's rights, as guaranteed by the Petition Clause.  *See* ECF 15, ¶ 102 (indicating that plaintiff has a "'right to petition the government for a redress of grievances'") (quoting *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017)); ECF 15, ¶ 101 (stating that plaintiff has a First Amendment right "'to be free from retaliation by a public official for the exercise of that right'") (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000)).

#### a.  Petition Clause

Sammons complains that Allison, acting at the direction of McCarthy, violated his right to petition the local government when Allison instructed Miller, the County Director of Information Technology (ECF 15, ¶ 8), to "ban Plaintiff from being able to email anyone within the Cecil County government" from May 19, 2020, until June 15, 2020.  *Id.* ¶ 109; *see id.* ¶¶ 108, 110.

"The First Amendment protects the right 'to petition the Government for a redress of grievances[.]'"  *Martin*, 858 F.3d at 249 (quoting *Kirby v. City of Elizabeth City*, 388 F.3d 440, 448 (4th Cir. 2004)).  The right to petition the government for redress is "one of 'the most precious liberties safeguarded by the Bill of Rights.'"  *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 524 (2002) (quoting *United Mine Workers of America, Dist. 12, Ill. State Bar Ass'n,* 389 U.S. 217, 222 (1967)).  Indeed, "[p]etitions contribute to the 'public airing' of disputes, the 'evolution of the law,' and the use of government as an 'alternative to force.'"  *Mirabella v. Villard*, 853 F.3d 641,

654 (3d Cir. 2017) (quoting *BE & K Constr.*, 536 U.S. at 532).  And, the right to petition "extends to all departments of the Government."  *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 612 (1972).

However "'[t]he right to communicate is not limitless[,]' and does not grant unlimited access to government officials."  *Justice v. Farley*, 5:11-CV-99-BR, 2012 WL 83945, at *4 (E.D.N.C. Jan. 11, 2012) (quoting *Lovern v. Edwards*, 190 F.3d 648, 656 (4th Cir. 1999) (alterations in *Justice*)); *see also Borough of Duryea v. Guarnieri*, 564 U.S. 379*,* 390-91 (2013) (indicating that the right to petition is not "unrestrained").  For instance, the right to petition "does not include the right to baseless litigation nor to 'petitions to the President that contain intentional and reckless falsehoods . . . .'"  *Leuthy v. LePage*, 1:17-cv-00296, 2018 WL 4134628, at *17 (D. Me. Aug. 29, 2018) (quoting *McDonald v. Smith*, 472 U.S. 479, 484 (1985)).  Further, "the First Amendment does not impose any affirmative obligation on the government to listen [or] to respond" to a petition.  *Smith v. Ark. State Hwy. Emps., Local 1315*, 441 U.S. 463, 465 (1979).

Of relevance here, "[i]t is axiomatic that the right to petition is not violated when a party can in fact petition."  *Selene v. Legislature of Idaho*, 514 F. Supp. 3d 1243, 1260 (D. Idaho 2021).  A court must consider "whether the government may 'nevertheless burden' the right to petition, given countervailing government interests."  *Mirabella*, 853 F.3d at 654 (quoting *BE & K Constr.*, 536 U.S. at 535).

The parties seem to assume that Speech Clause precedent applies in evaluating plaintiff's Petition Clause claim.  *See* ECF 33 at 41-43 (citing case law that resolved claims arising under the Speech Clause of the First Amendment); ECF 26-1 at 33-34 (same).  To be sure, the "rights of speech and petition share substantial common ground" and are "'cognate rights.'"  *Guarnieri*, 564 U.S. at 388 (quoting *Thomas v. Collins*, 323 U.S. 516, 530 (1945)); *see also McDonald*, 472 U.S.

at 482 ("The right to petition is cut from the same cloth as the other guarantees of [the First Amendment], and is an assurance of a particular freedom of expression.").  However, the two rights are distinguishable.

"The right to petition allows citizens to express their ideas, hopes and concerns to their government and their elected representatives, whereas the right to speak fosters the public exchange of ideas that is integral to deliberative democracy as well as to the whole realm of ideas and human affairs." *Guarnieri*, 564 U.S. at 388.  For this reason, the Supreme Court has instructed: "Courts should not presume there is always an essential equivalence in the two Clauses or that Speech Clause precedents necessarily and in every case resolve Petition Clause claims." *Id.* at 388 (citing *Thomas*, 323 U.S. at 530).   Rather, "[i]nterpretation of the Petition Clause must be guided by the objectives and aspirations that underlie the right.  A petition conveys the special concerns of its author to the government, and, in its usual form, re-quests [sic] action by the government to address those concerns." *Guarnieri.* 564 U.S. at 388-89 (citing *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 896-97 (1984)).

The *Guarnieri* Court also said, 564 U.S. at 389:  "There may arise cases where the special concerns of the Petition Clause would provide a sound basis for a distinct analysis; and if that is so, the rules and principles that define the two rights might differ in emphasis and formulation." For instance, the Supreme Court has endorsed the development of independent Petition Clause jurisprudence in the antitrust context.  *See United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965); *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961). Nonetheless, in *Guarnieri*, 564 U.S. at 389, the Court recognized that "claims of retaliation by public employees do not call for this divergence."  And, I cannot discern any reason why plaintiff's

claim calls for an analysis distinct from the kinds of considerations underlying Speech Clause precedent.

Sammons insists that the email restriction "must withstand strict scrutiny" because it amounted to a content-based restriction on his speech that was not imposed on other County residents. ECF 33 at 43. He points out that "it is undisputed that Defendants' email restriction singled out Mr. Sammons" yet "other residents of Cecil County . . . remained free to email their County representatives, while Mr. Sammons was restricted from doing so." *Id.* Thus, in his view, because "'[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content,'" strict scrutiny applies. *Id.* (quoting *Reed*, 576 U.S. at 170) (emphasis omitted) (alteration added).

