**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

VINCENT S. SAMMONS,

     *Plaintiff*,

     v.                            **Civil No.: 1:20-cv-03010-JRR**

ALAN J. MCCARTHY, *et al.*,

     *Defendants*.

## <u>MEMORANDUM OPINION</u>

Pending before the court are the parties' cross motions for summary judgment: Defendants Cecil County, Maryland (the "County"), Alan J. McCarthy, Alfred C. Wein, Jr., Jason L. Allison, Jennifer R. Lyall, Maggie D. Tome, and Brian F. Miller's Motion for Summary Judgment (ECF No. 120; "Defendants' Motion"), and Plaintiff Vincent S. Sammons' Cross Motion for Partial Summary Judgment (ECF No. 130; "Plaintiff's Motion"). The court has reviewed all papers; no hearing is necessary. Local Rule 105.6 (D. Md. 2023). For the reasons that follow, by accompanying order, Defendants' Motion will be granted in part and denied in part, and Plaintiff's Motion will be denied.

## I.   <u>BACKGROUND</u>

Plaintiff initiated this action against Defendants on October 16, 2020, for claims arising from three distinct incidents, referred to generally as the "Facebook Claim," the "Budget Meeting Claim," and the "County Email Claim." (ECF No. 1; ECF No. 15.) Defendants filed a motion to dismiss or for summary judgment as to Plaintiff's Amended Complaint (ECF No. 15; the "Amended Complaint"). (ECF No. 26.) The Honorable Ellen L. Hollander, then presiding, issued a memorandum opinion and order ruling on the motion (ECF Nos. 55, 56); the following counts remain:

> **Count I**: Violation of 42 U.S.C. § 1983 based upon First Amendment Viewpoint Discrimination—Facebook Claim—against Defendants McCarthy, Allison, and Lyall in their individual and official capacities;[1]
>
> **Count II**: Violation of 42 U.S.C. § 1983 based upon First Amendment Viewpoint Discrimination—Budget Meeting Claim—against Defendants McCarthy, Wien, and Tome in their official capacities only as to the Video Disruption, and in their individual and official capacities as to the Audio Disruption;
>
> **Count III**: Violation of 42 U.S.C. § 1983 based upon First Amendment Viewpoint Discrimination—County Email Claim—against Defendants McCarthy, Allison, and Miller in their official capacities;
>
> **Count IV**: Violation of Article 40 of the Maryland Declaration of Rights based upon Viewpoint Discrimination—Facebook Claim—against Defendants McCarthy, Allison, and Lyall, as well as the County (based upon respondeat superior liability);[2]
>
> **Count V**: Violation of Article 40 of the Maryland Declaration of Rights based upon Viewpoint Discrimination—Budget Meeting Claim—against Defendants McCarthy, Wien, and Tome, as well as the County (based upon respondeat superior liability);
>
> **Count VI**: Violation of Article 40 of the Maryland Declaration of Rights based upon Viewpoint Discrimination—County Email Claim—against Defendants McCarthy, Allison, and Miller, as well as the County (based upon respondeat superior liability).

(ECF No. 15 ¶¶ 73–155; ECF No. 56.)   After an extensive discovery period, the parties now file

their instant Motions.  Defendants seek summary judgment on all claims against them, and Plaintiff

seeks partial summary judgment on his claims against Defendants.  (ECF Nos. 120, 130.)

---

[1] As explained more fully below, in the context of § 1983, official capacity suits are treated as suits against the municipality.  *See Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (quoting *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n.55 (1978)); *Santos v. Frederick Cnty. Bd. of Comm'rs*, 725 F.3d 451, 469 (4th Cir. 2013).

[2] "The official/individual capacity distinction that is a part of 42 U.S.C. § 1983 does not apply to Maryland constitutional violations."  *Barbre v. Pope*, 402 Md. 157, 163 n.4 (2007); *see Ritchie v. Donnelly*, 324 Md. 344, 375 (1991) (holding that "[s]tate law does not allow . . . bifurcation" of state constitutional and intentional tort claims as to official and individual capacities); *Graham v. Maryland*, 738 F. Supp. 3d 644, 657 (D. Md. 2024) (same).

## II.    **UNDISPUTED FACTS**

### A.  The Parties

Plaintiff Vincent S. Sammons is a County resident who is socially and politically active in his community, having previously served on the Republican Central Committee for Cecil County and a related redistricting committee.  (Sammons Dep., ECF Nos. 120-7, 130-1 at 12:15–13:12, 15:11–17:1.)  Plaintiff maintains a number of Facebook pages in addition to his personal account.  *Id.* at 29:12–34:6.  Plaintiff has at various points expressed statements critical of McCarthy as a politician, including comments critical of his tax policies and about his alleged involvement in public corruption.  (ECF No. 15 ¶ 25.)

Defendant Alan J. McCarthy previously served as the County's County Executive from 2016 through 2020, when he lost his bid for re-election.  (McCarthy Dep., ECF Nos. 120-3, 130-2 at 15:3–12, 47: 5–9.)  Pursuant to Article 4, Section 402, of the Cecil County Charter:

> There is a County Executive, who shall be the chief executive officer of the County and shall faithfully execute the laws. All executive power vested in the County by the Constitution and laws of Maryland and this Charter shall be vested in the Executive. The Executive shall see that the affairs of the executive branch are administered properly and efficiently, and that employees of the executive branch faithfully perform their duties. The duties and responsibilities of the Executive shall include, but are not limited to:
>
> **(a)** Supervising and directing offices, agencies and divisions of the executive branch and ensuring that County employees as well as County boards and commissions faithfully perform their duties;
>
> **(b)** Preparing and submitting to the Council the annual County Budget.
>
> **(c)** Preparing and submitting to the Council and the public within six months after the close of the fiscal year an annual report on the activities and accomplishments of the County government, including a comprehensive annual financial statement;

3

> **(d)** Providing the Council with any information the Executive deems necessary or, as the Council by resolution may request, information concerning the executive branch which the Council may require for the exercise of its powers;
>
> **(e)** Recommending to the Council such measures for legislative action that the Executive may consider to be in the best interests of the County; and
>
> **(f)** Signing or causing to be signed on the County's behalf all deeds, contracts, and other instruments.

CECIL COUNTY CHARTER, Art. 4, § 402.

Defendant Alfred C. Wein, Jr., served as the County's Director of Administration from 1998 through 2020.  (Wein Dep., ECF Nos. 120-10, 130-8 at 9:13–12:9.)  Pursuant to Article 4, Section 410 of the Cecil County Charter:

> The Executive shall appoint a Director of Administration, subject to confirmation by the Council, who shall serve at the pleasure of the Executive. The Director of Administration shall be selected on the basis of qualifications as a professional administrator, skill in governmental budgeting and technical training for the duties of the office. The Director of Administration shall be a resident of the County within six months of appointment. The Director of Administration shall, subject to the direction of the Executive, supervise all departments, offices, and agencies of the executive branch, advise the Executive on all administrative matters and perform such other duties as may be assigned by the Executive or this Charter.

CECIL COUNTY CHARTER, Art. 4, § 410.  In Wein's words, the Director of Administration "[e]ssentially" runs the day-to-day operations for the County, along with the County Executive and department heads, and serves as a liaison between the department heads.  (ECF Nos. 120-10, 130-8 at 10:14–11:6.)

Defendant Jason L. Allison served as the County's County Attorney from about 2013 through 2020.  (Allison Dep., ECF Nos. 120-5, 130-3 at 8:10–26, 50:17–19.)  Pursuant to Article 4, Section 411 of the Cecil County Charter:

> The Executive shall appoint a County Attorney, subject to confirmation by the Council. The County Attorney shall be the chief legal officer of the County, conduct all the law business of the County, be a legal advisor to the Council, and be the legal advisor to the Executive, all departments, and other instrumentalities of the County government. The County Attorney may, with the approval of the Council, employ special legal counsel to work on problems when the work to be done is of such character or magnitude as to require services in addition to those regularly provided by the County Attorney. The County Attorney shall serve at the pleasure of the Executive.

CECIL COUNTY CHARTER, Art. 4, § 411.

Defendant Jennifer R. Lyall served as the County's Public Information Officer from 2017 through 2020. (Lyall Dep., ECF Nos. 120-4, 130-4 at 11:16–13:4.) Lyall described her duties as writing press releases, managing the County's website content, speechwriting, and managing social media accounts for various County departments. *Id.* at 13:7–11.

Defendant Maddie D. Tome currently serves as the County's Network Support Specialist and has been employed by the County since about 2018. (Tome Dep., ECF Nos. 120-9, 130-5 at 8:7–9:1.) In her role, Tome helps to maintain the County's website and serves as an administrator on the County's social media accounts. *Id.* at 10:4–12.

Defendant Brian F. Miller served as the County's Director of Information Technology ("IT") from 2017 through 2020. (Miller Dep., ECF Nos. 120-13, 130-9 at 8:13–9:7.) Miller described his duties as "moderniz[ing]" the IT environment, advising on strategic projects, and overseeing the daily operation of IT. *Id.* 9:18–10:1.

**B. The Facebook[3] Claim**

In 2015, Defendant McCarthy maintained a personal Facebook page (ECF No. 15-1; ECF Nos. 120-3, 130-2 at 19:20–21) and a Facebook page for his political campaign for County Executive.  (ECF No. 15 ¶¶ 13–16; ECF Nos. 120-3, 130-2 at 20:4–15.)   A number of people assisted McCarthy in the creation of the latter, including Dennis Minihane and Jennifer LePore. (ECF Nos. 120-3, 130-2 at 24:10–21.)   The name of the latter Facebook page has changed over time.   *Id.* at 38:6–19; ECF No. 15 ¶¶ 13–16.   McCarthy testified that he thought the name progressed as follows:

> I'm really not certain how it started. But, originally, it was probably Dr. Alan McCarthy for County Executive. . . .   And then it probably went to—after I won the primary, it probably went to some deviation

---

[3] As Judge Hollander previously explained:

> Facebook is a social media site and social networking service owned by Meta Platforms, Inc. f/k/a Facebook, Inc. *See Introducing Meta: A Social Technology Company*, META, https://about.fb.com/news/2021/10/facebook-company-is-now-meta/ (last visited Mar. 25, 2022). Facebook enables its users to "find and connect with people, groups, businesses, organizations, and others . . . " *Terms of Service*, FACEBOOK, https://www.facebook.com/terms.php (last visited Mar. 5, 2022); *see Bland v. Roberts*, 730 F.3d 368, 385 (4th Cir. 2013) (describing Facebook as "'an online social network where members develop personalized web profiles to interact and share information,'" such as "'news headlines, photographs, videos, personal stories, and activity updates,'" with other Facebook "'members'") (quoting *Lane v. Facebook, Inc.*, 696 F.3d 811, 816 (9th Cir. 2012)).