Defendants contend: "It is difficult to understand how strict scrutiny would apply to the County Attorney's decision to temporarily block Plaintiff from sending harassing emails to County employees." ECF 41 at 13. Further, they maintain that Sammons "fails to articulate how the temporary limitation favored others over him or how it was content based." *Id.* Thus, in their view, "strict scrutiny cannot be the controlling standard." *Id.*

To the extent that a governmental restriction is "'based on the content of . . . speech,'" it "'must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest.'" *Christian Legal Soc'y*, 561 U.S. at 679 n.11 (2010) (quoting *Pleasant Grove*, 555 U.S. at 469) (alteration in original). Prior to *Reed*, 576 U.S. 155, the Fourth Circuit had instructed that, "when conducting the content-neutrality inquiry, '[t]he government's purpose is the controlling consideration.'" *Cahaly v. Larosa*, 796 F.3d 399, 405 (4th Cir. 2015) (citation omitted) (brackets in *Cahaly*). However, in *Reed* the Supreme Court "rejected such an approach." *Cent. Radio Co.,* 811 F.3d at 632; *see also Barr*, 140 S. Ct. at 2346 (citing *Reed*). The

Fourth Circuit subsequently explained: "Because the government's purpose in adopting a law is no longer 'the controlling consideration,' *Reed* was a crucial decision, 'abrogat[ing] our Circuit's previous formulation for analyzing content neutrality.'" *Lucero v. Early*, 873 F.3d 466, 470 (4th Cir. 2017) (quoting *Cent. Radio Co.*, 811 F.3d at 632).

Summarizing the two-step methodology prescribed by *Reed*, applicable in the context of a legislative enactment, the *Lucero* Court said, 873 F.3d at 470 (brackets and ellipses added):

> First, a court should ask whether a law "on its face draws distinctions based on the message a speaker conveys." [*Reed*, 576 U.S. at 163] . . . . If so, the law is content based regardless of "the government's justification or purpose" in enacting it. *Cent. Radio Co.*, 811 F.3d [at] 632 [ ]. Second, even if the law is facially content neutral, it can nonetheless be considered content based if it "cannot be justified without reference to the content of the regulated speech, or [it was] adopted by the government because of disagreement with the message the speech conveys." *Reed*, [576 U.S. at 164] . . . .

In exhibits that the Court may consider, such as Allison's email correspondence with Sammons, Allison told Sammons that he is "finished communicating" with plaintiff "on *these matters* at this time" and that "any other or further communication to [Allison] must be in paper writing." ECF 15-13 at 6 (emphasis added). Later, Allison wrote: "At this point, I'm going to advise IT to block you from all communication with County agencies. You're adversarial, and have a litigious agenda." *Id.* at 2.

The exhibits suggest that Allison effectuated a ban, directed at plaintiff, barring him from emailing County officials because of the subject matter that plaintiff sought to discuss, namely Sammons's complaints about McCarthy. And, for present purposes, this is sufficient to show that the email restriction was plausibly content based and thus subject to strict scrutiny. *See Seum v. Obsorne*, 348 F. Supp. 3d 616, 633 (E.D. Ky. 2018) (finding that, within the context of resolving a motion to dismiss, plaintiff's allegations, if proven, would establish that the State's ban against plaintiff from the third floor of the State capitol building was content based where defendants

stated "'[t]his ban is . . . in response to the offensive comments that you made . . . .'"); *Mirabella v. Villard*, No. 14-7368, 2015 WL 4886439, at *7 (E.D. Pa. Aug. 17, 2015) (determining that, in resolving a motion to dismiss, strict scrutiny applied to a restriction imposed upon the plaintiff barring contact with municipal officials, because the restriction "distinguish[ed] speech based on who [was] speaking . . . because of a disagreement with the message conveyed"), *rev'd and remanded on other grounds*, 853 F.3d 641 (3d Cir. 2017).

When state action curtails constitutionally protected speech based on content, the Court must apply strict scrutiny to the restrictions. *Forsyth Cty.*, 505 U.S. at 134. A defendant must establish a justification showing that the challenged action is "narrowly tailored to serve a compelling governmental interest in order to survive." *Abrams v. Johnson*, 521 U.S. 74, 82 (1997); *see Consol. Edison Co. of New York v. Pub. Serv. Comm'n of New York*, 447 U.S. 530, 540 (1980). To indicate that a law or restriction regulating or restricting speech is narrowly tailored, "the Government carries the burden of showing that the challenged regulation advances the Government's [compelling] interest in a direct and material way." *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995) (citation and internal quotation marks omitted). But, a restriction is not narrowly tailored "if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve." *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 874 (1997). In other words, "[w]hen a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals." *Playboy Entm't Grp.*, 529 U.S. at 816.

Defendants argue the email restriction furthered their interest in preventing plaintiff from sending harassing emails to County employees. *See* ECF 26-1 at 34; ECF 41 at 14. And, courts have found that there is a legitimate State interest in limiting the harassment of government

employees. *See, e.g.*, *Fauconier v. Clarke*, 257 F. Supp. 3d 746, 755 (W.D. Va. 2017) (explaining that State prison had "legitimate penological interests in . . . reducing harassment of female staff"), *aff'd*, 709 F. App'x 174 (2018), *cert. denied*, ___ U.S.___, 139 S. Ct. 1353 (2019). Assuming such an interest is compelling, and that a purported restriction satisfies strict scrutiny, the governmental entity has the burden of demonstrating that no less restrictive alternative would advance a compelling interest. *See Rubin*, 514 U.S. at 487. In other words, the restriction must be narrowly tailored.

According to the defense, the restriction was narrowly tailored. Defendants explain: "Plaintiff still retained the ability to communicate with County employees—whether by telephone or written letter, the ability remained." ECF 26-1 at 33. Sammons counters: "During the time Mr. Sammons was barred from emailing Cecil County employees, most, if not all County employees were working from remote locations . . ., because of the covid pandemic." ECF 33 at 46 n.8. Thus, in his view, "[t]here is insufficient evidence in the record to support the argument that using a telephone to call public offices or mailing a letter to county office buildings was an adequate alternate means of communication." *Id.* Moreover, Sammons maintains that the email ban was overbroad because it barred him from "communicat[ing] *via* email with all of county government for any reason." *Id.* at 47 (italics in original).

In my view, Sammons has plausibly alleged that defendants imposed an overly broad restriction on his speech because of the subject matter plaintiff sought to discuss. Moreover, there is no indication, other than defendants' pure conjecture, to indicate that "[h]ad Plaintiff only been precluded from emailing Defendant Allision, it is without a doubt that he would have embarked upon similar harassing conduct with others in the County government." ECF 41 at 15. Indeed, after Sammons and Allison exchanged several emails, Allison summarized his position with

respect to Sammons's complaints.  ECF 15-13 at 6.  In response, Sammons thanked Allison.  *Id.* at 5.  Allison responded to Sammons indicating, among other things, that Sammons could call him at "any time."  *Id.* at 4.  Plaintiff replied, in relevant part: "You answered my questions adequately in the previous email correspondence.  I will follow up with the state in the areas you fail to have jurisdiction."  *Id.* at 3.