> Although "[t]he Facebook platform and the software that underlies that platform is, according to Facebook's *Terms of Service*, property of Facebook, Inc.", Facebook users "own the content [they] create and share on Facebook and the other Facebook Products . . ." *Davison v. Randall*, 912 F.3d 666, 682 n.4 (4th Cir. 2019) (internal quotation marks and citations omitted) (alteration in *Davison*).

> To that end, Facebook users can maintain personal profiles, which are used for non-commercial purposes and represent individual people. *What's the difference between a profile, Page and group on Facebook?*, FACEBOOK, https://www.facebook.com/help/337881706729661 (last visited Feb. 27, 2022). In addition, Facebook allows users to create a "Page", which is typically used by "artists, public figures, businesses, brands, organizations, and nonprofits" for the purpose of "connect[ing] with their fans or customers." *Id.* Such users "must have a profile to create a Page or help manage one." *Id.*

*Sammons v. McCarthy*, 606 F. Supp. 3d 165, 181 n.8 (D. Md. 2022).

> of it, you know: Dr. McCarthy, Republican candidate for County
> Executive, and then Dr. McCarthy County Executive.

(ECF Nos. 120-3, 130-2 at 38:12–20.)   The political page eventually became the "Dr. Alan McCarthy Cecil County Executive" page (hereinafter, the "McCarthy Facebook Page"). (ECF No. 15-3.)

A number of private citizens[4] had administrative rights with respect to, and posted on, the McCarthy Facebook Page, including Owen McElvoy, Dennis Minihane, Jennifer LePore, and, eventually, Jackson Leith.   (ECF Nos. 120-3, 130-2 at 24:10–25:4, 29:12–30:3.)   McCarthy testified that these individuals ran the McCarthy Facebook Page autonomously but under his "overall directions . . . to promote Cecil County." (ECF Nos. 120-3, 130-2 at 52:7–16.) Of import here, neither Allison nor Lyall had administrative rights to the McCarthy Facebook page.  (ECF Nos. 120-5, 130-3 at 39:21–40:6; ECF Nos. 120-4, 130-4 at 15:9–12, 16–21.)  McCarthy testified that he had no recollection of ever posting anything on the McCarthy Facebook Page or using the McCarthy Facebook Page to "respond[] to posts made by [his] constituents," except perhaps to wish them a "happy birthday."  (ECF Nos. 120-3, 130-2 at 28:12–16, 41:1–4, 46:11–19.)

The McCarthy Facebook Page identifies McCarthy as a "politician." (ECF No. 15-3 at p. 3.) It states that the McCarthy Facebook Page is managed by "Friends of Alan McCarthy." *Id.* at p. 5.  The provided screenshots of the McCarthy Facebook Page do not show that McCarthy directly (versus through someone else on his behalf) posted on the page. *Id.* Also, for some time, the McCarthy Facebook Page bore the official seal of the County. *Id.* at p. 1–2.

---

[4] Leith completed multiple internships with the County: one in the Fall of 2017, one from July to August 2019, one from mid-December 2019 to mid-January 2020, one from July 2020 to December 2020, and one from mid-December 2020 to mid-January 2021.  (Leith Dep., ECF No. 120-6 at 10:8–13:6.)  He volunteered with McCarthy's re-election campaign, and thus was posting to the McCarthy Facebook Page, from late January or early February 2020 through June 2020. *Id.* at 16:2–6, 24:1–12.  Plaintiff's alleged instances of being blocked from the McCarthy Facebook Page occurred prior to Leith's internship.  Leith testified that he did not ever block anyone on the McCarthy Facebook Page. *Id.* at 20:17–19.

Plaintiff testified that he believed that the McCarthy Facebook Page was an official page of the County.  (ECF Nos. 120-7, 130-1 at 51:12–16.)  In April 2019, Plaintiff began complaining that he was blocked from commenting on, and that his comments were deleted or hidden from, the McCarthy Facebook Page.  (ECF Nos. 120-7, 130-1 at 43:14–44:10.)  Plaintiff exchanged emails with Allison regarding his access to the McCarthy Facebook Page.  (ECF No. 15-2.)  In an email to Allison of April 27, 2019, Plaintiff stated that it was "a violation of First Amendment free-speech rights to block users from government-sponsored social media accounts just because they post critical comments," and that he "expect[ed] this to be corrected immediately to avoid retaining a civil liberty attorney to assist [him with a] remedy which may also result in a suit[] with the county for additional damages."  (ECF No. 15-5 at p. 1–2.)  Three days later, Allison informed Plaintiff by email that his access to the McCarthy Facebook Page had been restored.  (ECF No. 15-2 at p. 1.)  Allison testified that, at some point, he informed McCarthy that due to ambiguity as to whether the McCarthy Facebook Page was campaign-related, McCarthy needed to provide full access to the public until/unless that ambiguity was resolved (against requiring full public access).  (ECF Nos. 120-5, 130-3 at 36:10–27:6.)

In December 2019, Plaintiff again complained that he was blocked from the McCarthy Facebook Page.  (ECF Nos. 120-7, 130-1 at 157:16–18.)  Plaintiff sent an email on December 10, 2019, to a number of recipients, including Allison and McCarthy, stating:

> Here we go again. This is the second time this has happened within a year. The 3rd time[,] I will be seeking other means of remedy. I expect this to be corrected immediately.
>
> *I am unable to comment (actively blocked) and only sharing abilities. . . .

(ECF No. 120-15 at p. 2–3.)  Allison responded that the McCarthy Facebook Page is not a County social media site, and was instead the social media site for McCarthy's campaign.  *Id.* at p. 1.

Plaintiff countered that there was "precedent" to claim it was an official County page and stated: "I would like to ask you again to reconsider before I ask the courts to make a determination for us." *Id.* Allison directed Plaintiff to send his concerns to the McCarthy campaign, not the County. *Id.*

McCarthy testified that he has little understanding of the technology features of Facebook, including how Facebook works, how to change Facebook profile settings, or how to block members from commenting publicly on the McCarthy Facebook Page. (ECF Nos. 120-3, 130-2 at 26:15–17, 28:18–29:2, 41:1–15.) He attests that he did not know that Plaintiff had been blocked from the McCarthy Facebook page, nor would he have permitted (or directed) the people managing the account to do so. (ECF Nos. 120-3, 130-2 at 41:18–13.) Leith testified that he did not know McCarthy to make changes to the McCarthy Facebook Page himself, nor did McCarthy ever ask Leith to make changes to the McCarthy Facebook Page. (Leith Dep., ECF No. 120-6 at 19:10–15.)

### C. The Budget Meeting Claim

On May 12, 2020, the County Council convened a public budget hearing on the Fiscal Year 2020-2021 Budget (the "Budget Meeting") via Zoom in the wake of the COVID-19 pandemic and the related statewide emergency. (ECF No. 120-8.) "During the meeting, participants were able to see other participants in separate windows on their computer screens and were able to have real time voice communications."[5] (ECF No. 15 ¶ 34.) The meeting was led by Council President Robert Meffley. (ECF No. 120-8.) In convening the meeting, Meffley announced: "This is an opportunity for citizens to give comments on the proposed budget which the County Executive has submitted to the Council for consideration." (ECF No. 120-8 at 19:29–19:49.) Council Manager

---

[5] The video recording shows only the "speaker view" of the meeting, meaning that recorded video displays the person speaking at the time. (ECF No. 120-8.)

James Massey facilitated the meeting, with the assistance of Tome and Terry Hale (Massey's assistant) as the administrative hosts of the Zoom meeting, meaning they had the ability to mute and unmute people and to stop their video feeds.   (ECF Nos. 120-9, 130-5 at 33:2–19.)  Massey, Tome, and Hale were all together in a room for the Budget Meeting, while the Council members, McCarthy, and members of the public, including Plaintiff, attended by Zoom.  (ECF No. 120-8.)  Plaintiff set up his video feed to show signs that stated: "Vote for Hornberger" (McCarthy's political opponent), "No More Tax Increases," and "McCarthy Stop Blocking Me on Facebook." (ECF No. 15-10; ECF Nos. 120-7, 130-1 at 103:15–104:18.)

Following McCarthy's presentation on the budget, the Budget Meeting turned to public comments.  (ECF No. 120-8 at 34:36.)   During the public comments, and as a result of audio issues, Meffley directed Massey to ensure that participants' microphones were muted unless they were speaking.  (ECF No. 120-8 at 43:59.)  Massey called on Plaintiff to see if he would like to be heard, and Plaintiff did not respond.  (ECF No. 120-8 at  1:05:52.)  At the time Massey called upon Plaintiff, Hale had control of the laptop and mouse.  *Id.*  Tome had her phone in her hand, but did not move her hand during the time Plaintiff was called on; further, she did not look at her phone at that time. [6]  *Id.*   Massey waited approximately eight seconds before moving to the next participant.  *Id.*  Neither McCarthy nor Wein were in the room at the time.  *Id.*  Wein testified that he did not speak with Tome about whether Plaintiff should be allowed to speak at the meeting (ECF No. 120-10, 130-8 at 87:5–7.)

About twenty (20) minutes later, Wein entered the room where Massey, Tome, and Hale were hosting the meeting.  (ECF No. 120-8 at 1:21:35.)  He approached and spoke to Tome, while they both looked at the television monitor where meeting participants appeared.  *Id.*  Wein testified:

---

[6] Tome also attests that she "did not and could not mute [Plaintiff] from [her] cell phone."  (Tome Aff., ECF No. 131-1 ¶ 4.)