In other words, Sammons wrote that he was satisfied with Allison's response.  Nevertheless, Allison banned Sammons from communicating via email with any County employee for any reason.

To be clear, it is not certain that strict scrutiny review would necessarily defeat defendants' rationale for their actions in the event that they flesh out a sound basis for imposition of the email ban.  *See, e.g., Williams-Yulee v. The Florida Bar*, 575 U.S. 433, 445 (2015) (noting that the strict scrutiny is not "fatal in fact") (quoting *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237 (1995)).  But, such a debate is not proper at the motion to dismiss stage.

### b.  Retaliation

Count III and Count VI are predicated on a claim that defendants retaliated against plaintiff for the exercise of his First Amendment rights.  Plaintiff asserts: "Defendants' action of banning Plaintiff Sammons from communicating with government officials via email was committed under color of state law and constitutes a clear and egregious violation of his First Amendment rights." ECF 15, ⁋ 111.  Further Sammons alleges that this "acts of retaliation banning Plaintiff's right to email communications to Cecil County government officials was [sic] intentional and demonstrates the Defendants acted with actual malice and with a specific intent to harm Plaintiff's constitutional rights in an egregious way."  *Id.* ⁋ 113.

"The First Amendment prohibits government officials from subjecting individuals to 'retaliatory actions' after the fact for having engaged in protected speech." *Houston Comm. Coll. Sys. v. Wilson*, 595 U.S.___, ___S. Ct.___, 2022 WL 867307, at *3 (Mar. 25, 2022) (quoting *Nieves v. Bartlett*, 587 U.S.___, 139 S. Ct. 1715, 1722 (2019)); *see Hartman v. Moore*, 547 U.S. 250, 256 (2006); *see also Suarez Corp. Indus.*, 202 F.3d at 685 ("The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right."). Although retaliation "is not expressly referred to in the Constitution, [it] is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights." *ACLU of Md., Inc. v. Wicomico Cnty.,* 999 F.2d 780, 785 (4th Cir.1993). "Thus, by engaging in retaliatory acts, public officials place informal restraints on speech 'allow[ing] the government to produce a result which [it] could not command directly.'" *Suarez,* 202 F.3d at 685 (quoting *Perry v. Sindermann,* 408 U.S. 593, 597 (1972) (alterations in *Perry*) (concluding that former government employee stated a claim for violation of right to free speech where he alleged government did not renew his contract because he publicly criticized school administrators' policies) (additional citations omitted)). "'Such interference with constitutional rights is impermissible.'" *Suarez,* 202 F.3d at 685 (quoting *Perry,* 408 U.S. at 597).

To state a claim of retaliation for the exercise of First Amendment rights, a plaintiff must show that (1) the plaintiff engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected the First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendant's conduct. *See Constantine v. Rectors & Visitors of George Mason Univ*., 411 F.3d 474, 499 (4th Cir. 2005).

As to adverse action, a plaintiff must show that the governmental entity took an action in response to his speech that "would not have been taken absent the retaliatory motive." *Nieves*, 587 U.S. at ___, 139 S. Ct. at 1722.  A plaintiff can satisfy the second element of a claim for retaliation by showing that the defendant took an action that would "deter 'a person of ordinary firmness' from the exercise of First Amendment rights." *Martin*, 858 F.3d at 249 (quoting *Constantine*, 411 F.3d at 500).  And, although "[s]ome adverse actions may be easy to identify—an arrest, a prosecution, or a dismissal from governmental employment . . . . '[D]eprivations less harsh than dismissal' can sometimes qualify too." *Houston Comm. Coll. Sys.*, 2022 WL 867307, at *5 (quoting *Rutan v. Republican Party of Ill.*, 497 U.S. 62,  75 (1990)) (internal citations omitted; first alteration added).

There is no dispute that Sammons's email communications with County officials amounted to protected First Amendment activity.  Nor does there appear to be any dispute that there exists a causal relationship between plaintiff's protected speech and Allison's conduct.  Rather, the parties' arguments concern whether defendants' actions adversely affected plaintiff's exercise of his First Amendment rights.

As discussed above, the allegations are sufficient to support the claim that defendants violated plaintiff's First Amendment rights by banning him from emailing local officials for a period of one month.  ECF 15, ¶ 112; *see Mirabella*, 853 F.3d at 650 (finding that a "complete prohibition against Plaintiffs [from] contacting town officials and employees for any reason" amounted to an adverse action for purposes of bringing a First Amendment retaliation claim because it was "'sufficient to deter a person of ordinary firmness from exercising his constitutional rights'") (quoting *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006)).  Accordingly, plaintiff has adequately pleaded facts that, if proven, would establish that defendants acted

adversely with respect to plaintiff's First Amendment rights sufficient to state a claim for retaliation.

### c.  Miller & McCarthy

Defendants also maintain that the Court should dismiss Count III and VI as to McCarthy and Miller.  ECF 26-1 at 21.  They allege that, with respect to McCarthy, plaintiff's claim hinges on the "assump[tion] that Defendant Allison . . . acted at the direction of Defendant McCarthy by mere virtue of their employer-employee relationship."  *Id.* (citing ECF 15, ᴨᴨ 107-08).  And, concerning Miller, defendants claim that he was simply "added just because he 'had the requisite administrative credentials and technical knowledge to carry out the directive . . . to ban Plaintiff from being able to email anyone within the Cecil County government.'"  ECF 26-1 at 21 (quoting ECF 15, ᴨ 109).

At the motion to dismiss stage, I must assume the truth of the facts alleged.  Concerning McCarthy, the Complaint alleges plainly that "Allison, acting at the direction of Defendant McCarthy," instructed Miller to prohibit the delivery of any email communication from Sammons to any County employee.  ECF 15, ᴨ 108.  Further, plaintiff alleges that Miller carried out Allison's directive to implement the email ban.  *Id.* ᴨ 110.  These  assertions are sufficient to indicate that Miller and McCarthy were personally involved in the alleged deprivation of plaintiff's constitutional rights, such that Sammons may maintain his claims against them.  *See Love-Lane*, 355 F.3d at 782.