> A. At that part of the meeting, I decided to go home. I decided to leave.
> Q. Okay. If you were going to leave, why not just leave? Why did you come into this part of the meeting?
> A. I just spontaneously went in and said something to Maggie.
> Q. All right. What'd you say?
> A. It was more of a rhetorical question. Asked if she was observing the same thing we were.
> Q. Uh-huh. And why would you ask her that?
> A. Just no particular reason.
> Q. So, you're on your way home, and for no particular reason you go in and you ask her, "Are you seeing what I'm seeing?" Is that accurate?
> A. Yes.
> Q. Okay. And you had no purpose behind that at all?
> A. No.
> Q. Okay. Have you—well, what were you referring to, "Are you seeing what I'm seeing"?
> A. I was probably referring to the displays. Signs.

(ECF No. 120-10, 130-8 at 76:19–77:20.)

Tome testified that she did not remember much about her conversation with Wein:

> I vaguely remember—like, when I went back and watched it, I recalled something about we were—we were watching it in gallery view, which is viewer's choice. And I don't know how he was watching it, but when he walked in, he asked a question about the view.

(ECF Nos. 120-9, 130-5 at 21:4–14.)

After speaking with Wein, Tome took control of the laptop mouse from Hale and terminated Plaintiff's video feed.  (ECF No. 120-8 at 1:22:16; ECF Nos. 120-9, 130-5 at 16:3–12.) Tome testified that she made the decision to terminate Plaintiff's video feed herself and did not discuss that decision with anyone else prior to doing so.  (ECF Nos. 120-9, 130-5 at 28:1–10.)  She believed that campaign signs were improper during a public Council meeting based on her prior experience.  (ECF Nos. 120-9, 130-5 at 24:13–25:4, 39:6–10.)  She did not believe, or recall, that Wein told her that it was improper.  *Id.* at 24:13–25:4.  Tome did not terminate the video feeds of

11

a citizen wearing a "Trump 2020" hat or displaying a "yes to Southfields" sign. *Id.* at 44:4–14, 17–19. She testified that she perceived a political message on a sign to be different than a political sign on a piece of clothing. (ECF Nos. 120-9, 130-5 39:15–40:19.)

Massey did not hear the conversation between Wein and Tome; however, he testified that, after the meeting, Tome told him and Hale that she had interpreted Wein's statement as "the [E]xecutive didn't like the Hornberger sign." (Massey Dep., ECF No. 120-12 at 36:4–10; 55:6–16.) Massey believed that Tome "was afraid," based upon Wein's statement, and so she had "gone ahead and took it off without him actually saying that." *Id.* McCarthy testified that he did not instruct anyone to terminate Plaintiff's video feed and he was not made aware of the decision to do the same. (ECF Nos. 120-3, 130-1 at 264:5–265:3.)

### D. The County Email Claim

Following the Budget Meeting, on May 13, 2020, Plaintiff emailed Massey and the general Council email. (ECF No. 15-13.) His email reads:

> I was very disappointed on the abuse of technology to subdue my freedom of speech and the opportunity to interject and speak about the pending budget. I and others have been blocked from the County Executive social media page that I have officially communicated to the county twice on this matter, The first time the county attorney corrected it and the second time he made some lame legal opinion on why he can block others. To this day I remained blocked from commenting and correcting the County Executive on his false messages to the public while his cheerleaders sing him praise. Never the less, last night I wanted to speak out on how embarrassed I was to call these elected official Republicans due to their liberal tax and spend policies and I did not want the taxes to go up yet again. I also had a video feed up during the meeting that had several signs made that reflected my opinions on this that was later silenced as McCarthy did not like the fair but negative messaging. Meanwhile, The "YES to Southfields" video feed was allowed to continue throughout the online session. I was "given an opportunity" to speak last night however my mic was open so briefly the time I unmuted my mic the "opportunity" was over. The host has to open the mic and then the recipient has to also unmute manually the mic in order

> to talk. I had to click on a box to say yes unmute my mic and then
> had to go and unmute again on my interface to talk. In closing, I
> would like for the county Executive to UNBLOCK EVERYONE
> (not only me) and be allowed to have our voices back and give him
> the criticism he is deserving of on his tax and spend policies.

(ECF No. 15-13 at p. 17–18.)  He followed up six days later after not receiving a response, copying

Allison and a member of the press.  *Id.* at p. 17.

In the days that followed, Allison and Plaintiff continued to correspond about the McCarthy

Facebook Page and the Budget Meeting.  In one email, Plaintiff stated:

> You have had an aggressive stance from almost every request I have
> made in the past with the county. Always dragging your feet or some
> excuse on why you are not able to do something. Matter of fact, I
> had to get the state involved a few times to get your people to
> comply with my request. I think you need to come to the realization
> you also work for me as a citizen and I expect to get some answers
> on WHY and HOW I was denied to speak and my video feed closed
> down while others were allowed to be on during the public
> "meeting". These are civil rights violations and should not be taken
> lightly. If I do not get a legitimate response I will have no other
> option than to contact the Maryland State Bar to file a complaint
> about your conduct and contact other agencies yet again to force you
> to comply to this legitimate and respectful request. The press has the
> right to know about what is being filed and why these are ethics
> charges continue to be denied and being buried. More transparency
> is good for everyone.

*Id.* at p. 15.  In another instance, Plaintiff responded to Allison's email regarding his various

complaints with the comment:

> *NOTE: email communication will generally be considered by
> courts to be legally binding. Roth v AON Corporation (N.D. Ill.
> January 8, 2009)

*Id.* at p. 5.  In one email response, Allison directed Plaintiff to contact him via telephone or to

submit complaints via mail.  *Id.* at p. 4, 6.

In response to Plaintiff's correspondence that he would follow up with the state regarding

his complaints, Allison responded:

> Do what you think you have to do. I have no issue with that … your motive and integrity are other issues. If want to take this to war, I'll engage in you in war. You obviously have a tin ear, and are determined to put partisan politics over the best interests of our community. I'll be sure to make these communications public Vincent – its clear that you could care less about "We The People" and you are more invested in your personal agenda. So be it. At this point, I'm going to advise IT to block you from all communication with County agencies. You're adversarial, and have a litigious agenda. You have freedom of expression, but it will be via pen and paper, USPS, and not in harassing email to myself or other County officials.

*Id.* at p. 2–3.

In response to Plaintiff's question as to whether Allison was trying to threaten him for trying to file a complaint, Allison responded:

> No. What I'm doing is blocking you now from further communication via email. You can do what you want, consequences be damned. That's up to you. I could care less. What I'm not going to do is engage in a harassing course of discourse with you any longer. You have the right to communicate with County government. Your right is now restricted to paper and pen writing delivered via USPS. Your choice Sir. Bye bye.b[7]

*Id.* at p. 1–2.

That same evening, Allison sent another email to Plaintiff, but this one came from his personal email account:

> Man, you're a Mitch.[8] You bloviate all over social media and then, when called to the carpet, you make your FB page private? HAHAHAHAH. You're a hypocrite and coward of the first degree. I pity you. This is a private, personal communication – you're acting like a bottom feeder. I know your better than this. Get a grip, Sir.

(ECF No. 15-14.)  Plaintiff responded as follows:

---

[7] Plaintiff contends that this was Allison referring to him as a "bitch"; Allison testified it was a typographical error. (ECF No. 15 at p. 16 n.1; ECF Nos. 120-5, 130-3 at 124:12–17.)

[8] Plaintiff contends that the term "Mitch" here refers to a "male bitch"; Allison testified that the use of the term "Mitch" referred to Senator Mitch McConnell.  (ECF No 15 at p. 16 n.1; ECF Nos. 120-5, 130-3 at 128:13–129:8.)

> I ask you to stop harassing me. If you do not, I will seek the court[']s help. This is creepy. I thought your goal was to refrain from contact with me and is why you gave orders to block[] me from county email system.
>
> I find it difficult to believe you are actually an attorney with your odd behavior and demeanor.

*Id.*

Allison then blocked Plaintiff's email address from being able to send email to the County's email system. (ECF Nos. 120-5, 130-3 at 115:5–11.) Allison did so by contacting Miller as the Director of IT. *Id.* at 125:7–11; ECF Nos. 120-13, 130-9 at 16:16–17:9. Because Miller did not have administrative rights to the County's email system, he passed the request along to another employee, Gene Ikner. (ECF Nos. 120-13, 130-9 at 18:9–19:3.)

Of his rationale, Allison testified:

> [I]n terms of blocking the IT, he was clearly in a litigious posture and at that point I wanted to pump the brakes and get some cooling off time. But also, I needed to protect the county. At that point I didn't want e-mails flying around the county from Mr. Sammons to others—and he had threatened other employees in the past with litigation—I did not want that to occur with us being randomly spread out across the county, in some cases other states where people lived and commuted to county government in Cecil County for work. That made it impossible for me to be able to advise and protect these people, virtually impossible. So obviously, e-mail is a very fast and economical way to communicate, and it often leads— as we've spent the last two and a half hours engaged in e-mail correspondence—it's not an appropriate form for discussing the types of things that we were discussing, really, and especially with litigation. That has to be formalized. And when he—in my opinion—took this to that level, it was time to pump the brakes and that's what I did, sir.

(ECF Nos. 120-5, 130-3 at 116:4–117:4.)

Allison attested that he believed he had the authority to block Plaintiff's communications with the County because "once something goes to a litigation posture," it is "within my purview

to do that." *Id.* 118:18–119:2.  He asserts that he was "100 percent responsible" for the decision

to block Plaintiff's email address from the County email system.  *Id.* 138:20–139:3. McCarthy

testified that Allison informed him that he had blocked Plaintiff's email a few days after Allison

had taken that action.  (ECF Nos. 120-3, 130-2 at 292:6–12.)  County council member Jackie

Gregory expressed her disagreement with Allison's decision to block Plaintiff from the County's

email system.  (ECF Nos. 120-5, 130-3 at 141:11–144:4.)  After receiving the complaint, Allison

spoke with McCarthy and Wein about his decision, and he believed that they agreed with his action

because he did not get any "pushback."  *Id.* at 157:13–158:8.