### d. Qualified Immunity[29]

Defendants assert qualified immunity as to the conduct underlying Count III.  ECF 26-1 at 37.  Plaintiff posits that qualified immunity is unavailable to defendants because "[e]very reasonable Cecil County official would know the First Amendment 'protects the right to petition the Government for a redress of grievances.'"  ECF 33 at 55 (quoting *Martin*, 858 F.3d at 249).  Further, Sammons states: "They would also know that punishing the petitioner is also wrongful."  ECF 33 at 55 (citing *Perry*, 408 U.S. at 597; *Mirabella*, 853 F.3d at 651 n.5).

The parties agree that a decision of the Third Circuit, *Mirabella*, 853 F.3d 641, is informative here.  *See* ECF 26-1 at 30-32 (discussing the import of *Mirabella*, 853 F.3d 641); ECF 33 at 44-48 (same); ECF 41 at 19 (same).  In *Mirabella*, 853 F.3d at 646-47, a dispute arose between John and Maureen Mirabella and the Mirabellas' neighbors, regarding the neighbors' use of public wetlands owned by Montgomery Township, Pennsylvania (the "Township").  The Mirabellas sent an email to Township officials, seeking assistance as to the dispute but also threatening the local government with litigation.  *Id.* at 646-47.  Thereafter, a Township official, Walsh, sent an email (the "No Contact Email") to the Mirabellas stating, in relevant part: "'Please direct all further communications to the Township attorney.  Please never contact me, the Board of Supervisors or the Township employees directly.  Do not call me at work, email me at work or speak to me in public or private.  The dye is caste [sic].'"  *Id.* at 647 (quoting record) (emphasis omitted).  Walsh sent a copy of the email to numerous Township officials.  *Id.* at 647-48.

The Mirabellas subsequently filed a § 1983 suit against various Township officials, including Walsh, asserting claims, *inter alia*, for violation of their First Amendment rights.  *Id.* at

---

[29] As discussed, defendants' assertion of qualified immunity is inapplicable to plaintiff's official capacity claims in Count III as well as plaintiff's State law claim in Count VI.

648.  In particular, they lodged claims under the Petition Clause and claimed retaliation for the exercise of plaintiffs' right to petition the government.  *See Mirabella*, 2015 WL 4886439, at *1. Thereafter, the defendants moved to dismiss the complaint, asserting the defense of qualified immunity.  *Mirabella*, 853 F.3d at 648.  The district court, in relevant part, found that plaintiffs had stated plausible claims against Walsh for retaliation and violation of the Petition Clause.  *See Mirabella*, 2015 WL 4886439, at *5-9.  Further, it found that Walsh was not entitled to qualified immunity as to these claims.  *Id.* at *6, 9.

The Third Circuit agreed that the Mirabellas' allegations amounted to plausible claims of retaliation and violation of the Petition Clause, in violation of the First Amendment.  *Mirabella*, 853 F.3d at 649-57.  But, it reversed the district court based on qualified immunity.  *Id.* at 657.

Concerning the Petition Clause claim, the Third Circuit characterized the right at issue as "the right to be free from a restriction on communicating with one's government, when the plaintiff has threatened or engaged in litigation against the government."  *Id.*  Even assuming heightened scrutiny, the court concluded that "while other cases have held that there is a clearly established right to petition a local government, those cases did not involve litigation."  *Id.*  Thus, it found that Walsh was entitled to qualified immunity as to the Petition Clause claim.  *Id.*

With respect to the plaintiffs' claim for retaliation, the *Mirabella* Court recognized "the right to be free from a retaliatory restriction on communication with one's government, when the plaintiff has threatened or engaged in litigation against the government."  *Id.* at 653.  But, the court indicated that the right was not yet clearly established when Walsh sent the No Contact Email.  *Id.* The court noted that plaintiffs had failed to identify either "Supreme Court precedent [or] a 'robust consensus of cases of persuasive authority.'"  *Id.* (quoting *Mammaro v. New Jersey Div. of Child Prot. & Permanency*, 814 F.3d 164, 166 (3d Cir. 2016)).

94

As in *Mirabella*, Sammons had threatened, directly or impliedly, to bring suit against the local government.  *See* ECF 15-5 at 1-2 (email dated April 27, 2019, from plaintiff to McCarthy, Meffley, and other County officials, stating: "I would expect [the ban on posting comments to the Page] to be corrected immediately to avoid retaining a civil liberty attorney to assist my remedy which may also result in a suite [sic] with the county for additional damages"); *see also* ECF 15-6 at 2 (in an email from plaintiff to Allison, McCarthy, and other County officials on December 10, 2019, plaintiff complained of the deprivation of access to the Page and said: "This is the second time this has happened within a year.  The 3rd time I will be seeking other means of remedy.  I expect this to be corrected immediately").  Further, as in *Mirabella*, County officials responded to Sammons's complaints by curtailing the exercise of his right to petition.  *See* ECF 15, ¶¶ 44-49.  In light of *Mirabella*, as of April 2017, when that case was decided, there was at least some authority recognizing a "right to be free from a restriction on communicating with one's government, [even] when the plaintiff has threatened or engaged in litigation against the government."  *Mirabella*, 853 F.3d at 657.  And, Allison allegedly directed Miller to implement the email ban against plaintiff in May 2020.  *See* ECF 15, ¶¶ 44-49.  By then, Mirabella had been "on the books" for about three years.

*Mirabella* is a Third Circuit decision, however, and it is not binding authority in this jurisdiction.  Furthermore, as the *Mirabella* Court observed, there is a dearth of case law indicating that plaintiff had a clearly established right to communicate with his local government, free from restriction, after threatening litigation.  *Mirabella*, 853 F.3d at 657.  And, perhaps most significant, in *Mirabella* the No Contact Email prohibited the plaintiffs from contacting their local government in *any* form.  *Id.* at 647.  Thus, a County official who studied *Mirabella* might have reached a plausible, if erroneous, conclusion that Cecil County could lawfully ban a resident from

communicating with County officials via email, so long as the ban expressly provided the resident with an alternative channel through which he could continue to communicate with County officials, such as the U.S. mail.  Indeed, in his email correspondence with plaintiff, Allison adopted that precise position.  *See* ECF 15-13 at 1 ("You have the right to communicate with County government.  Your right is now restricted to paper and pen writing delivered via USPS.").