## III.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if

the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law."  FED. R. CIV. P. 56(c).  A material fact is one that "might affect

the outcome of the suit under the governing law."  *Libertarian Party of Va. v. Judd*, 718 F.3d 308,

313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A

genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return

a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When considering a motion for summary judgment, a judge's function is limited to

determining whether sufficient evidence exists on a claimed factual dispute to warrant submission

of the matter to a jury for resolution at trial.  *Id*. at 249.  Trial courts in the Fourth Circuit have an

"affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding

to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting

*Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).  A "party cannot create a genuine dispute

of material fact through mere speculation or compilation of inferences."  *Shin v. Shalala,* 166 F.

Supp. 2d 373, 375 (D. Md. 2001) (citations omitted); *see Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 780 (4th Cir. 2023) (providing that "plaintiffs need to present more than their own unsupported speculation and conclusory allegations to survive").

In undertaking this inquiry, the court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007). The court "must not weigh evidence or make credibility determinations." *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also Jacobs v. N.C. Adin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015) (explaining that the trial court may not make credibility determinations at the summary judgment stage). Indeed, it is the function of the factfinder to resolve factual disputes, including issues of witness credibility. *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014).

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citations omitted). In so doing, "the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." *Id.* (citations omitted); *see Doe v. Morgan State Univ.*, 544 F. Supp. 3d 563, 574 (D. Md. 2021) (same).

## IV.    ANALYSIS

Given the various parties, claims, and arguments asserted, the court first turns to some overarching, relevant legal principles.

### A. First Amendment Principles

Among its many protections, the First Amendment provides: "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."[9]  U.S. CONST. AMEND. I.  "The hallmark of the protection of free speech is to allow 'free trade in ideas'—even ideas that the overwhelming majority of people might find distasteful or discomforting." *Virginia v. Black*, 538 U.S. 343, 358 (2003) (quoting *Abrams v. United States,* 250 U.S. 616, 630 (1919)).  As this court previously explained, "Article 40 of the Maryland Declaration of Rights is Maryland's constitutional counterpart to the provisions for freedom of speech and freedom of the press contained in the First Amendment." *Sammons v. McCarthy*, 606 F. Supp. 3d 165, 199 (D. Md. 2022).  Article 40 is read *in pari materia* with the First Amendment, and the court need not consider the claims separately. *Nefedro v. Montgomery Cnty.*, 414 Md. 585, 593 n.5 (2010).

"[T]he Free Speech Clause prohibits only *governmental* abridgment of speech," not "*private* abridgment of speech."  *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 808 (2019)(emphasis in original).  Courts must therefore ensure "'that constitutional standards' . . . are only enforced 'when it can be said that the State is responsible for the specific conduct of which the plaintiff complains'—a requirement known as 'state action.'"  *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 189 (4th Cir. 2022) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)).

In analyzing a First Amendment claim regarding the abridgment of free speech, the court must first inquire "whether the plaintiff has engaged in 'protected speech.'"  *Goulart v. Meadows*, 345 F.3d 239, 246 (4th Cir. 2003) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,* 473 U.S. 788, 797 (1985)).  "If so, the court 'must identify the nature of the forum, because the

---

[9] "The First Amendment is applicable to the States through the Due Process Clause of the Fourteenth Amendment." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 750 n.1 (1976).

extent to which the Government may limit access depends on whether the forum is public or nonpublic.'" *Id.* (quoting *Cornelius*, 473 U.S. at 797). In order words, "the nature of the government property (or 'forum') determines the permissible scope of government control." *White Coat Waste Project*, 35 F.4th at 196 (citing *Cornelius,* 473 U.S. at 800). After identifying the nature of the forum, the court assesses "whether the justifications for exclusion from the relevant forum satisfy the requisite standard.'" *Goulart*, 345 F.3d at 246 (quoting *Cornelius*, 473 U.S. at 797).

A "core postulate" of the freedom of speech is that the government "may not discriminate against speech based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019). Such content-based government regulations of speech "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163–64 (2015) (citing cases). Content-based regulations are those that "target speech based on its communicative content," meaning those that apply to "particular speech because of the topic discussed or the idea or message expressed." *Id.*

Courts utilize a two-step process in analyzing content neutrality. *Lucero v. Early*, 873 F.3d 466, 470–71 (4th Cir. 2017). "First, a court should ask whether a law 'on its face draws distinctions based on the message a speaker conveys.'" *Lucero v. Early*, 873 F.3d 466, 470–71 (4th Cir. 2017) (quoting *Reed*, 576 U.S. at 163–64). If so, "the law is content based regardless of 'the government's justification or purpose' in enacting it.'" *Id.* at 470–71 (quoting *Cent. Radio Co. Inc. v. City of Norfolk*, 811 F.3d 625, 632 (4th Cir. 2016)). If not, "it can nonetheless be considered content based if it 'cannot be justified without reference to the content of the regulated speech, or

[it was] adopted by the government because of disagreement with the message the speech conveys.'" *Id.* (quoting *Reed*, 576 U.S. at 164).

**B.  42 U.S.C § 1983**

"Section 1983 provides a cause of action against '[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State' deprives someone of a federal constitutional or statutory right."  *Lindke v. Freed*, 601 U.S. 187, 194 (2024) (emphasis omitted) (quoting 42 U.S.C. § 1983).  Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983.  "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred,'" including, relevant here, the First Amendment.  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan,* 443 U.S. 137, 144, n.3 (1979)).

"To establish personal liability under § 1983, . . . the plaintiff must 'affirmatively show[] that the official charged acted personally in the deprivation of the plaintiff's rights,'" which is to say that the "official's 'own individual actions' must have 'violated the Constitution.'"  *Williamson v. Stirling*, 912 F.3d 154, 171 (4th Cir. 2018) (first quoting *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985); and *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).  While "[p]ersonal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law," "[o]fficial-capacity suits, in contrast, 'generally represent only another way of pleading

an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (quoting *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 690, n.55 (1978)).  Accordingly, "[f]or purposes of Section 1983, these official-capacity suits are 'treated as suits against the [municipality].'" *Santos v. Frederick Cnty. Bd. of Comm'rs*, 725 F.3d 451, 469 (4th Cir. 2013) (quoting *Hafer v. Melo*, 502 U.S. 21, 25 (1991)).

"More is required in an official-capacity action, however, for a governmental entity is liable under § 1983 only when the entity itself is a 'moving force' behind the deprivation."  *Graham*, 473 U.S. at 166 (quoting *Polk County v. Dodson,* 454 U.S. 312, 326 (1981)); *see King v. Rubenstein*, 825 F.3d 206, 223 (4th Cir. 2016) (same).  To demonstrate such a claim, the municipality's "'policy or custom' must have played a part in the violation of federal law."  *Graham*, 473 U.S. at 166 (citing *Monell*, 436 U.S. at 690, n.55; then *Oklahoma City v. Tuttle,* 471 U.S. 808, 817–18 (1985)).  Such claims have two components: "(1) the municipality had an unconstitutional policy or custom; and (2) the unconstitutional policy or custom caused a violation of the plaintiff's constitutional rights."  *Saltz v. City of Frederick, MD*, 538 F. Supp. 3d 510, 554 (D. Md. 2021) (citing *Bd. of Comm'rs of Bryan Cnty., v. Brown*, 520 U.S. 397, 403 (1997)).  A municipality's unconstitutional policy or custom can be shown:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Starbuck v. Williamsburg James City Cnty. Sch. Bd.*, 28 F.4th 529, 533 (4th Cir. 2022); *see Pratt-Miller v. Arthur*, 701 F. App'x 191, 192–93 (4th Cir. 2017) (quoting *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (same)).

### 1. *Counts I and IV as to the Facebook Claim*

Defendants first argue that there is no evidence to support Plaintiff's claims that McCarthy, Allison, or Lyall acted personally in the deprivation of Plaintiff's rights as to his Facebook Claim and that the McCarthy Facebook Page was not operated under color of state law.[10] (ECF No. 120-1 at p. 29–35.)

### a. Allison and Lyall

As to Defendants' first argument (and as the court discussed above), it is well-established that a plaintiff must show that a public official "acted personally in the deprivation of the plaintiff's rights,'" meaning that the official's "'own individual actions' must have 'violated the Constitution.'" *Williamson v. Stirling*, 912 F.3d 154, 171 (4th Cir. 2018) (quoting *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985)). "[M]ere knowledge of such a deprivation does not suffice." *Id.* (quoting *Wright*, 766 F.2d at 850). Indeed, "[l]iability under § 1983 attaches only upon personal participation by a defendant in a constitutional violation." *Rice v. Cecil Cnty., Maryland*, — F. Supp. 3d —, No. CV MJM-23-2344, 2024 WL 4335722, at *3 (D. Md. Sept. 27, 2024).

Defendants contend that Plaintiff has failed to adduce any evidence to show such personal action here. Moreover, the undisputed evidence shows that neither Allison nor Lyall had administrative rights to the McCarthy Facebook Page—meaning, they did not have the ability to block a user or delete comments from the McCarthy Facebook Page. (ECF Nos. 120-5, 130-3 at 39:21–40:6; ECF Nos. 120-4, 130-4 at 15:9–12, 16–21.) Instead, such administrative rights were held and utilized by private citizens. (ECF Nos. 120-3, 130-2 at 24:10–25:4, 29:12–30:3.) The

---

[10] Defendants also argue that the McCarthy Facebook Page was a not a public forum. (ECF No. 120-1 at p. 30.) Because the court concludes that operation of the McCarthy Facebook Page did not amount to state action, it does not reach the question of forum.

screenshots from the McCarthy Facebook Page show posts to the page by these private individuals. (ECF No. 15-3.)