Plaintiff insists that this distinction with *Mirabella* should make no difference in light of the pandemic.  In his view, during the pandemic, the ban on emailing County officials effectively precluded plaintiff from communicating with County government, because no one was at work to receive phone calls or mail.  *See* ECF 33 at 38 n.8.  He states:  "During the time Mr. Sammons was barred from emailing Cecil County employees, most, if not all County employees were working from remote locations, such as their homes, because of the covid pandemic."  *Id.*  Thus, as plaintiff sees it, "the argument that using a telephone to call public offices or mailing a letter to county office buildings [were] adequate alternate means of communication" misses the mark."  *Id.*

But, the Complaint is devoid of any allegation concerning plaintiff's inability to communicate with County government via telephone or the U.S. mail during the time that the email ban was in effect.  Moreover, there are no allegations that suggest, for example, that all County employees worked remotely during the pandemic and never checked phone messages or retrieved mail sent to the office.  And, it is well established that "'a complaint may not be amended by the briefs in opposition to a motion to dismiss.'"  *Sager v. Hous. Comm'n of Anne Arundel County*, 855 F. Supp. 2d 524, 557 (D. Md. 2012) (quoting *Arbitraje Casa de Cambio, S.A. v. U.S. Postal Serv.*, 297 F. Supp. 2d 165, 170 (D.D.C. 2003)).  Accordingly, in the absence of any such assertion in the Complaint, plaintiff has failed to plead facts that, if proven, would establish that

the email ban effectively deprived plaintiff of any effective means of contacting County government officials.

In sum, I cannot say that plaintiff had a clearly established right to communicate via email with County officials after he had threatened litigation against the County.  Consequently, I am persuaded that McCarthy, Miller, and Allison are entitled to qualified immunity as to Count III, in their individual capacities.

### 4.  Declaratory Judgment

In Count VII, plaintiff asks the Court to issue a declaratory judgment holding that certain provisions of the Communication Plan are unconstitutional, null, and void.  ECF 15 at 40-42. Plaintiff avers that these provisions are unlawful on the ground that they amount to "official written policies that are contrary to citizen's [sic] rights protected by the First and Fourteenth Amendments to the United States Constitution and also by Article 40 of the Maryland Declaration of Rights." ECF 15, ¶ 160.

In particular, Sammons points to a provision of the Communication Plan that states: "'Cecil County Government reserves the right to monitor and remove any content at any time for any reason at its sole, subjective discretion.  Comments, opinions, advice, statements, discussion posts, wall posts, and any other user-generated content that is deemed inappropriate by Cecil County Government will be removed from the page.'"  *Id.* ¶ 158 (quoting ECF 15-4 at 17).  Further, the Communication Plan indicates: "'If an individual continually posts prohibited or offensive material, the Cecil County Government may exercise its right to block that individual from posting content onto the Cecil County Facebook Page.'"  ECF 15, ¶ 159 (quoting ECF 15-4 at 18).  In plaintiff's view, these provisions of the Communication Plan confer unfettered discretion on

County officials "without regard to important constitutional restrictions applicable to Cecil County officials that prohibit government censorship and viewpoint discrimination."  ECF 15, ⁋ 161.

Defendants claim that plaintiff lacks standing to request a declaratory judgment because he "has not demonstrated an actual or impending controversy between himself and any of the Defendants with respect to Count VII."  ECF 26-1 at 35.  In particular, they argue: "Plaintiff does not allege that he made any comments on the 'Cecil County Government' Facebook page, which is the only page covered by the provisions in question, or that he did make posts to the 'Cecil County Government' Facebook page but that they were deleted."  *Id.*  In their view, any disagreement that Sammons may have with these provisions of the Communication Plan "would be most appropriately addressed by the representative branches of government, not the courts." *Id.* at 36 (citing *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982)).   Further, they contend that even if the Communication Plan applied to the County Executive Page, plaintiff cannot obtain declaratory relief "as the [Page] is no longer active and Defendant McCarthy is no longer an office holder."  ECF 26-1 at 36.

Sammons counters that there remains a disputed fact concerning whether the Communication Plan governed the County Executive Page because the Communication Plan "purports to apply to all official county social media sites and the parties dispute whether [the County Executive Page] was an official county social media site."  ECF 33 at 48.  Further, plaintiff claims that the Complaint "alleges plainly that Mr. Sammons wants to have the ability to comment on the social media pages of his local government, and Defendants have displayed a willingness on multiple occasions to deny him that ability."  *Id.* at 49.  As he sees it, it is irrelevant that "McCarthy is no longer County Executive," because there remains a threat that the

Communication Plan will be used to frustrate the exercise of plaintiff's free speech rights in the future.  ECF 33 at 49.

It is a bedrock principle that Article III of the Constitution confines the federal courts to the adjudication of "actual, ongoing cases or controversies." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990) (citations omitted); *see Carney v. Adams*, ___U.S.___, 141 S.Ct. 493, 498 (2020); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013); *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir. 2020).  "Indeed, 'no principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.'"  *Dreher v. Experian Info. Solutions, Inc.*, 856 F.3d 337, 343 (4th Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 343 (2016)).

"Article III's restriction of the judicial power to 'Cases' and 'Controversies' is properly understood to mean 'cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process.'"  *Uzuegbunam v. Preczewski*,___U.S.___, 141 S.Ct. 792, 798 (2021) (citations omitted). Therefore, during the pendency of a case, an actual controversy must exist.  *See Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974); *Int'l Bhd. of Teamsters, Local Union No. 639 v. Airgas, Inc.*, 885 F.3d 230, 234 (4th Cir. 2019); *Williams v. Ozmint*, 716 F.3d 801, 808 (4th Cir. 2013).  In the absence of a case or controversy, "the court's subject matter jurisdiction ceases to exist . . . ." *S.C. Coastal Conservation League v. U.S. Army Corps. of Eng'rs*, 789 F.3d 475, 482 (4th Cir. 2015); *see Gardner v. GMAC, Inc.*, 796 F.3d 390, 395 (4th Cir. 2015) (same).