Plaintiff concedes that the evidence has demonstrated no personal action by Lyall. (ECF No. 130 at p. 18 n.4.) He contends, however, that there is a dispute of material fact as to Allison, specifically because Allison acted to have Plaintiff's access to the McCarthy Facebook Page restored. (ECF No. 130 at p. 18.) The court is constrained to understand Plaintiff's argument that such evidence would allow a reasonable factfinder to conclude Allison personally acted to deprive Plaintiff of his First Amendment rights. Plaintiff's theory that Allison acted personally to deny him access to the McCarthy Facebook Page is speculative and lacks record support; and is contradicted by undisputed record evidence. Speculation is insufficient to defeat summary judgment. *See Robinson*, 70 F.4th at 780, *supra*. The court will therefore grant Defendants' Motion to the extent it seeks summary judgment on Counts I and IV as against Allison and Lyall.

     b.  <u>McCarthy</u>

As to McCarthy's personal action, the court finds it necessary to address the concept of state action and Defendants' other argument that the McCarthy Facebook Page did not constitute action under color of state law. Of import here, while the "state action" constitutional standard requirement is "technically distinct" from the § 1983 color of state law requirement, "courts treat them 'as the same thing.'" *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 189–90 (4th Cir. 2022) (quoting *United States v. Price*, 383 U.S. 787, 794 n.7 (1966)).

"The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019), *as amended* (Jan. 9, 2019) (quoting *West v. Atkins*, 487 U.S. 42, 49

(1988)).    It excludes "merely private conduct, no matter how discriminatory or wrongful." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 50 (1999)).    Assessment of whether someone acted under color of state law "demand[s] that 'the conduct allegedly causing the deprivation of a federal right be fairly attributable to the State.'" *Davison*, 912 F.3d at 679 (quoting *Holly v. Scott*, 434 F.3d 287, 292 (4th Cir. 2006)).

Whether conduct constitutes action under color of state law "is a matter of normative judgment, and the criteria lack rigid simplicity." *Id.* at 679–80 (quoting *Holly*, 434 F.3d at 292). No one factor is "individually dispositive." *Holly*, 434 F.3d at 292 (quoting *Goldstein v. Chestnut Ridge Volunteer Fire Co.,* 218 F.3d 337, 343 (4th Cir. 2000)).    "Courts must examine the 'totality of the circumstances,' to determine if the action at issue 'bore a sufficiently close nexus with the State to be fairly treated as that of the State itself.'" *Davison*, 912 F.3d at 680 (first quoting *Holly*, 434 F.3d at 292; then quoting *Rossignol*, 316 F.3d at 525).

While state action can be "easy to spot" "in the run-of-the-mill case," the Supreme Court's recent decision in *Lindke v. Freed* addresses circumstances where "the line between private conduct and state action is difficult to draw."  601 U.S. 187, 195 (2024).  Indeed "[w]hile public officials can act on behalf of the State, they are also private citizens with their own constitutional rights."  *Id.* at 196.  The Court recognized that an official's social media "illustrates" the necessity of the state action dynamic:

> The dispute between Lindke and Freed illustrates this dynamic. Freed did not relinquish his First Amendment rights when he became city manager. On the contrary, "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417, 126 S. Ct. 1951, 164 L.Ed.2d 689 (2006). This right includes the ability to speak about "information related to or learned through public employment," so long as the

> speech is not "itself ordinarily within the scope of [the] employee's duties." *Lane v. Franks*, 573 U.S. 228, 236, 240, 134 S. Ct. 2369, 189 L.Ed.2d 312 (2014). Where the right exists, "editorial control over speech and speakers on [the public employee's] properties or platforms" is part and parcel of it. *Halleck*, 587 U.S. at 816, 139 S. Ct. 1921. Thus, if Freed acted in his private capacity when he blocked Lindke and deleted his comments, he did not violate Lindke's First Amendment rights—instead, he exercised his own.

*Id.* at 196–97. Against that backdrop, the Court articulated the applicable test to evaluate whether a public official's social media constitutes state action under § 1983. *Id.* at 198. A public official's social media activity constitutes state action where the official: "(1) possessed actual authority to speak on the State's behalf, and (2) purported to exercise that authority when he spoke on social media." *Id.* "The appearance and function of the social-media activity are relevant at the second step, but they cannot make up for a lack of state authority at the first." *Id.*

   "The first prong of this test is grounded in the bedrock requirement that 'the conduct allegedly causing the deprivation of a federal right be *fairly attributable to the State*.'" *Lindke v. Freed*, 601 U.S. 187, 198 (2024) (emphasis in original) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)). If the public official was not "entrust[ed]" with such responsibilities, the government "cannot 'fairly be blamed' for the way he discharged them." *Id.* at 199 (quoting *Lugar*, 457 U.S. at 937). For instance, where a plaintiff alleges a public official used social media as an outlet for city updates and citizen concerns, the public official's conduct is "not attributable to the State unless he was 'possessed of state authority' to post city updates and register citizen concerns." *Id.* at 199 (quoting *Griffin v. State of Md.*, 378 U.S. 130, 135 (1964)). A plaintiff must "show more than that [public official] had *some* authority to communicate with residents on behalf of [municipality]. The alleged censorship must be connected to speech on a matter within [the official's] bailiwick," with careful attention paid to the relevant statute, ordinance, regulation,

custom, or usage.  *Id.* at 199–200.  Ultimately, "the presence of state authority must be real, not a mirage."  *Id.* at 199 (quoting *Griffin*, 378 U.S. at 135).

As to the second prong:

> State officials have a choice about the capacity in which they choose to speak. "[G]enerally, a public employee" purports to speak on behalf of the State while speaking "in his official capacity or" when he uses his speech to fulfill "his responsibilities pursuant to state law." *West*, 487 U.S. at 50, 108 S. Ct. 2250. If the public employee does not use his speech in furtherance of his official responsibilities, he is speaking in his own voice.

*Lindke v. Freed*, 601 U.S. 187, 201 (2024).  This consideration involves a "fact-specific undertaking  in which the post's content and function are the most important considerations."  *Id.* at 203.

> In some circumstances, the post's content and function might make the plaintiff 's argument a slam dunk. Take a mayor who makes the following announcement exclusively on his Facebook page: "Pursuant to Municipal Ordinance 22.1, I am temporarily suspending enforcement of alternate-side parking rules." The post's express invocation of state authority, its immediate legal effect, and the fact that the order is not available elsewhere make clear that the mayor is purporting to discharge an official duty. If, by contrast, the mayor merely repeats or shares otherwise available information— for example, by linking to the parking announcement on the city's webpage—it is far less likely that he is purporting to exercise the power of his office. Instead, it is much more likely that he is engaging in private speech "relate[d] to his public employment" or "concern[ing] information learned during that employment." [*Lane v. Franks*, 573 U.S. 228, 238 (2014)].

*Id.*

In conducting this inquiry, the *Lindke* Court notes the importance of "awareness that an official does not necessarily purport to exercise his authority simply by posting about a matter within it:"

> Hard-to-classify cases require awareness that an official does not necessarily purport to exercise his authority simply by posting about

26

a matter within it. [A public official] might post job-related information for any number of personal reasons, from a desire to raise public awareness to promoting his prospects for reelection. Moreover, many public officials possess a broad portfolio of governmental authority that includes routine interaction with the public, and it may not be easy to discern a boundary between their public and private lives. Yet these officials too have the right to speak about public affairs in their personal capacities. See, *e.g.*, *id.*, at 235–236, 134 S. Ct. 2369. Lest any official lose that right, it is crucial for the plaintiff to show that the official is purporting to exercise state authority in specific posts.

*Id.*

With all of this in mind, the court turns to the claims and undisputed facts at issue here. As to the first prong, Plaintiff refers to the Cecil County Charter to demonstrate the operation of the McCarthy Facebook Page was within McCarthy's "bailiwick." The Charter provides that the County Executive is tasked with faithfully executing the laws, and overseeing the affairs, of the executive branch, and includes specific duties like "[p]reparing and submitting to the Council the annual County Budget," "[p]reparing and submitting to the Council and the public within six months after the close of the fiscal year an annual report on the activities and accomplishments of the County government, including a comprehensive annual financial statement," and "[r]ecommending to the Council such measures for legislative action that the Executive may consider to be in the best interests of the County." CECIL COUNTY CHARTER, Art. 4, § 402.

These duties, according to Plaintiff, "clearly carried with them the authority to comment on social media regarding matters related to Cecil County government and to register citizens' complaints related to the budget, new taxes in proposed budgets, or the proper and efficient functioning of the local government without graft or corruption." (ECF No. 130 at p. 13.) While the first prong requires Plaintiff "show more than that" McCarthy "had *some* authority to communicate with residents on behalf of" the County, *Lindke*, 601 U.S. at 188, *supra* (emphasis

in original), the court assumes without finding that the first prong is satisfied here where Defendants appear to concede as such. (ECF No. 120-1 at p. 33.)

As to the second prong, Defendants argue "there is no evidence that McCarthy used the McCarthy Facebook [P]age as anything other than for the purpose of self-promotion in the political arena and not as a tool of governance." (ECF No. 120-1 at p. 33.) Stated differently, Defendants' position is that McCarthy did not use the McCarthy Facebook Page "in furtherance of his official responsibilities." *Lindke*, 601 U.S. at 201. Plaintiff understandably relies upon aspects of the appearance of the McCarthy Facebook Page that he found confusing, including use of the County Executive title, the County's official seal, and McCarthy's County contact information. The second prong, however, requires consideration of both appearance and function, and ultimately asks whether McCarthy used the McCarthy Facebook Page in furtherance of his official responsibilities, such that his operation of it was action under color of state law. The undisputed evidence shows no such action.

Indeed, as Judge Hollander previously described:

> The Page describes McCarthy as a politician, rather than a government official. . . . Further, one of the Page's header photographs juxtaposes McCarthy with other prominent Republican politicians. . . . The Page also lists a link to the web page "https://alanmccarthycountyexecutive.com". . . .

> In addition, the screenshots reflect that an entity called "Friends of Alan McCarthy," rather than McCarthy himself, was responsible for the content of the Page. . . . Moreover, . . . the screenshots of the Page do not show that McCarthy ever published any posts on the Page, or otherwise engaged with his constituents through it.

> Broadly speaking, the screenshots show posts celebrating McCarthy's achievements in office. . . . Among other things, the Page published posts touting the County's low unemployment rate, an increase in the number of available manufacturing jobs in the County, and the construction of the County's first public school in thirty years. . . .