"Two related doctrines . . . each originating in the case-or-controversy requirement of Article III . . . underlie [the] determination [of whether a case is justiciable]. First, a plaintiff must demonstrate standing . . . .  Second, the case must be 'ripe.'" *Trump v. New York*, ___U.S.___, 141

S.Ct. 530, 535 (2020) (internal citations omitted); *see Raines v. Byrd*, 521 U.S. 811, 818 (1997) ("One element of the case-or-controversy requirement" is that a plaintiff must establish standing to sue.); *Spokeo, Inc.*, 578 U.S. at 338 ("Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy."); *South Carolina v. United States*, 912 F.3d 720, 726 (4th Cir. 2019) ("The standing doctrine derives from the Constitution's limitation on Article III courts' power to adjudicate cases and controversies.") (internal quotation marks and citations omitted). The *Clapper* Court explained, 568 U.S. at 408: "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches."

The doctrine of standing consists of two distinct "strands": constitutional standing, pursuant to Article III, and prudential standing. *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004). And, "the standing inquiry asks whether a plaintiff ha[s] the requisite stake in the outcome of a case . . . ." *Deal v. Mercer County Board of Ed.*, 911 F.3d 183, 187 (4th Cir. 2018) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000)).

To establish Article III standing, a plaintiff must satisfy three elements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). They are, *id.* (internal quotation marks and citations omitted):

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

The cases are legion with regard to these elements.  *See*, *e.g.*,  *Uzuegbunam*, 141 S.Ct. at 798;  *Spokeo*, 578 U.S. at 338; *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 168 (2014); *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018); *see also Thole v. U.S. Bank N.A.*,___U.S.___, 140 S. Ct. 1615, 1618 (2020); *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 200 (4th Cir. 2020).  At bottom, these requirements ensure that the plaintiff has "'a personal stake in the outcome of the controversy.'"  *Gill v. Whitford*, ___U.S.____, 138 S. Ct. 1916, 1929 (2018) (citation omitted).

An injury in fact is the "'[f]irst and foremost' of standing's three elements."  *Spokeo*, 578 U.S. at 338 (alteration in *Spokeo*; citation omitted); *see Griffin v. Dep't of Labor Fed. Credit Union*, 912 F.3d 649, 653 (4th Cir. 2019) ("An injury in fact is an indispensable aspect of constitutional standing . . . .").  To satisfy the injury-in-fact requirement, the plaintiff must plausibly allege "an invasion of a legally protected interest" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."  *Spokeo*, 578 U.S. at 339  (quotation marks and citation omitted); *see Maryland Shall Issue*, 971 F.3d at 210. These subsidiary elements are distinct.  *See Spokeo*, 578 U.S. at 340 (opining that concreteness and particularity are "quite different"); *accord Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir. 2020).[30]

Under Article III, "a party invoking the jurisdiction of a federal court [must] seek relief for a particularized injury," which is a requirement that "serves vital interests going to the role of the judiciary in our system of separated powers."  *Hollingsworth v. Perry*, 570 U.S. 693, 696 (2013).

---

[30] To be sure, "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Susan B. Anthony List*, 573 U.S. at 159 (quoting *Babbitt v. Farm Workers*, 422 U.S. 289, 298 (1979)).  Here, plaintiff does not face threat of prosecution based on a criminal statute.

A particularized injury "must affect the plaintiff in a personal and individual way." *Spokeo*, 578 U.S. at 339 (internal quotation marks omitted). To be concrete, the injury must be "real and not abstract." *Id.*; *see Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (requiring the alleged injury to be "distinct and palpable, as opposed to merely abstract"). But, concreteness is not coterminous with tangible economic or physical harm. *See Spokeo*, 578 U.S. at 339-40. To the contrary, an "injury-in-fact is often predicated on intangible harm," *Baehr*, 953 F.3d at 252, including the invisible wounds inflicted by discrimination. *See Allen v. Wright*, 468 U.S. 737 (1984) (remarking that the stigma of discrimination "accords a basis for standing" to "'those persons who are personally denied equal treatment' by the challenged discriminatory conduct") (citation omitted); *see, e.g.*, *Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984) (male retiree had standing to challenge gender-based classification in Social Security allocations); *Bostic v. Schaefer*, 760 F.3d 352, 371-72 (4th Cir. 2014) (same-sex couple had standing to challenge state's same-sex marriage ban).

As for the imminence requirement, although it is "'a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes.'" *Clapper*, 568 U.S. at 409 (quoting *Lujan*, 504 U.S. at 564 n.2). Accordingly, an allegation of threatened injury in the future is sufficient to establish standing only "if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List*, 573 U.S. at 158 (quoting *Clapper*, 568 U.S. at 414 & n.5). An injury that "relies on a highly attenuated chain of possibilities" does not qualify as "certainly impending." *Clapper*, 568 U.S. at 410.

The "'case or controversy' constraint of Article III" includes principles of standing as well as ripeness, which "presents a 'threshold question [ ] of justiciability.'" *Scoggins v. Lee's Crossing*

*Homeowners Ass'n*, 718 F.3d 262, 269 (4th Cir. 2013) (citation omitted).  Like standing, ripeness is an issue of subject matter jurisdiction. *Sansotta v. Town of Nags Head*, 724 F.3d 533, 548 (4th Cir. 2013); *see Nat'l Ass'n for the Advancement of Colored People v. Bureau of the Census*, 382 F. Supp. 3d 349, 363 (D. Md. 2019) ("*NAACP*") (describing standing and ripeness as "overlapping facets" of subject matter jurisdiction).

As with standing, the ripeness doctrine is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction . . . ." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (internal quotation marks omitted). Whereas standing focuses on who can sue, ripeness "'concerns the appropriate timing of judicial intervention.'"  *Cooksey v. Futrell*, 721 F.3d 226, 240 (4th Cir. 2013) (quoting *Va. Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 389 (4th Cir. 2001)); *see NAACP*, 382 F. Supp. 3d at 363 (noting that standing concerns who may sue, while ripeness pertains to when a party may sue).

Under the ripeness doctrine, the Court considers: "(1) whether delayed review would cause hardship to the plaintiff; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented."  *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998).

Notably, a claim is not ripe for judicial review "'if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  *Scoggins*, 718 F.3d at 270 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).  In other words, "the ripeness requirement is designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements' . . . ."  *Ohio Forestry Ass'n, Inc.*, 523 U.S. at 732-

33 (citations omitted); *see also South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019); *NAACP*, 382 F. Supp. 3d at 370.