28

> The Page is also replete with posts promoting McCarthy's suitability
> for office, and distinguishing McCarthy from his primary opponent,
> Danielle Hornberger. For example, on April 30, 2020, the County
> Executive Page described McCarthy as "the trusted conservative in
> this race" and critiqued Hornberger for airing "negative ads
> attacking [McCarthy]" in an attempt to "lie and scare people." And,
> on May 5, 2020, the Page published a post criticizing Hornberger
> for issuing a "mailer" that purportedly "attack[ed] public safety
> professionals in Cecil County" . . . .

*Sammons v. McCarthy*, 606 F. Supp. 3d 165, 207–208 (D. Md. 2022) (citations omitted).

The McCarthy Facebook Page screenshots do not show posts by McCarthy or engagement of McCarthy with his constituents via the McCarthy Facebook Page. (ECF No. 15-3.) Crucially, unlike *Lindke* and *Davison*, no evidence has been offered tending to show (or reasonably permitting a conclusion that) McCarthy himself used the McCarthy Facebook Page to post, engage with constituents on questions or concerns regarding his official duties, or solicit questions or concerns in the course of, or related to, his official duties. *Cf. Dixon v. Clyburn*, No. 9:23-CV-04500-SAL-MHC, 2025 WL 354416, at *4 (D.S.C. Jan. 31, 2025) (explaining that the plaintiff's allegations that a public official used his Twitter accounts "to feature his job activities, work of the U.S. Congress, constituent concerns, and broadly communicate about job-related matters with the public" failed to plausibly allege a violation of his First Amendment Rights because, in view of *Lindke*, "simply posting about matters within his authority does not by itself establish that Clyburn purported to exercise his official authority") (record citation omitted)). Instead, the posts are of the type that "celebrat[e] McCarthy's achievements in office," and "promote [his] suitability for office." *Sammons*, 606 F. Supp. 3d at 208. At bottom, Plaintiff points to no evidence regarding the "content and function" of the McCarthy Facebook Page to allow a reasonable factfinder to conclude that McCarthy utilized the McCarthy Facebook Page for communications in furtherance of his official responsibilities. Therefore, the undisputed facts do not animate the second *Lindke*

prong; and therefore, the undisputed facts do not support a finding that McCarthy, through the McCarthy Facebook Page, acted under color of state law to deprive Plaintiff of his First Amendment right.

Briefly, this conclusion is further reinforced by another deficiency in Plaintiff's claim—that of a state actor.   As discussed, the undisputed facts do not suggest or support a finding that McCarthy (the public official at issue) personally blocked Plaintiff or deleted Plaintiff's comments from the McCarthy Facebook Page.  Rather, the undisputed facts are that the regular operation of the McCarthy Facebook Page was undertaken by private citizens.  While Plaintiff is correct that, in narrow circumstances, actions of private parties can constitute actions under color of state law, such circumstances do not find support in the record of undisputed facts here.

Specifically, Supreme Court precedent provides that "a private entity can qualify as a state actor in a few limited circumstances—including, for example, (i) when the private entity performs a traditional, exclusive public function, . . . (ii) when the government compels the private entity to take a particular action, . . . or (iii) when the government acts jointly with the private entity." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 809 (2019) (citing, in order: *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352–54 (1974); *Blum v. Yaretsky*, 457 U.S. 991, 1004–1005 (1982); and *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941–42 (1982)).  Importantly, "there is no bright-line rule separating state action from private action," and so the court shall engage in a fact-specific inquiry that considers the totality of the circumstances.  *Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 116 (4th Cir. 2022).  Here, there has been no evidence identified or offered on which a reasonable factfinder could conclude that the County (through McCarthy) engaged in some joint enterprise with private citizens (through McCarthy) in furtherance of the state's actions.

The layers of separation from the state further support the court's conclusion that operation of the McCarthy Facebook Page did not constitute action under color of state law.

For the foregoing reasons, the court will grant Defendants' Motion to the extent it seeks summary judgment as to McCarthy on Counts I and IV, as well as the County.

### 2. Counts II and V as to the Budget Meeting Claim

Plaintiff's Counts II and IV relate to two different purported violations of Plaintiff's free speech—the audio disruption and the video disruption. The court addresses each.

#### a. Audio Disruption

Defendants first contend they are entitled to summary judgment as to Plaintiff's claim arising from the audio disruption because the video evidence of the Budget Meeting affirmatively shows that no Defendant acted to impede Plaintiff's audio; said another way, Defendants assert none of the undisputed facts support a conclusion that any Defendant acted to impede or disrupt Plaintiff's audio access/participation in the Budget Meeting. (ECF No. 120-1 at p. 37–38.)

As described above, the undisputed facts regarding the Budget Meeting, to include the video, are that the meeting was hosted by Council Manager Massey, and that Tome and Hale were present. (ECF No. 120-8.) Further, it is undisputed that Hale and Tome had administrative control of the Zoom meeting, meaning they managed the muting and unmuting of attendants' audio. (ECF Nos. 120-9, 130-5 at 33:2–19.) During the public comment portion of the meeting, Massey called on Plaintiff to see if he would like to be heard, following which about eight seconds passed during which Plaintiff did not respond. (ECF No. 120-8 at 1:05:52.) Tome was not in control of the laptop and mouse at that time. *Id.* While Tome had her phone in her hand at the time Plaintiff's name was called, she neither looked at, nor utilized, her phone. *Id.* McCarthy and Wein were not in the room with Massey, Tome, and Hale at the time. *Id.*

Leaving aside that no evidence is offered to support Plaintiff's theory that Tome terminated Plaintiff's audio at the direction of McCarthy or Wein, the video footage offers nothing to support a conclusion that Tome impeded Plaintiff's audio, and rather plainly refutes such a conclusion in Plaintiff's favor. Faced with this undisputed evidence, Plaintiff directs the court to two Fourth Circuit decisions that caution courts against rejecting a plaintiff's account where a video shows "some support" for the defendant's version of events. (ECF No. 130 at p. 26.) *See Lewis v. Caraballo*, 98 F.4th 521, 529 (4th Cir. 2024); *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011). These two cases address Supreme Court precedent, flowing from *Scott v. Harris*, 550 U.S. 372 (2007), that, on summary judgment, a court should not credit a plaintiff's account where it is "blatantly contradicted by the record" such that "no reasonable jury could believe it." *Id.* at 380. It is true that the Fourth Circuit cautions that "*Scott* is the exception, not the rule," *Lewis*, 98 F.4th at 529 (quoting *Harris v. Pittman*, 927 F.3d 266, 275–76 (4th Cir. 2019)), however, here Plaintiff's account is "blatantly contradicted" by the undisputed record evidence such that no reasonable jury could conclude that Tome muted Plaintiff's audio. *Scott*, 550 U.S. at 380. Plaintiff presents no evidence to the contrary competent to raise a genuine dispute of material facts regarding same. The court will therefore grant Defendants' Motion as to Counts II and V as against McCarthy, Wein, Tome, and the County to the extent the claims arise from the alleged audio disruption.

  b. Video Disruption

Defendants further contend that the official capacity claims against McCarthy, Wein, and Tome fail because they were not final policymakers for purposes of municipal liability. (ECF No. 120-1 at p. 39–41.) They also argue they are entitled to summary judgment because Tome's actions to restrict Plaintiff's video were related to "the disruptive nature of the presentation of the

signs, not the content." *Id.* at p. 41–42.  In his opposition, Plaintiff starts by asserting that this court "should begin by reconsidering its prior rulings on Plaintiff's claims related to the budget meeting" because at the time of its prior ruling, the parties all assumed that the Budget Meeting was a limited public forum.  (ECF No. 130 at p. 22.)  The court addresses the parties' arguments in turn.

        *i.       Reconsideration of the Budget Meeting as a Limited Public Forum*

Turning first to Plaintiff's request for reconsideration, it bears more than passing mention that Plaintiff has waited until summary judgment to address the court's order from more than two years ago.  He has not filed a formal (separate) motion seeking such relief or sought leave to amend his Amended Complaint in view of the purported newly discovered evidence.  In any event, the court will consider Plaintiff's request.  Plaintiff argues that the court should reconsider its previous ruling because Plaintiff now asserts that the Budget Meeting constituted a traditional public forum, as opposed to a limited public forum, and that distinction affected the court's ruling on qualified immunity as to Count II.  (ECF No. 130 at p. 22–25.)

According to Plaintiff, while the parties previously believed the Budget Meeting to be a limited public forum, the evidence demonstrates that is not the case, citing to a single statement made by Meffley in deposition regarding the Budget Meeting "speaker guidelines."[11]  *Id.* at p. 23. At his deposition, Meffley testified:

> Q. So, let's go back in time before Zoom meetings. Before the pandemic, people would sign up—
> A. Yes.
> Q. — in some fashion if they wanted to have a public comment.
> A. Yes.
> Q. Okay. And do you recall how that was done?

---

[11] The Speaker Guidelines concern the May 2020 meeting and are not newly discovered evidence. *See Cecil County Council Public Budget Hearing – May 12, 2020*, https://www.ccgov.org/Home/Components/Calendar/Event/8846/20 (last visited March 7, 2025).

> A. Yes. Before the meeting, people would come up—I think it was 15 minutes before the meeting, they would come up and sign their name. They didn't have to state what they were going to talk about 'cause you could talk about anything.

(Meffley Dep., ECF Nos. 120-11, 130-7 at 33:9–20.)

Supreme Court precedent generally recognizes "three types of government-controlled spaces: traditional public forums, designated public forums, and nonpublic forums." *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 11 (2018). "'Traditional' public forums—'such as streets, sidewalks, and parks'—'have the characteristics of a public thoroughfare, a purpose that is compatible with expressive conduct, as well as a tradition and history of being used for expressive public conduct.'" *Davison v. Randall*, 912 F.3d 666, 681 (4th Cir. 2019), *as amended* (Jan. 9, 2019) (quoting *Am. Civil Liberties Union v. Mote*, 423 F.3d 438, 443 (4th Cir. 2005)). In contrast, "'[l]imited' or 'designated' forums are forums that are 'not traditionally public, but [that] the government has purposefully opened to the public, or some segment of the public, for expressive activity.'" *Davison*, 912 F.3d at 681 (quoting *Mote*, 423 F.3d at 443). Limited public forums are created where "a government entity . . . create[s] a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 470 (2009).