The doctrines of ripeness and standing have largely blurred in declaratory judgment actions. *See* 13B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 3532.5 (3d ed. 2018). In *MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118 (2007), the Supreme Court recognized that "standing and ripeness boil down to the same question" of justiciability. *Id.* at 128 n.8; *accord Susan B. Anthony List*, 573 U.S. at 157 n.5; *see South Carolina v. United States*, 912 F.3d at 730; *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006); *see also Capital Associated Indus., Inc. v. Stein*, 283 F. Supp. 3d 374, 380 (M.D.N.C. 2017) (characterizing discussion of standing and ripeness as "one involving 'standing'" in light of *MedImmune* and *Susan B. Anthony List*). This much is clear: Both ripeness and standing "require that those seeking a court's intervention face some actual or threatened injury to establish a case or controversy." *Doe v. Duling*, 782 F.2d 1202, 1206 n.2 (4th Cir. 1986).

That said, the requirements for ripeness, like those for standing, are "relaxed in First Amendment cases." *Cooksey*, 721 F.3d at 240. "'In a wide variety of settings, courts have found First Amendment claims ripe, often commenting directly on the special need to protect against any inhibiting chill.'" *Id.* (quoting *Bill Richardson v. Gonzales*, 64 F.3d 1495, 1500 (10th Cir. 1995)).

The Fourth Circuit has explained that where a plaintiff seeks prospective relief, a plaintiff can show "a sufficiently imminent injury" to satisfy Article III standing if the plaintiff alleges "'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Kenny v. Wilson*, 885 F.3d 280, 288 (4th Cir. 2018) (quoting *Babbitt v. Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). Concerning the latter element, the *Kenny* Court indicated that, to be

credible, a threat of enforcement must not be "imaginary or wholly speculative, chimerical, or wholly conjectural." *Kenny,* 885 F.3d at 288 (cleaned up).  And, the Fourth Circuit stated: "'[P]ast enforcement against the same conduct is good evidence that the threat of enforcement is not chimerical.'"  *Kenny*, 855 at 288 (quoting *Susan B. Anthony List*, 573 U.S. at 164).  Additionally, a "[t]hreat of prosecution is especially credible when defendants have not 'disavowed enforcement' if plaintiffs engage in similar conduct in the future."  *Kenny*, 855 at 288 (quoting *Susan B. Anthony List*, 573 U.S. at 164).

Plaintiff states that he "wants to have the ability to comment on the social media pages of his local government . . . ."  ECF 33 at 49.  And, as set forth above in greater detail, the Communication Plan governs the way in which the County administers the County Facebook Pages.  *See* ECF 15-4 at 17-18.  Indeed, it lists eleven different "Current Facebook Accounts" associated with the County that are subject to the terms of the Communication Plan.  *Id.* at 17.  Further, at least with respect to the "Cecil County Government Facebook Page" the Communication Plan provides County officials with the ability to "remove any content at any time for any reason at its sole, subjective discretion."  *Id.*  Thus, plaintiff's desire to post comments onto the social media sites associated with the County arguably satisfies the first element of the *Kenny* test.

Nonetheless, plaintiff has failed to show that there "exists a credible threat of prosecution" sufficient to establish Article III standing with respect to Count VII.  *Kenny*, 912 F.3d at 288.  Nor is there any indication that the Communication Plan has been invoked or will be invoked in the future to inhibit the exercise of plaintiff's free speech rights.

*Davison*, 912 F.3d 666, is again instructive.  As stated, *Davison* concerned a suit against a Chair of a County Board of Supervisors, asserting that the Chair engaged in viewpoint

discrimination in the administration of her official Facebook page. *Id.* at 672-73.   Before the trial

court, the plaintiff sought and obtained a declaratory judgment to the effect that defendant acted

under color of state law in managing the Facebook page at issue; the Facebook page operated as a

public forum; and the Chair could not engage in viewpoint discrimination in the administration of

the subject Facebook page without running afoul of the First Amendment. *See Davison v. Loudoun*

*County Bd. of Supervisors*, 267 F. Supp. 702, 723 (E.D. Va. 2017).

On appeal, the defendant challenged the plaintiff's standing to pursue this form of

declaratory relief. *Davison*, 912 F.3d at 677-79.   The defendants had not challenged Davison's

standing with respect to his request for prospective declaratory relief before the trial court.   But,

the Fourth Circuit explained that "'standing to sue is a jurisdictional issue of constitutional

dimensions and it may be addressed for the first time on appeal.'"   *Davison*, 912 F.3d at 677

(quoting *Hodges v. Abraham*, 300 F.3d 432, 443 (4th Cir. 2002)).

The Fourth Circuit rejected the argument, however.   Invoking *Kenny*, 885 F.3d 280, the

*Davison* Court explained, in relevant part, 912 F.3d at 678-679:

> Randall previously blocked Davison from the Chair's Facebook Page based
> on the content of his posts, providing "good evidence that the threat of enforcement
> is not chimerical." *Driehaus*, 134 S.Ct. at 2345 (internal quotation marks omitted).
> Additionally, Randall testified that she continues to believe she can ban Davison
> and others from the Chair's Facebook Page based on their views without triggering
> the First Amendment *at all*. . . .   Accordingly, Davison established that he has been
> subject to past enforcement and that Randall has not "disavowed" future
> enforcement, which, under *Kenny*, is sufficient to establish a credible threat of
> enforcement.

This case is distinguishable from *Davison* because there is no indication that the provisions

of the Communication Plan were enforced against plaintiff in the past.   To be sure, Sammons

complains that his free speech rights were violated when, on two occasions, County officials

deleted comments that plaintiff made on the County Executive Page, and subsequently blocked

plaintiff from making further comments on that Page.  *See* ECF 15, ¶¶ 25-33.   But, the Communication Plan does not purport to apply to the Page.

As discussed, the Communication Plan provides guidance to County officials who administer social media sites affiliated with the County.  *See* ECF 15-4 at 14-18.   It lists eleven different "Current Facebook Accounts" associated with the County that are subject to the terms of the Communication Plan.   *Id.* at 17.   But, the County Executive Page is not one of the County's enumerated Facebook Pages.   And, Sammons has not pointed to any case law that suggests that defendants' alleged actions with respect to the Page could somehow transform it into an official County Facebook Page within the ambit of the Communication Plan.   Thus, the fact that plaintiff's posts were deleted from the County Executive Page does not establish that the relevant provisions of the Communication Plan were enforced against Sammons in the past.