Of import here, the same standards apply to traditional public forums and designated or limited public forums as to content-based restrictions—"restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited." *Mansky*, 585 U.S. at 11. "Even in a limited public forum, however, the government 'must not discriminate against speech on the basis of viewpoint,' and any restriction 'must be reasonable in light of the purpose served by the forum.'" *Davison*, 19 F.4th at 635 (quoting *Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five*, 470 F.3d 1062, 1067–68 (4th Cir. 2006)).

34

In her decision, Judge Hollander concluded that Plaintiff had plausibly alleged a claim of viewpoint discrimination as to the Budget Meeting—which is impermissible in either a traditional or limited public forum. *Sammons v. McCarthy*, 606 F. Supp. 3d 165, 222 (D. Md. 2022). She then separately determined that Defendants were entitled to qualified immunity as to the video disruption because Plaintiff "[did] not point to any case law that indicates he had a clearly established right to transmit a video feed displaying expressive signs during a virtual public meeting" and the court similarly "ha[d] not been able to identify any such authority." *Id.* at 223. Thus, Plaintiff's forum argument under the claims here does not obviate Judge Hollander's decision as to qualified immunity.

In any event, the court is persuaded that the Budget Meeting constituted a limited public forum. The Budget Meeting via Zoom was convened for a limited use by specific groups for discussion of certain subjects, namely the budget. *See Summum*, 555 U.S. at 470, *supra*. Indeed, at the Budget Meeting, Meffley introduced the opportunity for public comment, stating: "This is an opportunity for citizens to give comments on the proposed budget which the County Executive has submitted to the Council for consideration." (ECF No. 120-8 at 19:29–19:49.) This sentiment is echoed by, as Defendants cite, the County Council Policies and Procedures, § A387-25, which provides: "At public hearings and at legislative meetings, the presiding officer will provide time for members of the public to address the Council on pertinent matters." These undisputed facts support that the Budget Meeting was "not akin to a public street, park, or theater," but rather a "special type of enclave" devoted to a specific topic—the budget. *Mote*, 423 F.3d at 444 (*United States v. Grace,* 461 U.S. 171, 180 (1983)). The Budget Meeting is similar to the type of meetings that the Fourth Circuit has, and district courts in this circuit have, considered limited public forums. *See, e.g.*, *Davison v. Rose*, 19 F.4th 626, 635 (4th Cir. 2021) (school board meetings); *Steinburg*

*v. Chesterfield Cnty. Plan. Comm'n*, 527 F.3d 377, 385 (4th Cir. 2008) (planning commission public meeting); *Scearce v. Pittsylvania Cnty. Bd. of Supervisors*, No. 4:23-CV-00012, 2023 WL 6121129, at *1 (W.D. Va. Sept. 19, 2023) (county Board of Supervisors public meeting). The court is thus persuaded that the Budget Meeting constituted a limited public forum.

In reply, Plaintiff changes course; he appears to argue the court should reconsider Judge Hollander's decision of qualified immunity as to the video feed disruption because it was in error. (ECF No. 134 at p. 11–12.) "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *D.C. v. Wesby*, 583 U.S. 48, 62–63 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "In the Fourth Circuit, we have a split burden of proof for the qualified-immunity defense. The plaintiff bears the burden on the first prong, and the officer bears the burden on the second prong." *Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022). In considering the second prong, Judge Hollander reasoned that Plaintiff had not identified any "case law that indicates he had a clearly established right to transmit a video feed displaying expressive signs during a virtual public meeting," and the court was not able "to identify any such authority." *Sammons*, 606 F. Supp. 3d at 223. The same is still the case, and the court therefore discerns no clear error in Judge Hollander's opinion and declines Plaintiff's request.

### ii.    *Video Disruption*

As described above, Defendants argue they are entitled to summary judgment because Tome, McCarthy, and Wein were not final policymakers for municipal liability,[12] and because the undisputed facts show Tome did not block Plaintiff's video feed because of its content (and do not

---

[12] The parties fail to advance particularly compelling arguments on either end as to whether McCarthy or Wein were final policymakers for the purposes of the official capacity claims arising from the video feed disruption. Defendants assert as such, relying on a conclusory assertion and a block quote, and Plaintiff does not meaningfully address it as to this point. The court therefore declines to consider this argument.

support a conclusion in favor of Plaintiff on this issue). (ECF No. 120-1 at p. 39–42.) In response, Plaintiff avers that the County can be held liable based on Tome's actions where she acted pursuant to her understanding of a policy. (ECF No. 130 at p. 26–27.) The court is persuaded that there are material facts in genuine dispute that bar summary judgment. The determination here requires the weighing of evidence, including, at the very least, Tome's and Wein's testimony and credibility. The court thus denies Defendants' Motion to the extent they seek summary judgment as to Counts II and V on the basis of the video disruption.

### 3. *Counts III and VI as to the County Email Claims*

Plaintiff's Counts III and IV appear to assert claims that, by imposing a block of his email to the County's email system, Defendants infringed on his First Amendment right to petition and did so in retaliation of his exercise of said right. (ECF No. ¶¶ 101–102, 106.) Defendants argue they are entitled to summary judgment because the decision to block Plaintiff's email was neither a full restriction of his right to petition nor content-based. (ECF No. 120-1 at p. 45–48.) They further argue that no facts support a finding that McCarthy and Miller were involved in the email decision, and so Plaintiffs claims against them fail. *Id.* at p. 48–49. Finally, they contend that municipal liability is not warranted here because Allison was not a final policymaker. *Id.* at 49.

"Among other rights essential to freedom, the First Amendment protects 'the right of the people . . . to petition the Government for a redress of grievances.'" *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 382 (2011). The right to free speech and the right to petition are "cognate rights." *Id.* at 388. The Supreme Court has recognized:

> Both speech and petition are integral to the democratic process, although not necessarily in the same way. The right to petition allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives, whereas the right to speak fosters the public exchange of ideas that is integral to deliberative democracy as well as to the whole realm of ideas and

> human affairs. Beyond the political sphere, both speech and petition
> advance personal expression, although the right to petition is
> generally concerned with expression directed to the government
> seeking redress of a grievance.

*Id.*  The right to petition is "one of 'the most precious of the liberties safeguarded by the Bill of

Rights.'"  *BE & K Const. Co. v. N.L.R.B.*, 536 U.S. 516, 524–25 (2002) (quoting *Mine Workers v.*

*Illinois Bar Assn.,* 389 U.S. 217, 222 (1967)).  While similar to the freedom of speech:

> Courts should not presume there is always an essential equivalence
> in the two Clauses or that Speech Clause precedents necessarily and
> in every case resolve Petition Clause claims. . . .  Interpretation of
> the Petition Clause must be guided by the objectives and aspirations
> that underlie the right. A petition conveys the special concerns of its
> author to the government and, in its usual form, requests action by
> the government to address those concerns.

*Guarnieri*, 564 U.S. at 388–89 (citation omitted).  The parties here appear to agree that Speech

Clause precedent is applicable to Plaintiff's claims under the Petition Clause, and, like Judge

Hollander, this court discerns no reason to depart from that.  *See Sammons*, 606 F. Supp. 3d at 225.

"[T]he right to petition is not '[u]nrestrained,' . . . or 'absolute.'"  *Mirabella v. Villard*, 853

F.3d 641, 654 (3d Cir. 2017) (first quoting *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379,

390 (2011); then *McDonald v. Smith*, 472 U.S. 479, 484 (1985)). As this court previously

recognized, it "does not grant unlimited access to government officials."  *Sammons*, 606 F. Supp.

3d at 224 (quoting *Justice v. Farley*, 5:11-CV-99-BR, 2012 WL 83945, at *4 (E.D.N.C. Jan. 11,

2012)).  *Cf. Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S.

789, 812 (1984) ("While the First Amendment does not guarantee the right to employ every

conceivable method of communication at all times and in all places, . . . . a restriction on expressive

activity may be invalid if the remaining modes of communication are inadequate." (quoting

*Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981)).

38

"Expression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). Such restrictions "are valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Id.* (citing cases).

Also at issue, to sustain a First Amendment § 1983 retaliation claim, a plaintiff must demonstrate: "(1) he engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendant's conduct." *Jones v. Solomon*, 90 F.4th 198, 213 (4th Cir. 2024) (quoting *Martin v. Duffy* (*Martin II*), 977 F.3d 294, 299 (4th Cir. 2020)); *see Bretemps v. Town of Brentwood, Md.*, 9 F. Supp. 3d 571, 578 (D. Md. 2014) (same).

### a.  Miller

As to Miller, Defendants argue that no evidence supports a finding that Miller played a role in the decision to block Plaintiff's email from the County email system. (ECF No. 130-1 at p. 48–49.) Plaintiff, now with the benefit of discovery, concedes Miller's role was "limited" and does not oppose Defendants' Motion as to him. (ECF No. 130 at p. 34 n.7.) The court will therefore grant Defendants' Motion to the extent it seeks summary judgment on Counts III and VI as to Miller.

### b.  Allison

As to Allison, Defendants first argue that the email restriction was not a restriction on Plaintiff's First Amendment rights because it was content-neutral and other petitioning alternatives remained. As discussed above, a core postulate of the First Amendment jurisprudence is that the

government "may not discriminate against speech based on the ideas or opinions it conveys." *See Iancu v. Brunetti*, 588 U.S. 388, 393 (2019), *supra*.    Content-based speech restrictions "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (citing cases).    Relatedly, "the fact that a distinction is speaker based does not . . . automatically render the distinction content neutral"; indeed, "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content." *Id.* at 170 (quoting *Citizens United v. Federal Election Comm'n,* 558 U.S. 310, 340 (2010)).    "[L]aws favoring some speakers over others demand strict scrutiny when the [government's] speaker preference reflects a content preference." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 658 (1994) (citing *Buckley v. Valeo*, 424 U.S. 1 (1976)).