Moreover, plaintiff has not alleged that he ever posted a comment to a County Facebook Page governed by the terms of the Communication Plan, let alone that any such post was deleted by County officials.  Furthermore, none of the County officials who, according to plaintiff, violated his free speech rights with respect to the County Executive Page—McCarthy, Allison, and Lyall— retained the roles in County government that they possessed at times relevant to the Complaint. *See Office of the County Executive*, Cecil County, Maryland, https://www.ccgov.org/government/office-of-the-county-executive (last visited Mar. 6, 2022).

In the absence of a contention that any provision of the Communication Plan has ever been enforced against plaintiff in the past, coupled with the lack of allegations indicating the Communication Plan will likely be enforced against plaintiff in the future, plaintiff has no ground to pursue the declaratory relief that he seeks.  *Cf. Trump*, 141 S. Ct. at 536-37 (dismissing suit for

prospective declaratory relief where case "was riddled with contingencies and speculation that impede judicial review").

The Court expresses no opinion as to whether the Communication Plan impermissibly confers too much discretion on County officials with respect to the administration of the County's social media sites such that it amounts to a violation of the First Amendment.  Rather, it is sufficient for present purposes to note that Sammons has not established, to any degree of likelihood, that his free speech rights will be inhibited by future enforcement of the Communication Plan. Consequently, I agree with defendants that plaintiff lacks standing to assert a claim for declaratory relief on the basis he asserts.  Accordingly, I shall grant the Motion with respect to Count VII.

### 5.  Damages

As mentioned, plaintiff seeks compensatory and punitive damages from defendants, "in an amount to be determined at trial, together with reasonable attorney's fees, expert witness fees and other costs as permitted by law."  ECF 15 at 24, 27, 31, 34, 36-37, 40.  The Motion seeks dismissal of the request for compensatory and punitive damages.   ECF 26-1 at 37-39.

### a.  Compensatory Damages

With respect to plaintiff's requests for compensatory damages, defendants contend that Sammons must show damages that are "'grounded in determinations of plaintiff['s] actual losses.'" ECF 26-1 at 38 (quoting *Memphis Comm. Sch. District v. Stachura*, 477 U.S. 299, 307 (1986) (alteration in ECF 26-1).   And, defendants claim that "Plaintiff fails to allege any 'actual losses,'" such as "losing a job or being forced to relocate, emotional distress, humiliation, anxiety, etc., such that he fails to state a claim for which the relief requested can be granted."  ECF 26-1 at 38.

Defendants' claim is without merit.  Plaintiff has pleaded sufficient facts to support a cause of action for violations of his free speech rights, from which it is plausible that

compensatory damages could flow. As required by Fed. R. Civ. P. 8, the allegation for compensatory damages places defendants on notice that plaintiff has requested such damages. In the event that plaintiff succeeds on his free speech claims, he would be entitled to compensatory damages that are "grounded in determinations of plaintiff['s] actual losses." *Stachura*, 477 U.S. at 307. But, the defense does not point to any case law, and the Court is unaware of any, that suggests the plaintiff must specifically identify his "actual losses" in a pleading, or else risk losing the ability to recover compensatory damages.

### b. Punitive Damages

As to plaintiff's claim for punitive damages, defendants correctly observe: "[T]hey are not recoverable against the County under § 1983." ECF 26-1 at 38. Indeed, the Supreme Court has instructed that "a municipality is immune from liability for punitive damages under 42 U.S.C. § 1983." *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).

However, Sammons did not name the County as a defendant in his claims arising under § 1983. Rather, as discussed above, plaintiff has stated claims under 42 U.S.C. § 1983 against the Individual Defendants in their official capacities. Nonetheless, claims lodged against municipal officers in their official capacities are effectively claims against the municipality. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991) (explaining that "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent") (internal quotation marks and citations omitted). Thus, as a matter of law, plaintiff may not recover punitive damages in Counts I through III with respect to the Individual Defendants in their official capacities.

Defendants also argue that the Court should reject plaintiff's request for punitive damages from the Individual Defendants in their personal capacities. As defendants point out, punitive

damages are "only proper to punish those 'who act with a malicious intent to deprive plaintiffs of their rights or to do the injury . . . or with reckless or callous indifference to the federally protected rights.'"   ECF 26-1 at 39 (quoting *Piver v. Pender Cnty. Bd. of Educ.*, 835 F.2d 1076, 1082 (4th Cir. 1987)).   And, defendants maintain that the Complaint does not allege with adequate specificity "facts which indicate that Defendants' conduct was 'motivated by evil motive or intent' or that it 'involve[d] reckless or callous indifference to [his] federally protected rights[.]'"   ECF 26-1 at 39 (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)) (alterations in ECF 26-1).

In my view, defendants' argument is premature.   To be sure, defendants may later show that punitive damages are not appropriate in this case.   But, at the pleading stage, I must credit plaintiff's allegations as true.   And, in each Count, plaintiff has alleged that the relevant defendants acted with actual malice with respect to plaintiff's constitutional rights.   *See*, *e.g.*, ECF 15, ⁋ 82. Accordingly, I shall reject defendants' request to dismiss plaintiff's prayer for punitive damages against the Individual Defendants, in their individual capacities.

## IV.    Conclusion

For the aforementioned reasons, I shall instruct the Clerk to correct the spelling of McCarthy's surname and to terminate Sniadowski from the suit.   I shall also deny the Reconsideration Motion, as well as Mr. McDermott's remaining motions.   And, I shall grant the Motion in part and deny it in part.

With respect to Counts I through VI, I shall construe the Motion as a motion to dismiss, pursuant to Rule 12(b)(6).   And, I shall grant the Motion with respect to Count II and Count V to the extent they include a claim under the Maryland Open Meetings Act, G.P. §§ 3-301, *et seq.*   In addition, I shall grant the Motion with respect to Count II and V as to Meffley, without prejudice. I shall also grant the Motion as to Count II to the extent it includes claims against McCarthy, Wein,

and Tome, in their individual capacities, based on blocking the transmission of plaintiff's video feed. Further, I shall grant the Motion as to Count III as to Allison, McCarthy, and Miller, in their individual capacities. And, I shall grant the Motion as to Count VII.

In addition, I shall grant the Motion with respect to plaintiff's request for punitive damages as to Counts I through III, to the extent that they are requested against the Individual Defendants in their official capacities.

The Motion is otherwise denied.

An Order follows.


Date: March 29, 2022                               _____/s/_____

                                                   Ellen L. Hollander
                                                   United States District Judge