Here, there are material facts in dispute that prevent summary judgment, including at the very least, Allison's justification for blocking Plaintiff's email from the County's email system. Again, such facts require the weighing of evidence and assessment of witness credibility—tasks that are the sole province of the factfinder.    The same is true of Plaintiff's claim that Allison's actions constituted retaliation for Plaintiff's exercise of his First Amendment Right.

Second, Defendants argue that they are entitled to summary judgment as to any claims for municipal liability based upon Allison's actions because there is no dispute that Allison was not a final decisionmaker for the County.    Consistent with the court's discussion of official capacity claims, *supra*, "in assessing whether a municipality may be held liable for the constitutional or statutory violations of their decisionmakers, the touchstone inquiry is whether 'the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.'" *Hunter v. Town of Mocksville, N. Carolina*, 897 F.3d 538, 554–55 (4th Cir. 2018) (quoting *Liverman v.*

*City of Petersburg*, 844 F.3d 400, 413 (4th Cir. 2016)). Indeed, "it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).

As reflected above, "in assessing whether a municipality may be held liable for the constitutional or statutory violations of their decisionmakers, the touchstone inquiry is whether 'the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.'" *Hunter*, 897 F.3d at 554–55 (quoting *Liverman*, 844 F.3d at 413). "If so, the decisionmaker's actions may fairly be attributed as reflecting municipal policy." *Id.* at 555 (citing *Pembaur*, 475 U.S. at 481). "A 'final policymaker' for the purposes of municipal liability is someone who has 'the responsibility and authority to implement final municipal policy with respect to a particular course of action.'" *Lytle v. Doyle*, 326 F.3d 463, 472 (4th Cir. 2003) (same).

"[W]hether a particular official has final policymaking authority is a question of state law." *Starbuck v. Williamsburg James City Cnty. Sch. Bd.*, 28 F.4th 529, 533–34 (4th Cir. 2022) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)). Courts "must look to the relevant legal materials, including state and local positive law, as well as custom or usage having the force of law." *Hunter*, 897 F.3d at 555 (quoting *Riddick v. Sch. Bd. of City of Portsmouth*, 238 F.3d 518, 523 (4th Cir. 2000)).

Defendants argue that, because Allison reported to Wein, who in turn reported to McCarthy, Allison is not a final policymaker for purposes of municipal liability. (ECF No. 120-1 at p. 49.) Defendants' argument refers to this court's opinion in *Lilly v. Baltimore Police Department* in which the court describes:

> A final policymaker will generally be someone whose decisions are not subject to review by another official or governmental body. *McMillian v. Monroe Cnty.*, 520 U.S. 781, 785–86, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997). Therefore, if there is any kind of review of an

individual's decision, that individual is not the final policymaker. *Quinn v. Monroe Cnty.*, 330 F.3d 1320, 1326 (11th Cir. 2003) ("Because the Career Service Council has the power to reverse any termination decision made by Roberts, he is not a final policymaker with respect to termination decisions at the library."); *Tharling v. City of Port Lavaca*, 329 F.3d 422, 427 (5th Cir. 2003) (finding that a local law requiring approval of City Council for employment decisions made by City Manager rendered City Council the final policymaker); *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 468 (7th Cir. 2001) ("The question is whether the promulgator, or the actor, as the case may be-in other words, the decisionmaker-was at the apex of authority for the action in question."). However, it is not sufficient that the relevant decisionmaker has "'discretionary authority in purely operational aspects of government.'" *Lane v. Anderson*, 660 F. App'x 185, 197 (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1386 (4th Cir. 1987)).

694 F. Supp. 3d 569, 588 (D. Md. 2023).

On this question, there are, again, material facts in dispute. Allison testified that his basis for making the decision to block Plaintiff's email was that Plaintiff was in a "litigious posture," which put the decision "within [his] purview" as the County Attorney. (ECF Nos. 120-5, 130-3 at 116:4–117:4, 118:18–119:2.) Indeed, that is further supported by the Cecil County Charter, which provides that the County Attorney is the "chief legal officer of the County" tasked with "conduct[ing] all the law business of the County, . . . [and] be[ing] the legal advisor to the Executive, all departments, and other instrumentalities of the County government." CECIL COUNTY CHARTER, Art. 4, § 411. Such assertions lend themselves to a conclusion that he was a final policymaker; however, in the contrary, record evidence exists to support a finding that others had authority over the decision as Allison consulted with McCarthy and Wein (albeit, after the decision was already made) and faced complaints from County Council members who contacted IT about the email block. Where such material facts are in dispute, summary judgment is not warranted.

42

Accordingly, the court will deny Defendants' Motion to the extent it seeks summary judgment of Counts III and VI as against Allison and the County.

    c.  <u>McCarthy</u>

Finally, Defendants seek summary judgment on Counts III and VI as against McCarthy because it is not disputed that McCarthy was not a party to Allison's decision to block Plaintiff's email (Count VI) and thus there is no basis for municipal liability based on his actions (Counts III and VI).  (ECF No. 120-1 at p. 48–49.)

"At times, 'supervisory officials may be held liable . . . for the constitutional injuries inflicted by their subordinates.'"  *Campbell v. Florian*, 972 F.3d 385, 398 (4th Cir. 2020), *as amended* (Aug. 28, 2020) (quoting *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994)).  Supervisory liability under § 1983 "arises from the obligation of a supervisory law officer to insure that his subordinates act within the law."  *Burley v. Baltimore Police Dep't*, 422 F. Supp. 3d 986, 1031 (D. Md. 2019) (quoting *Randall v. Prince George's County, Maryland*, 302 F.3d 188, 203 (4th Cir. 2002)).  "'If a supervisory law officer is deliberately indifferent to that responsibility, he then bears some culpability for illegal conduct by his subordinates,' and he may be held liable."  *Campbell*, 972 F.3d at 398 (quoting *Randall*, 302 F.3d at 203).  Such liability "is not premised upon *respondeat superior* but upon 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict."  *Id.* (quoting *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994)).

Generally, courts have used the same standard—the standard set forth in *Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994)—"to analyze both *Monell* failure to supervise claims and personal capacity supervisory liability claims."  *Shipley v. Disney*, No. CV SAG-21-3173, 2022 WL

2789076, at *8 (D. Md. July 15, 2022). The three elements necessary to establish supervisor liability include:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994); *see Pratt-Miller v. Arthur*, 701 F. App'x 191, 193 (4th Cir. 2017) (same).

Summary judgment is not warranted here because the same disputed material facts as to Allison bear on McCarthy's role, specifically as to causation—*i.e.,* whether there was an affirmative causal link between his inaction as to Allison's decision and Plaintiff's constitutional injury. The same is true for any claim as to McCarthy based on Plaintiff's claim for retaliation.

As to the claims of municipal liability arising from McCarthy's actions, the same disputes of fact in determining whether Allison was a final policymaker for purposes of municipal liability pertain to whether McCarthy—as the County Executive who Allison "serve[d] at the pleasure of"—was a final policymaker with "authority to review the decision of a subordinate," here, Allison. *See* CECIL COUNTY CHARTER, Art. 4, § 411; *Starbuck v. Williamsburg James City Cnty. Sch. Bd.*, 28 F.4th 529, 534 (4th Cir. 2022). If so, "approval of that allegedly unconstitutional decision can also give rise to liability under Section 1983." *Starbuck*, 28 F.4th at 534. "Imposing liability on a municipality for its ratification of the acts of subordinates accords with the purpose of municipal liability under Section 1983." *Id.*

Against this backdrop, the court will deny Defendants' Motion to the extent it seeks summary judgment of Counts III and VI as against McCarthy and the County.

### C. Plaintiff's Motion

Plaintiff seeks partial summary judgment as to some of his claims. (ECF No. 130 at p. 36–37.)  The court addresses each in turn.

First, Plaintiff seeks summary judgment as to the County's liability for Tome's decision to block his video during the Budget Meeting (Counts II and V).  *Id.* at p. 36.  As the court explained *supra*, there are material facts in dispute, namely, Tome's rationale for blocking Plaintiff's video and an assessment of credibility as to the conversation between Tome and Wein, among others. The court will therefore deny Plaintiff's Motion on this basis.

Plaintiff also seeks summary judgment as to the County's liability under Counts III and VI and Allison's liability under Count VI, based upon Allison's decision to block his email address and because he was a final policymaker.  Again, for the reasons discussed above, there are material facts in dispute that bear on Plaintiff's arguments.  Such facts concern Allison's rationale for blocking Plaintiff's email, and the related roles of McCarthy, Wein, and the County Council members.  The weighing of these facts and assessment of the credibility of witnesses are, again, the sole province of the factfinder.  The court will therefore deny Plaintiff's Motion on this basis.

## V.    <u>CONCLUSION</u>

For the reasons set forth herein, by separate order, Defendants' Motion will be granted in part and denied in part,[13] and Plaintiff's Motion will be denied.

---

[13] Defendants assert that "[b]ased on the evidentiary record in this matter, there is no basis for any claim for punitive damages to proceed."  (ECF No.  120-1 at p. 50.)  Neither party substantively addresses this argument; the court therefore declines to do so.  Defendants are free to raise this issue again on a pretrial motion to be heard closer to trial, once scheduled.

For clarity, this case will proceed as follows:

| Counts | Defendants |
|---|---|
| Count II: First Amendment Viewpoint Discrimination under 42 U.S.C. § 1983 (Budget Meeting Claim – Video Disruption) | McCarthy, Wein, Tome (official capacities) |
| Count III: First Amendment Viewpoint Discrimination under 42 U.S.C. § 1983 (County Email Claim & Retaliation) | McCarthy, Allison (official capacities) |
| Count V: Article 40 Viewpoint Discrimination (Budget Meeting Claim – Video Disruption) | The County, McCarthy, Wein, Tome |
| Count VI: Article 40 Viewpoint Discrimination (County Email Claim & Retaliation) | The County, McCarthy, Allison |

March 11, 2025                          /s/_____
                                        Julie R. Rubin
                                        United States District Judge